**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------x

MACK BUTLER, DASHAUN SIMS, CLYDE LOFTON,                11-cv-02602 (JS) (GRB)
PAUL ALVER, KEVIN KING, and RICKEY LYNCH,
on behalf of themselves and all others similarly situated,

                                   ***Plaintiffs,***           **<u>CONSOLIDATED</u>**
                                                        **<u>AMENDED CLASS ACTION</u>**
         ***vs.***                                **<u>COMPLAINT</u>**


SUFFOLK COUNTY, VINCENT F. DEMARCO, in his            **JURY TRIAL**
individual and official capacity, JOSEPH T. CARACAPPA,    **DEMANDED**
in his individual and official capacity, and JOHN P.
MEYERRICKS, in his individual and official capacity,

                               ***Defendants.***

--------------------------------------------------------------------x

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ........................................................................... 1

JURISDICTION AND VENUE ...................................................................... 2

PARTIES ....................................................................................................... 3

    I.     The Named Plaintiffs ....................................................................... 3

    II.    The Defendants ............................................................................... 5

CLASS ACTION ALLEGATIONS ............................................................... 6

FACTUAL ALLEGATIONS .......................................................................... 8

    I.     Background ...................................................................................... 8

    II.    Overcrowding at the Suffolk County Correctional Facilities ................................. 9

    III.   The Squalid, Unhygienic, and Hazardous Living Conditions at the Suffolk
        County Correctional Facilities ...................................................... 11

        A.    The Riverhead Facility – *"I know we've done things wrong, but
              nobody should have to live like this"* ........................................ 11

             i.     Chronic Exposure to Human Waste ............................. 11

             ii.    Hazardous Showers – Corrections officer admits *"I would not
                   even put my dog in these showers"* ........................... 13

             iii.   Prolonged Exposure to Mold, Rust, Vermin, Freezing
                  Temperatures, and Leaking Water, in a Facility Lacking
                  Adequate Ventilation ................................................... 14

        B.    The Yaphank Facility – *"I shouldn't have to live in fear for my health
              and safety"* ............................................................................ 17

             i.     Chronic Exposure to Human Waste ............................. 17

              ii.    Hazardous Showers ....................................................... 18

             iii.   Prolonged Exposure to Mold, Rust, Vermin, Freezing
                  Temperatures, and Leaking Water, in a Facility Lacking
                  Adequate Ventilation ................................................... 19

IV.     Lack of Access to Clean Drinking Water and Safe Food at the Suffolk
County Correctional Facilities – *I wouldn't even give my dog the stuff they
gave us* ............................................................................................................... 21

        A.      Riverhead's Contaminated Drinking Water and Food.............................. 22

        B.      Yaphank's Contaminated Drinking Water and Food................................ 24

V.      Defendants' Pattern and Practice of Deliberate Indifference to the Inhumane
Conditions at the SCCF ..................................................................................... 27

        A.      Suffolk County ....................................................................................... 27

        B.      Defendants DeMarco, Caracappa, and Meyerricks .................................. 33

CAUSES OF ACTION ........................................................................................................ 36

PRAYER FOR RELIEF ....................................................................................................... 38

Plaintiffs Mack Butler, Dashaun Sims, Clyde Lofton, Paul Alver, Kevin King, and Rickey Lynch (collectively, the "named Plaintiffs"), on behalf of themselves and all others similarly situated, by their attorneys Shearman & Sterling LLP and of-counsel New York Civil Liberties Union, in their Amended Consolidated Class Action Complaint (the "Complaint") herein against Suffolk County (the "County"), Vincent F. DeMarco, Joseph T. Caracappa, and John P. Meyerricks (collectively, the "Defendants"), allege as follows:

## NATURE OF THE ACTION

1.     The men detained in the Suffolk County Correctional Facilities (the "SCCF"), the majority of whom have not been convicted of any crime, are subjected to inhumane conditions that pose unreasonable and substantial risks to their health.  The men are forced to live in overcrowded conditions, amidst filth, overflowing sewage, and pervasive mold, rust, and vermin. The Fifth Circuit once noted, "No one in civilized society should be forced to live under conditions that force exposure to another person's bodily wastes."  Yet night after night, the men confined in the SCCF – both at the Riverhead and Yaphank facilities – are forced to do exactly that.

2.     The men detained in the SCCF lack access to clean drinking water and safe food, as well as basic necessities such as sanitary and properly functioning sinks, toilets, and showers. Rodents and insects invade their living areas and contaminate their food.  In the winter, the men sleep in freezing cells, made colder still by leaking water that drips into their sleeping quarters. They attempt to stave off the cold with a single worn blanket.  These conditions, independently and through their mutually reinforcing effects, produce a serious deprivation of basic human needs.

3.      Even corrections officers at the SCCF have commented on the deplorable and inhumane conditions at the facilities, describing them as unfit for animals.  As a direct result of the poor conditions of the facilities, the men detained there suffer from chronic ailments – including persistent and recurring digestive and respiratory issues, skin infections and rashes, and dehydration – and are at a current and ongoing risk of suffering from more serious ailments in the future.

4.      This action is brought to end a pattern and practice of deliberate indifference to the inhumane conditions in which the men detained in the SCCF live.  The Defendants are those who are responsible for overseeing the facilities but have failed to ensure a safe and sanitary environment for the men, instead allowing the facilities to remain overcrowded and to continue deteriorating.

5.      The Defendants have known about the appalling conditions in the SCCF for years, but they have failed to make reasonable efforts to remedy those conditions.  As a result, Plaintiffs, six current and former detainees and prisoners housed within the SCCF, bring this action for injunctive relief in the form of an appropriate remedial order to improve the conditions in the facilities to meet constitutionally acceptable standards, declaratory relief, and money damages to redress Defendants' violation of Plaintiffs' rights under the Eighth and Fourteenth Amendments to the United States Constitution and the Due Process Clause of the New York State Constitution.

## JURISDICTION AND VENUE

6.      This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.  This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and

1343(a)(3).  This Court may exercise supplemental jurisdiction over the claims based on New York law pursuant to 28 U.S.C. § 1367.

7.      This Court has jurisdiction to issue the declaratory relief requested pursuant to the Declaratory Relief Act, 28 U.S.C. §§ 2201 and 2202.  This Court may also grant injunctive relief pursuant to 18 U.S.C. §§ 2283, 2284, and 3626, and Rule 65 of the Federal Rules of Civil Procedure.

8.      Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(2).  All the events described in this Complaint occurred in the Eastern District of New York.

## PARTIES

**I.      The Named Plaintiffs**

9.      Mr. Mack Butler, 37 years old, has four young children and has lived in Suffolk County for most of his life.  Mr. Butler is currently detained in the Riverhead Correctional Facility ("Riverhead") of the SCCF located at 100 Center Drive, Riverhead, New York 11901. He has been detained in the SCCF since January 2011 and is still awaiting trial.  At all times while detained in the SCCF, Mr. Butler has been exposed to the conditions described in this Complaint.

10.     Mr. Dashaun Sims, 23 years old, grew up in Suffolk County, in Amityville, New York.  He has a three-year-old son.  Mr. Sims is currently detained in Riverhead and has been detained in that facility since May 2010.  Mr. Sims is awaiting sentencing.  At all times while detained in the SCCF, Mr. Sims has been exposed to the conditions described in this Complaint.

11.     Mr. Clyde Lofton, 26 years old, has a young son and worked as a chef prior to his incarceration in the SCCF.  Mr. Lofton is currently detained in the Yaphank Correctional Facility

("Yaphank") of the SCCF, at 69 Yaphank Avenue, Yaphank, New York. He has been detained in Yaphank since September 2011 and is still awaiting trial. At all times while detained in the SCCF, Mr. Lofton has been exposed to the conditions described in this Complaint.

12.    Mr. Paul Alver, 21 years old, grew up in Suffolk County, in Bayshore, New York, in a large family. He has training in carpentry and electrical wiring. Mr. Alver is currently detained in Yaphank and has been detained in that facility since September 2011. Mr. Alver is currently serving a sentence for a non-violent crime. At all times while detained in the SCCF, Mr. Alver has been exposed to the conditions described in this Complaint.

13.    Mr. Kevin King, 27 years old, is the father of two young children and worked in retail and construction prior to his incarceration in the SCCF. He was detained in Riverhead from January 2011 until early April 2012. Mr. King was convicted in January 2012 of a non-violent crime. At all times while detained in the SCCF, Mr. King was exposed to the conditions described in this Complaint.

14.    Mr. Rickey Lynch, 49 years old, has spent much of his life in Suffolk County, in Coram, New York, and ran a cleaning business prior to his incarceration in the SCCF. Mr. Lynch was detained in Yaphank from July 2010 through November 2010 and Riverhead from November 2010 through October 2011. Mr. Lynch was convicted in October 2011 of a non-violent crime. At all times while detained in the SCCF, Mr. Lynch was exposed to the conditions described in this Complaint.

15.    As a result of their confinement in the SCCF and exposure to the conditions described in this Complaint, Plaintiffs have suffered intestinal illnesses, skin conditions, respiratory infections, fungal infections, nose bleeds, headaches, blurred vision, and dizziness.

16.     Each named Plaintiff currently detained in the SCCF at the time of the filing of this Complaint sues for injunctive relief, declaratory relief, compensatory damages, and punitive damages on behalf of himself and all other members of the Plaintiff class who are similarly situated, and for injunctive relief on behalf of all members of the Plaintiff class who be will detained in the SCCF in the future.  Each named Plaintiff previously detained in the SCCF sues for declaratory relief, compensatory damages, and punitive damages on behalf of himself and all other members of the Plaintiff class who are similarly situated.

## II.     The Defendants

17.     Defendant Suffolk County operates the SCCF through its Sheriff's Office and allocates funds for the maintenance of the SCCF.  The Sheriff's Office promulgates and implements policies at the SCCF, including those governing the living and housing conditions, grievance procedures, and access to medical and other program services, mandated by local law and court orders, at the SCCF.

18.     Defendant Vincent F. DeMarco is the Sheriff of Suffolk County, a post he has held since November 8, 2005.  As Sheriff, Defendant DeMarco is the chief executive officer at the Suffolk County Sheriff's Office.  The Sheriff's Office operates the SCCF and, upon information and belief, currently employs approximately 300 deputy sheriffs and 900 corrections officers to work in those facilities.  As Sheriff, Defendant DeMarco has final policy-making authority for all matters relating to the operation of the SCCF, including final policy-making authority and ultimate responsibility for the custody, treatment, control, and care of all persons detained in the SCCF.  The individuals working at the SCCF are Defendant DeMarco's agents and employees.  Defendant DeMarco is sued in his individual and official capacity.

19.     Defendant Undersheriffs Joseph T. Caracappa and John P. Meyerricks are Defendant DeMarco's deputies, and, upon information and belief, they oversee the day-to-day

operation of the SCCF.  Defendant Caracappa was previously a Suffolk County legislator and a member of the Public Safety & Public Information Committee of the Suffolk County Legislature. In that role, Defendant Caracappa attended various Public Safety & Public Information Committee meetings, including meetings in 2004, 2006, and 2007, during which the Committee discussed the desperate need for renovations and maintenance of the SCCF.  Defendants Caracappa and Meyerricks are sued in their individual and official capacities.

## CLASS ACTION ALLEGATIONS

20.     Plaintiffs bring this action on their own behalf and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of all persons who are, were, or will be imprisoned in the SCCF.

21.     Plaintiffs Butler, Sims, Lofton, and Alver represent a class of persons ("Injunctive Class") primarily seeking injunctive and declaratory relief and defined as follows:

> All persons who, now or at any time in the future, are or will be detainees or prisoners in the custody of the Suffolk County Sheriff's Department and housed in the Suffolk County Correctional Facilities located in Riverhead, New York and Yaphank, New York.

22.     All of the named Plaintiffs represent a class of persons ("Damages Class") seeking damages for harms incurred as a result of the conditions described herein and defined as follows:

> All persons who are or were detainees or prisoners in the custody of the Suffolk County Sheriff's Department and housed in the Suffolk County Correctional Facilities ("SCCF") located in Riverhead, New York and Yaphank, New York and who were or will be released from the SCCF on or after April 5, 2009.

23.     The SCCF has a daily average population of 1,732 detainees and prisoners.  Upon information and belief, the classes consist of thousands of individual claimants and joinder of all their members is impracticable.

24.     The questions of law and fact presented by the named Plaintiffs are common to other members of the classes.  Each class member's claim raises the same basic questions: (1) whether the conditions of confinement described in this Complaint violate the United States Constitution and New York State law; (2) for the Injunctive Class, what type of injunctive relief is appropriate and necessary to ensure the conditions at the SCCF meet constitutional standards; and (3) for the Damages Class, what damages should be awarded to redress the harms suffered by the members of the class as a result of the unconstitutional conditions they were subjected to at the SCCF.

25.     The claims of the named Plaintiffs are typical of the claims of the classes.  The named Plaintiffs, like all class members, allege that Defendants violated their rights under the United States Constitution and New York State law by subjecting them to the conditions of confinement described in this Complaint.  All class members will benefit from amelioration of the conditions at the SCCF and issuance of appropriate remedies.  The named Plaintiffs' interests in successfully resolving this action are thus consistent with the interests of all other class members, and there is no actual or potential conflict between the named Plaintiffs and other members of the classes.

26.     The named Plaintiffs have retained competent and experienced counsel.  The named Plaintiffs, through counsel, will fairly and adequately represent and protect the interests of all class members.

27.     The Plaintiffs' counsel, Shearman & Sterling LLP, is an international law firm with offices in New York City and 19 other locations worldwide.  Shearman & Sterling has extensive experience in complex federal litigation and in *pro bono* federal civil rights litigation, and has the necessary personnel and financial resources to effectively litigate this case.

28.     Of-counsel in this case, the New York Civil Liberties Union (the "NYCLU"), is a non-profit membership organization founded in 1951 as the New York State affiliate of the American Civil Liberties Union.  The NYCLU has long been devoted to protecting the fundamental rights and values embodied in the United States Constitution and the New York Constitution, and has extensive experience in litigating federal court class action cases involving civil rights claims.  Indeed, the NYCLU has specific history successfully litigating class actions involving the SCCF in the Eastern District of New York.  In 1974, the NYCLU served as class counsel in *Manicone v. Cleary*, 74 Civ. 575 (JBW) (E.D.N.Y.), a class action challenging certain conditions of confinement at the SCCF.  That case resulted in a consent order that remained in effect for more than two decades, during which time the NYCLU consistently served as counsel to the class in enforcement actions and motions to modify the consent order.

## FACTUAL ALLEGATIONS

**I.     Background**

29.     The Suffolk County Correctional Facilities consist of the Riverhead Correctional Facility, a medium/maximum security jail, and the Yaphank Correctional Facility, a minimum security jail.  The majority of the men detained in the SCCF either are awaiting trial or have been convicted of minor, non-violent crimes.  In a study published in 2008, the Suffolk County Criminal Justice Coordinating Council (the "SCCJCC"), an interagency council formed to monitor prison conditions and crime in Suffolk County, estimated that 58% of people housed in the SCCF were pretrial detainees and 33% were sentenced prisoners.  Sentenced prisoners are either serving a local jail sentence, which typically does not exceed one year, or are awaiting transfer to a New York state prison.  Other individuals detained in the SCCF are alleged to have

violated the terms of their parole and are awaiting their parole hearings or serving a sentence for a parole violation.

30.      The SCCF has a history of violating minimum health and safety standards for correctional facilities in the State of New York.  In 1997, *The New York Times* quoted a spokesman for the New York State Commission of Corrections ("NYSCOC"), who described the SCCF as "the most seriously and profoundly overcrowded county facility in the state."  Seven years later, a February 2004 article in *The New York Times* quoted the Suffolk County Sheriff's Office as acknowledging that the severe overcrowding issues in the SCCF continued and estimating that the SCCF was typically housing at least 1,400 persons, but often more than 1,500, in facilities that, at the time, could handle just over 1,100.

31.      In studies conducted that same year, and again in 2007, the SCCJCC concluded that the facilities remained dangerously overcrowded.

32.      In 2010, a physician who provided medical services to those detained in the SCCF in 2007 and 2008 filed a lawsuit in this Court against the County for retaliating against her for reporting substandard and inadequate medical care and possible abuse of the men detained there. *See Dillon v. Suffolk Cnty. Dep't of Health Serv., et al.*, 07-CV-04722 (ADS) (WDW) (filed Nov. 1, 2010).

**II.      Overcrowding at the Suffolk County Correctional Facilities**

33.      Despite the fact that the current stated capacity of the SCCF is 1,327 persons across both the Riverhead and Yaphank facilities, the SCCF has sought permission from the State of New York to house a daily average of 1,732 persons.

34.      In 2004, NYSCOC ordered two dormitories in Yaphank to be permanently shut down, decreasing capacity by 140 beds, due to the decrepit and unsafe conditions that culminated in a serious sewage overflow in the dormitories.  NYSCOC subsequently approved the

temporary use of the Yaphank gymnasium as a housing area to make up for those lost beds. More than eight years later, approximately 60 men continue to be housed in the gymnasium area in Yaphank.  Upon information and belief, no alternative indoor space is provided for fitness and recreational activities.

35.     According to the 2007 SCCJCC study referred to above, *see supra* ¶ 29, at Riverhead, 208 cots were set up inside the day area space and 56 cots were set up in the day area space of each "Pod" (*i.e*., individual cells built around a central open space) to accommodate the overflow of men detained there.  The SCCJCC described these additional cots as "encroaching on space that was designed for other purposes."  Additionally, according to the same study, 192 cells originally intended to house only one person were double-bunked to house two people. That same year, the Suffolk County Sheriff's Office Chief of Staff referred to the overcrowding as a "code red" situation.

36.     The 2007 SCCJCC study noted that the overcrowding variances that the NYSCOC granted were contingent on Suffolk County complying with the Commission's recommendation to add permanent jail space.  A new Suffolk County correctional facility was originally scheduled to be completed in 2011, but was later delayed until "early 2012."  Upon information and belief, at the time of filing this Complaint, this planned addition neither is in operation nor has an official opening date.

37.     Suffolk County frequently transfers men detained in the SCCF back and forth to other correctional facilities, such as the facilities in Nassau County, to lower the population count in the SCCF, at great cost to the County.  Nevertheless, the SCCF remains overcrowded.

III.    **The Squalid, Unhygienic, and Hazardous Living Conditions at the Suffolk County Correctional Facilities**

38.    The men detained in Riverhead and Yaphank are forced to live in squalid, unhygienic, and hazardous living conditions that pose a substantial and ongoing risk to the men's physical and mental health.  Many of the men detained in the SCCF have been housed in other correctional facilities as the result of either transfers or previous or subsequent incarcerations, and they describe the uninhabitable conditions at the SCCF as the worst conditions of any jail or prison they have known.  On information and belief, all of the conditions described herein have persisted regularly since at least 2009.

A.    **The Riverhead Facility –** *"I know we've done things wrong, but nobody should have to live like this"*

39.    All of the men detained in Riverhead are subjected to inhumane conditions that deprive them of the basic human need for a sanitary and warm environment.  As one man detained in Riverhead described his conditions, "[T]he word I would use is torture – I know we've done things wrong, but nobody should have to live like this."

i.    **Chronic Exposure to Human Waste**

40.    Riverhead's plumbing problems have created an unsanitary environment for the men detained there by exposing them to human waste on a regular and ongoing basis.

41.    Each individual cell contains a toilet that sits two to three feet away from the individual's bed.  Flushing a toilet in an adjoining or nearby cell causes sewage to rise up in another's toilet.

42.    During the day, the men detained in Riverhead attempt to mitigate the effects of these "ping-pong toilets" by warning each other when they are about to flush a toilet so that those in neighboring cells may flush their toilets at the same time, which lessens the ping-pong

11

effect.  Nevertheless, many of them have had other men's fecal matter and waste rise up through the pipes and spout onto their buttocks when using their own toilets.

43.    The toilet seats have accrued filth over time as a result of the frequent waste back-up and overflow, and the residue has caused the men to suffer from rashes on their buttocks.

44.    Nearly every night, when the men are sleeping (and cannot make a plea to the others to flush simultaneously), the toilets collect waste from those in neighboring cells and sometimes that waste overflows onto the cell floors.

45.    The men detained in Riverhead wake up daily to accumulated waste that causes them to regularly vomit, cough, and suffer from nausea and severe headaches due to the fumes. On the Four East North cell block, the men regularly place towels or other items over their toilet bowls in a futile attempt to contain the stench.

46.    Corrections officers in Riverhead are also exposed to the strong odors released by the waste back-up in the toilets and the frequent overflow of waste onto the floors of the men's cells.  The facility's nurses have called the ping-pong toilets a "serious health hazard" and commented that no one should be locked up in a cell inhaling bodily waste.

47.    The men have raised the plumbing problems with corrections officials on many occasions.  Nevertheless, the toilets have not been fixed.

48.    Living in close proximity to human waste is a health hazard.  Human excrement carries harmful microorganisms, which can cause diarrhea, fever, cramps, and vomiting, in addition to more severe conditions.  Persons in close proximity to human waste can contract parasites or hepatitis and develop skin and eye infections.

49.     The exposure to sewage and human waste poses serious, ongoing harm to the health of the men detained in Riverhead.

>    **ii.     Hazardous Showers – Corrections officer admits *"I would not even put my dog in these showers"***

50.     The showers in Riverhead are decrepit, coated with thick, black mold, and reek of mildew.  The faucets and pipes are rusted over.

51.     Sewage backs up out of the shower drains regularly, and there is often standing water in the showers because the drains are frequently clogged.  The water the men use to wash themselves sometimes smells like sewage.

52.     When the men detained in Riverhead shower, they try not to touch anything in the showering area in an attempt to avoid direct contact with the mold, mildew, rust, and sewage. But, due to the narrow size of the stalls, and inadequate footwear, the men often come into contact with these substances while showering.

53.     Routine exposure to the mold, rust, sewage, and brown water in the showers has given the men skin conditions such as:  severe fungal infections on their feet; dry, cracked, itchy feet; discolored green or black toenails; painful, itchy, and flakey skin rashes that bleed and scab when scratched; and bumps on their backs, chests, arms, and buttocks.

54.     The corrections officers and medical staff in Riverhead are well aware of the unsanitary conditions of the showers.  Corrections officers have stated that they "would not even put [their] dog[s] in [those] showers."  Similarly, nurses have remarked that the showers are "horrible" and "unsanitary."

55.     The men have raised the unsanitary conditions of the showers with corrections officials on many occasions.  Nevertheless, the showers have not been fixed.

56.    When the men have requested cleaning supplies to try to remove the mold themselves, corrections officials have either not responded to their requests or provided only ineffective cleaning solution in insufficient quantities.  The men regularly request, but are rarely provided, gloves to protect their hands and arms.  Consequently, those men who have tried to remove the mold with the weak solution provided have not been able to do so and have been left with thick, black fingernails.  The men's requests for reasonable, adequate cleaning materials have gone unanswered.

57.    The hazardous showers pose a serious, ongoing harm to the health of the men detained in Riverhead.

### iii.    Prolonged Exposure to Mold, Rust, Vermin, Freezing Temperatures, and Leaking Water, in a Facility Lacking Adequate Ventilation

58.    The mold and rust in Riverhead are not limited to the showers.  The communal "slop sinks," where the men access drinking water and wash their spoons, cups, and clothes, are also lined with mold.  There is also mold on the walls of the men's cells.

59.    The SCCF have attempted on various occasions to mask mold by painting directly over it.  The paint cannot contain the mold growth, however, and chips of moldy paint frequently drop into living spaces, including onto the men's beds.

60.    According to the U.S. Centers for Disease Control and Prevention and the World Health Organization, exposure to mold – particularly indoors – can lead to upper respiratory tract problems in otherwise healthy people, including bronchitis, which can become chronic.  Mold can also cause serious lung infections, exacerbate asthma symptoms in persons with asthma, and cause otherwise healthy people to develop asthma.  Mold exposure can also cause people to develop ongoing allergies that will linger with them even after they are no longer exposed to high concentrations of mold.

14

61.     Rust covers the bars of the men's cells, their bed frames, and the air vents.  Flakes of rust from the vents and chips of paint peeling off the walls fall onto the men's bedding and clothes.

62.     In addition to mold and rust, vermin are also a constant presence in Riverhead. Insects and cockroaches roam in the individual cells and in the showers.

63.     Vermin carry disease, contaminating food with their feces and saliva.  Their secretions can cause allergic reactions and exacerbate asthmatic conditions.  The health hazards created by the vermin are further exacerbated by inadequate plumbing and ventilation in the facility.

64.     Alongside the general filth, the men detained in Riverhead live in very cold temperatures in the wintertime, causing them severe discomfort, particularly at night.  Some of the men have described the temperature inside Riverhead as akin to sleeping in a refrigerator. The men often see corrections officers wearing their coats while working in the housing areas.

65.     Despite the low temperatures, each man receives only a single, thin blanket. Many of these blankets have holes in them.  In an attempt to keep warm at night, some men try to obtain extra blankets by taking the blankets left behind by men who have been discharged. But corrections officials do not permit the men to have more than one blanket and confiscate any additional blankets they find during inspections.

66.     Lack of heat for extended periods disrupts sleep patterns, causes stress, and increases susceptibility to disease.

67.     When the men have complained to the corrections officers about the cold air temperature in Riverhead, some officers have turned up the air conditioning while simultaneously opening all the windows, making it even colder.

15

68.    The cold temperature inside Riverhead is compounded by the cold water – sometimes brown in color – leaking from the ceiling into some of the men's cells.

69.    Upon information and belief, the source of the leaks is ill-fitted or broken pipes in the ceiling.  The leaks are worse when it rains.

70.    The leaking water wets the men's bedding, mattresses, and clothing, making the cells damp and causing mold and paint to "melt off" the walls onto the men's beds.

71.    The men are also at risk of exposure to asbestos from the leaking pipes, which are lined with insulation believed to contain asbestos.  The leaking water has caused floor tiles in the facility to turn upward, exposing the glue underneath them, also believed to contain asbestos.

72.    According to the U.S. Centers for Disease Control and Prevention, long-term exposure to asbestos can cause a serious, progressive disease that scars lung tissue and results in respiratory problems of increasing severity.

73.    Riverhead's air vents are caked over with a mix of rust, mold, dust, and dirt, permitting very little air flow.

74.    Despite these toxic conditions, windows are often kept shut, preventing fresh air from circulating (except, that is, when some corrections officers attempt to punish the men for complaining about the cold temperatures in the facility by opening the windows to let in the freezing air).

75.    Riverhead's unsanitary environment is compounded by inadequate ventilation. Inadequate ventilation creates and exacerbates unsanitary and unhealthy conditions by providing an environment hospitable to fungus, mold, rust, and bacteria, and by contributing to the transmission of airborne diseases.  The serious nature of the problem is magnified for those who

suffer from asthma or other respiratory ailments or have compromised immune systems, such as those men who have HIV infections.

76.     As a result, the noxious fumes of feces, urine, and mold stagnate in the cells, and moldy and toxic air persists in the facility.

77.     Asthmatic men have suffered from a worsening of their condition since being incarcerated in Riverhead.  Even non-asthmatic men experience difficulty breathing and suffer from frequent coughs and chest pain as a result of their exposure to the conditions in Riverhead.

78.     The men have raised these unsanitary and hazardous conditions with corrections officials on many occasions.  Nevertheless, these conditions have persisted unabated.

79.     The men's exposure to mold, rust, vermin and their excretions, freezing temperatures, and leaking water, in an environment with inadequate ventilation, individually and through their mutually reinforcing effects, poses serious, ongoing harm to their health.

**B.     The Yaphank Facility – *"I shouldn't have to live in fear for my health and safety"***

80.     Yaphank is a minimum security facility that primarily houses pretrial detainees. In Yaphank, the men sleep in dormitories rather than individual cells.  They live in inhumane conditions, in an already overcrowded facility.  The conditions described below deprive the men detained in Yaphank of the basic human need for a sanitary and warm environment.

**i.     Chronic Exposure to Human Waste**

81.     Yaphank's plumbing problems have created an unsanitary environment for the men detained there and deprived them of the basic human need for working toilet facilities.

82.     For example, three of the five communal toilets in an area of Yaphank known as "North 1" and two of the five communal toilets in "South 2" are broken and filled with stagnant feces and urine.  The broken toilets are covered with plastic bags, which do little to contain their

stench.  In the gymnasium, there are only three or four working toilets for roughly 65 men housed in that part of the facility.  All six urinals in "North 2," five of the six urinals in "South 2," and half of the urinals and three of the seven toilets in "North 3" are broken.  Because large numbers of men are required to use a few functioning toilets, the toilets overflow, and waste seeps into the sleeping areas.

83.    Sewage regularly seeps out of the shower drains and is often found in puddles on the floor near the communal table where the men eat their meals.

84.    The men have raised the problems relating to both the broken toilets and sewage from the showers with corrections officials on many occasions.  Nevertheless, the plumbing issues have persisted unabated.

85.    Exposure to sewage and human waste poses serious, ongoing harm to the health of the men detained in Yaphank.  *See supra* ¶ 48.

ii.    **Hazardous Showers**

86.    The showers in Yaphank are coated with thick, black mold and mildew and reek of mold, mildew, and waste.

87.    Sewage regularly backs up out of the shower drains.  The water the men use to wash themselves is sometimes brown and smells like sewage.

88.    When the men detained in Yaphank shower, they try not to touch anything in the showering area in an attempt to avoid direct contact with the mold, mildew, and sewage.  But, due to the narrow size of the stalls, and inadequate footwear, the men often come into contact with these substances while showering.

89.    As a result of their daily exposure to the mold, mildew, sewage, and brown water, the men in Yaphank suffer from skin conditions such as: severe fungal infections on their feet;

dry, cracked, itchy feet; discolored green or black toenails; painful, itchy skin rashes that bleed and scab when scratched; and bumps on their backs, chests, and arms.

90.     The men have raised the issues of the mold, mildew, and sewage in the showers with corrections officials on many occasions.  Nevertheless, the showers have not been fixed.

91.     When the men have requested cleaning supplies to remove the mold themselves, corrections officials have either not responded to their requests or provided ineffective cleaning solution in insufficient quantities.  As a result, the men have not been able to remove the mold. The men's requests for stronger cleaning materials have gone unanswered.

92.     The hazardous showers pose a serious, ongoing harm to the health of the men detained in Yaphank.

        iii.    **Prolonged Exposure to Mold, Rust, Vermin, Freezing Temperatures, and Leaking Water, in a Facility Lacking Adequate Ventilation**

93.     Mold is found on the bars, walls, and vents around the housing areas in Yaphank.

94.     The SCCF have attempted on various occasions to mask mold by painting directly over it.  The paint has not been able to contain the mold growth, however, and paint and mold chip off of the walls onto the beds.

95.     Exposure to mold can cause and exacerbate various respiratory illnesses.  *See supra* ¶ 60.

96.     Rust covers the bars surrounding the housing areas, bed frames, and air vents. Flakes of rust from the vents and the bottom of the top bunks of the bunk beds, along with chips of paint peeling off of the walls, fall onto the men's bedding and clothes.

97.     In addition to the mold and rust, vermin is a constant presence in Yaphank.  The men detained in Yaphank often see mice, roaches, spiders, gnats, and flies in housing and food preparation areas of the facility.  Some men have been bitten by spiders in the facility.  Mice eat

the food the men purchase from the commissary, even when it is stored in closed lockers. The men try to seal the gaps in their lockers using tape, or by stuffing paper towels, in an attempt to protect their food.

98.     Vermin carry disease, contaminating food with their feces and saliva. Their secretions, saliva, hairs, certain body parts, and feces can cause allergic reactions and exacerbate asthmatic conditions. The health hazards created by the vermin are further exacerbated by inadequate plumbing and ventilation in the facility.

99.     Alongside the general filth of the facility, the men live in freezing temperatures during the winter. The gymnasium area – which houses men on a permanent basis, *see supra* ¶ 34 – is especially cold.

100.    The men are each provided with a single blanket, many of which have holes, providing insufficient protection against the cold temperatures inside the facility.

101.    Lack of heat for extended periods disrupts sleep patterns, causes stress, and increases susceptibility to disease.

102.    Yaphank's ceilings leak water into the dormitories and onto the men's beds, particularly when it rains, compounding the cold and causing their bed frames to rust. The men have been forced to move their beds into tight quarters of the dormitories to avoid the dirty, freezing water leaking from the ceilings. The men, including those of more advanced age, have also slipped on the resulting water puddles in the dormitories.

103.    The men are at risk of exposure to asbestos from the leaking pipes, which are lined with insulation believed to contain asbestos. Upon information and belief, the leaking water has caused floor tiles in the facility to turn upward, exposing the glue underneath them, also believed to contain asbestos.

104.    Long-term exposure to asbestos can cause a serious, progressive disease and respiratory problems of increasing severity.  *See supra* ¶ 72.

105.    Black mold and rust cover Yaphank's vents and circulate in the air when the air conditioning is on.  The men who sleep on the top bunk of bunk beds sleep within inches of the moldy and rusty vents.

106.    Despite these toxic conditions, windows are kept shut, preventing fresh air from circulating.  As a result, moldy and toxic air persists in the facility.

107.    Inadequate ventilation creates and exacerbates unsanitary and unhealthy conditions and is particularly harmful to those who suffer from respiratory ailments or have compromised immune systems.  *See supra* ¶ 75.

108.    Asthmatic men have suffered from a worsening of their condition since being incarcerated in Yaphank.  Even non-asthmatic men experience difficulty breathing and suffer from frequent coughs and chest pain as a result of their exposure to the conditions.

109.    The men have raised these unsanitary and hazardous conditions with corrections officials on many occasions.  Nevertheless, these conditions have persisted unabated.

110.    The exposure of the men detained in Yaphank to mold, rust, vermin and their excretions, freezing temperatures, and leaking water, in an environment with inadequate ventilation, individually and through their mutually reinforcing effects, poses serious, ongoing harm to their health.

**IV.    Lack of Access to Clean Drinking Water and Safe Food at the Suffolk County Correctional Facilities – *"I wouldn't even give my dog the stuff they gave us"***

111.    Adding to the inhumane conditions of confinement at the SCCF, the men detained in Riverhead and Yaphank are deprived of access to clean, safe, and adequate drinking water and food.

21

**A.  Riverhead's Contaminated Drinking Water and Food**

112.  The men detained in Riverhead lack access to clean drinking water.

113.  Tap water is their primary source of drinking water.  It regularly is brown or yellow in color, contains particles of unidentified sediment, tastes metallic, and smells "like a cesspool."

114.  Several of the men have gauged the water's filth and sediment levels by attaching a white sock to the faucet and running the tap; the results were uniformly a brown sock filled with a rusty brown substance.

115.  Sometimes the water is particularly dark brown.  On those days, the men try to make light of a bad situation, warning each other that "[t]hey're serving iced tea again."

116.  When the sinks in individual cells are broken, as they often are, the men are forced to drink water from the slop sinks, which, as described above, *see supra* ¶ 58, are lined with mold.

117.  Drinking the tap water has caused the men to suffer from stomach aches and cramps, nausea, vomiting, and diarrhea.

118.  The only alternative drinking water available to the men is from urns, found in each cell block, containing hot water for the men to use with items purchased from the commissary like coffee or soup.  Upon information and belief, although the heated water in the urns comes out of the taps, the men prefer to drink it in the hope that the heating process has killed some germs, and they will therefore avoid becoming ill.  Only two urns are distributed to each tier each day and, given that the men are forced to use the urns as their primary source of drinking water, do not hold sufficient quantities to meet their daily needs.  The urns themselves have at times contained mold.

22

119.    Bottled water is not sold from the commissary.  The many men who forgo drinking the contaminated tap water to avoid becoming ill and instead drink only the limited hot water found in the urns, the small milk boxes distributed with meals, and the small cup of sugary juice distributed each day, are unable to obtain adequate fluids.

120.    As a result of their inadequate water intake, men detained in Riverhead feel weak, dizzy and dehydrated, and suffer from severe headaches.

121.    Some men even refuse to wash their spoons in the water, for fear of contamination.

122.    Similar to the water, the food served to the men detained in Riverhead is unsafe and inadequate.

123.    The men's meals are handed to them through slots in the bars which are rarely or never cleaned.  The slots are caked with rust, paint chips, and old food, all of which regularly fall onto the men's food when the trays are passed through.

124.    Rust and paint is chipping off of the bars near or around the eating area.

125.    Rodents and insects have been seen running around Riverhead's kitchen.

126.    As a result, flakes of rust and mice droppings have been found in the food served to the men.  At times, the served food has been partially eaten by mice.  One prisoner witnessed someone pull what appeared to be a rat's tail from the food.  As described above, rodents carry many kinds of diseases.  *See supra* ¶¶ 63, 98.

127.    Riverhead's kitchen tap water is often brown in color, but it is still boiled and served to the men.

128.    The carts used in Riverhead to distribute food have often been filthy and contaminated the men's meals.

129.    The food served in Riverhead is always either cold or room temperature, even if it is a meal intended to be served hot.

130.    The chicken served to the men is often undercooked, sometimes raw and with visible blood.

131.    The men have suffered stomach cramps and vomited after eating the food served at Riverhead.  To avoid becoming ill, those who can afford it eat only food purchased from the commissary.

132.    The lack of access to clean, safe, and adequate drinking water and food poses serious, ongoing harm to the health of the men detained in Riverhead.

**B.    Yaphank's Contaminated Drinking Water and Food**

133.    The men detained in Yaphank lack access to clean drinking water.

134.    Tap water is their primary source of drinking water.  It regularly is brown or yellow in color, contains particles of unidentified sediment, tastes metallic, or smells like waste.

135.    Several men have gauged the water's filth and sediment levels by attaching a white sock to the faucet and running the tap; the results were uniformly a brown sock filled with a rusty brown substance.

136.    Drinking the tap water has caused the men to suffer from stomach aches, nausea, and vomiting.

137.    The only alternative drinking water available to the men is from urns, found in each housing tier, containing hot water for the men to use with items purchased from the commissary like coffee or soup.  Upon information and belief, although the heated water in the urns comes out of the taps, the men prefer to drink it in the hope that the heating process has killed some germs, and they will therefore avoid becoming ill.  Only two urns are distributed to

each housing tier each day and, given that the men are forced to use the urns as their primary source of drinking water, do not hold sufficient quantities to meet their daily needs.

138.    Bottled water is not sold from the commissary.  The many men who forgo drinking the contaminated tap water to avoid becoming ill and instead drink only the limited hot water found in the urns, the small milk boxes distributed with meals, and the small cup of sugary juice distributed each day, are unable to obtain adequate fluids.

139.    As a result of their inadequate water intake, men detained in Yaphank feel weak, dizzy and dehydrated, and suffer from severe headaches.

140.    Similar to the water, the food served to the men detained in Yaphank is unsafe and inadequate.

141.    The men detained in Yaphank have been served food that has been partially eaten by rodents and contains rodent droppings or roaches.  As described above, vermin and their excrement carry diseases.  *See supra* ¶ 98.

142.    The communal table on which the men detained in Yaphank eat their meals is rusty and has paint chipping off it.

143.    The cart used in Yaphank to distribute food is kept in an area lined with mold.

144.    The food served to the men is often cold or room temperature, even if it is a meal intended to be served hot.

145.    The chicken served to the men is often undercooked or raw with visible blood.

146.    Describing the quality of food served at Yaphank, one man explained, "I wouldn't even give my dog the stuff they gave us."

147.    The men have suffered from stomach cramps and vomiting after eating the food served at Yaphank.

148.    To avoid becoming ill, those who can afford it eat only food purchased from the commissary.  However, as described above, rodents and insects frequently crawl into the men's lockers and eat their commissary food.  *See supra* ¶ 97.

149.    The lack of access to clean, safe, and adequate drinking water and food poses serious, ongoing harm to the health of the men detained in Yaphank.

150.    The conditions at the SCCF described in this Complaint, individually and through their mutually reinforcing effects, have caused the men detained in the facilities to suffer from frequently recurring nausea, vomiting, severe headaches and migraines, dizziness, nose bleeds, skin rashes, severe fungal infections, and intestinal and respiratory problems.  The conditions also pose an unreasonable risk of serious damage to the men's long-term health.  Upon information and belief, living in these conditions has also negatively affected the mental health of the men, causing increased tension among them and leading to suicidal thoughts and actions.

151.    The SCCF's overcrowding and pervasive unsanitary conditions have created a situation in which the number of injuries and illnesses resulting from those conditions far exceed the medical resources of the facilities.  The nurses who walk around the SCCF have verbally acknowledged the health risks associated with the unsanitary conditions, but have also complained to the men detained there that the medical staff receives too many medical slips and that they cannot respond to them all.  The men are seen by the medical clinic weeks, and sometimes months, after they put in an initial request, even when they are very ill or in severe pain and only after submitting multiple requests.  Some men who have requested medical treatment for symptoms arising out of the facilities' conditions described in this Complaint were never seen by the clinic at all.

26

**V.      Defendants' Pattern and Practice of Deliberate Indifference to the Inhumane Conditions at the SCCF**

    **A.      Suffolk County**

152.    Suffolk County, through its Sheriff's Office, the County Executive, and the Legislature (collectively in this section "Suffolk County"), has engaged in a pattern and practice of deliberate indifference to the inhumane and unconstitutional conditions at the SCCF.

153.    Suffolk County has systematically and deliberately ignored, or failed to take reasonable measures to address, the visibly deplorable and unconstitutional conditions at the SCCF.  As described in detail in this Complaint, the facilities are overcrowded and filled with rust and holes, causing them to leak water in many areas inside the facilities.  Areas of the walls, ceilings, and showers are covered in black mold.  Men are forced to live in each others' filth and waste.  The facilities are infested with rodents and insects.  The water is undrinkable and visibly dirty, and the food is inadequate and unsafe and served in visibly filthy conditions.

154.    Suffolk County has also systematically and deliberately ignored, or failed to take reasonable measures to address, the complaints about the deplorable and unconstitutional conditions raised by the men detained in the SCCF.  For years, the men detained in Riverhead and Yaphank have submitted grievances through the SCCF's complaint procedures describing the conditions set forth in this Complaint and have sought medical treatment for their injuries arising from these conditions.

155.    Finally, Suffolk County has systematically and deliberately ignored, or failed to take reasonable measures to address, the findings in various official reports of the deplorable and unconstitutional conditions at the SCCF by the New York State Commission of Corrections, the Suffolk County Budget Review Office, and the Suffolk County Criminal Justice Coordinating Council, among others.

27

156.    These overcrowded, uninhabitable, and hazardous conditions are the product of decades of neglect and the refusal by the County to adequately maintain the SCCF and ensure that there is sufficient space for its detainee and prisoner population.  Since 1980, the New York State Commission of Corrections has warned Suffolk County that it may not ignore its overcrowding problems.  But that is exactly what Suffolk County has done.  The Suffolk County Budget Review Office, which reviews and monitors the budget for the Legislature, reported in 2004 that Suffolk County has applied "band-aids . . . to a problem that was never adequately addressed and has been allowed to fester for another twenty years."

157.    In 2002, the New York State Commission of Corrections warned Suffolk County that it "must literally address the problem rather than making a gesture to reduce overcrowding." In response to Suffolk County's lack of progress in addressing the issue of overcrowding at the SCCF, in 2003, the State Commission of Corrections rescinded Suffolk County's variances on the condition that Suffolk County build a new facility to house another 1,200 men.  Instead, the County allocated $1.1 million to start-up expenses for only 120 new beds and $150,000 to study whether more beds were needed, and stated in a capital budget report released in 2004 that they "may not want to build" the new correctional facility.

158.    Later, in 2006, Defendant DeMarco, newly elected as County Sheriff, tried to convince the State Commission of Corrections that once the first phase of the new facility was built, providing 380 extra beds, the second phase, to provide some 600 more beds, would be unnecessary.  However, the Commission stated that adding 380 extra beds would not be enough. The Commission was correct.  In 2007, Defendant DeMarco sought even more variances because, he said, "[w]e blew our variance caps."  Defendant DeMarco was required to negotiate for an additional 152 beds.  Between 2002 and 2006, the County spent $9 million to have the

28

men housed in other facilities out of the county, and the County budgeted around $1.5 million per year to continue doing so.

159.    Suffolk County knew or should have known that its pattern of refusing to address overcrowding concerns and its policy of merely applying "band-aids" – and allowing those band-aids to "fester for another twenty years" – created a real risk of violating the men's constitutional rights by creating conditions like those reflected above.  In 2004, the capital budget report, prepared by the Suffolk County Budget Review Office, discussed the closure of two Yaphank dormitories due to their uninhabitability and the significant cost incurred to relocate the men housed there:  $282,200 in March 2004 and $432,035 in April 2004, with a total cost to exceed $5 million if they were not reopened.  The capital budget report also noted that the County was reliant on the NYSCOC variances to house their detainee and prisoner population and, if those variances were rescinded, the County would not only incur significantly more costs but could face other significant liability including the "*possible default in constitutional obligations to inmates [that] could ultimately result in remedial actions imposed by federal courts.*"

160.    Suffolk County knew or should have known that its facilities were not properly maintained and had been permitted to fall into total disrepair, and that this continued failure to address the problem had reached "desperate" proportions.  In 2004, when the New York State Commission of Corrections closed the uninhabitable Yaphank dormitories, the Suffolk County Budget Review Office noted in a capital budget report that "the closure last month of the two 60-bed dormitories at this facility by the New York State Commission of Corrections is indicative of *seriously deficient conditions* in parts of the facility."

161.    This same report related in graphic detail the deteriorating conditions at the Riverhead facility and the many years of neglect by the County to address the deteriorating conditions:

> The Riverhead Correctional Facility, originally constructed in the late 1960's, is in need of significant maintenance, repair, and upgrading due both to its age and the fact that, for the past twenty-three years, increases in the inmate population have inordinately taxed its infrastructure. As a result, plumbing, heating, electrical and other mechanical systems have been overloaded and are breaking down. It was clearly evident during a recent tour of the facility…that *the infrastructure is suffering from benign neglect*: buckets are set out throughout the facility's non-cell areas to catch water from the leaking roof; ceiling tiles in corridors and work areas are buckling and falling, flooring is torn up and uneven, often from water damage, creating tripping hazards; vent work is corroding from persistent moisture and leaks, leading to rust stains on walls, loosening or loss of baseboards, and the rusting of metal file cabinets to the floor; several cells are "closed" due to ceiling deficiencies; and the fire alarm system is virtually useless…*Unbelievably, there is an area in this facility where one can look up and actually see the sky*; believably, the state of the facility is one of the contributing factors that enabled the Sheriff's Office to set the 1998-2002 Suffolk County departmental record for frequency of Worker's Compensation claims, with 30.6 claims per 100 employees in 2001…*The facility is at a critical juncture. One has only to look at the staggering problems and costs presently facing the County due to the lack of maintenance at the Yaphank Correctional Facility to see the future of this facility, if this project is not fast-tracked.*

162.    Despite these conditions, the Sheriff's Office Chief of Staff testified before the Public Safety & Public Information Committee of the Suffolk County Legislature that funds for the renovation and maintenance of Riverhead had been moved either from 2005 until 2007 or from 2006 until sometime after 2007.  While the Chairperson admonished everyone to "read the evaluation of the facility," little has been done to rectify the uninhabitable conditions in Riverhead.

163.    In 2005, the Budget Review Office prepared another capital budget report and noted, in detail, the desperate conditions at both Yaphank and Riverhead.  The report noted that eight dormitories in Yaphank desperately needed attention:  "[The] building as it exists now is in poor condition.  There are several repair and maintenance items which must be addressed,

specifically the renovations to the *shower and toilet facilities* in the dorms. *Water continues to leak* through the walls into the hallways."

164.    At Riverhead, the 2005 report noted that very little, if anything, had changed since the Budget Review Office had visited the facility a year earlier:

> It was clearly evident during a recent site visit to the facility that *the infrastructure continues to suffer from a lack of care.* Water intrusion continues to be a major problem. Cracks can be seen in the exterior walls, bricks have fallen into the recreation yard. Damage to ceiling tiles is evident throughout the facility. Flooring is worn through to the sub-floor while sections of the floor [that] have had to be removed are now uneven creating tripping hazards. The fire alarm system is obsolete, unreliable and in a state of disrepair. There are electrical shorts in the wiring behind the walls causing frequent false alarms. The only method to verify an alarm is to confirm it by telephone. An inspection of several electrical rooms and pipe chases reveal aging electrical panels and transformers as well as leaking and corroded pipes that require constant repair…*The condition of many of the bathroom and shower facilities was horrendous.* Dimmer switches do not work so that lights must be left on in sleeping areas at all times or else the room will be completely dark, presenting a security problem. Controls for the HVAC system are not operational…*If these renovations are not approved and completed in a timely manner and conditions continue to deteriorate the County runs the risk of having additional housing units shut down...*Renovations, repairs, and continuous scheduled maintenance will have to constantly take place to preserve and maintain this facility.

165.    The Budget Review Office recognized and reported that the conditions in Riverhead were "desperate" and that the "repair and maintenance of this facility should be given the highest priority."

166.    This fact was also broadly recognized by other County officials. In 2005, the then-Undersheriff Donald Sullivan testified before the Public Safety & Public Information Committee of the Suffolk County Legislature that the requested capital projects for both Yaphank and Riverhead "all deal with the deterioration in our infrastructure over many many years, a topic that we have been before this Legislature about many, many times over the last three plus years and needs to be addressed or it gets worse as time goes by." Further, with regard to Riverhead, the Undersheriff testified, "[i]f these renovations are not approved, these

deteriorating conditions will accelerate; if that occurs the County may once again find itself having to close a portion of inmate housing due to uninhabitable conditions, only this time at [the] Riverhead facility."

167.    In 2006, 2007, 2008, and 2009, the Budget Review Office stated that capital funds needed to be allocated to repair, maintain, and renovate the Riverhead facility:  "The Riverhead Correctional Facility must continue to be maintained and renovated.  A proactive plan of scheduled repairs and preventative maintenance must be formulated and executed to maintain the integrity of this facility. *The building cannot continue to be neglected as it has been in the past*."

168.    For years, men have been transferred daily in and out of the SCCF due to the persistent overcrowding of the facilities.  On May 23, 2007, the then-Deputy Warden Joseph Rubacka testified before the Public Safety Committee of the Suffolk County Legislature about the costs of housing the men "out of county," which could reach up to $240 per day per prisoner. According to Rubacka, the men detained in the SCCF were treated like royalty in other facilities. By contrast, Rubacka stated, at that time, it only cost Suffolk County $5 per day to house a prisoner "because we give him a pair of sneakers and three meals and he's good to go."

169.    In 2008, the SCCJCC published the results of its study of the overcrowding at the SCCF, described above, *see supra* ¶¶ 31, 35, concluding that the facilities were dangerously overcrowded.

170.    By 2011, the conditions at the facilities continued to deteriorate and the need for repairs and renovation remained "desperate," according to the Budget Review Office.

171.    Year after year, Suffolk County officials learned about the deteriorating and uninhabitable conditions at the SCCF.  Yet, little was done except to add an ever-increasing

number of men to the populations residing in the unsanitary and dangerous conditions at the SCCF.

172.    The foregoing policies, acts, inaction, omissions, and systematic failures are the official policies, practices, and customs of Defendant Suffolk County.  The foreseeable result of these policies, practices, and customs was the further deterioration of the already inhumane conditions at the SCCF.

173.    Defendant Suffolk County was deliberately indifferent to the unconstitutional conditions at the SCCF and established a policy, practice, and/or custom of approving and tolerating the unconstitutional conditions by refusing to remediate them.

174.    Despite knowledge of such unlawful policies, practices, and/or customs, Defendant Suffolk  County's policy-making officials and officials with oversight responsibilities over the SCCF have not taken steps to terminate these policies, practices, and/or customs, and instead have supported, ratified, or implemented these policies, practices, and/or customs through their active encouragement or deliberate indifference to the effect of such policies, practices, and/or customs upon the constitutional rights of persons in their care or custody.

175.    As a direct and proximate result of Suffolk County's persistent and widespread practice and official policy of failing to provide for even the most necessary and urgent repairs of the facilities, or to even minimally address decades of overcrowding, the men detained in the SCCF have been forced to live in inhumane conditions that deprive them of their constitutional rights.

**B.    Defendants DeMarco, Caracappa, and Meyerricks**

176.    Defendant DeMarco, as the Sheriff of Suffolk County, is responsible for the care of persons detained in the SCCF.  To fulfill this duty, the Sheriff's Office is empowered to request County funds from the Suffolk County Legislature and to report to the Public Safety

33

Committee of the Suffolk County Legislature about the need for capital funding to repair, maintain, and renovate the Yaphank and Riverhead facilities.

177.    Defendants Caracappa and Meyerricks, as Undersheriffs of Suffolk County, are charged with oversight of corrections for the Suffolk County Sheriff's Office and are responsible for protecting and preserving the health and welfare of persons detained in the SCCF and designing and implementing policies, procedures, and practices to ensure that the facilities are maintained in a sanitary condition.

178.    Defendants DeMarco, Caracappa, and Meyerricks are charged with enforcement of all New York State and Suffolk County laws and regulations designed to preserve the health and welfare of persons detained in the SCCF.

179.    Defendants DeMarco, Caracappa, and Meyerricks knew or should have known of the visibly deplorable and unconstitutional conditions at the SCCF.

180.    Defendants DeMarco, Caracappa, and Meyerricks knew or should have known of the complaints raised by the men detained in the SCCF about those conditions and their injuries arising from those conditions.

181.    Finally, Defendants DeMarco, Caracappa, and Meyerricks knew or should have known of the fact that the conditions of the SCCF had been deteriorating over the better part of the last decade and would only become worse without appropriate remedial efforts.  Seven years ago, an official from the Sheriff's office testified before the Suffolk County Legislature about the "deterioration" of the facilities, and how, if that deterioration was not addressed, the facilities would only become "worse as time goes by" and become "uninhabitable."  *See supra* ¶ 166. Furthermore, the Suffolk County Budget Review Office submitted multiple public reports to the County Legislature describing the continuously deteriorating conditions at the SCCF, the

NYSCOC rescinded its variances to the SCCF because the conditions at the SCCF had not been remediated, and the SCCJCC publicly reported in 2008 that the facilities were dangerously overcrowded.  *See supra* ¶¶ 156-170.  This was all within, or should have been within, Defendants DeMarco, Caracappa, and Meyerricks's respective knowledge.

182.    Defendant Caracappa also knew or should have known of the conditions at the SCCF as a former Suffolk County Legislator and former member of the Public Safety Committee of the Suffolk County Legislature.  The Public Safety Committee reviews capital budget reports in detail before those reports and capital requests go to the full legislature.

183.    Despite their knowledge of the unconstitutional conditions at the SCCF, Defendants DeMarco, Caracappa, and Meyerricks have engaged in a pattern and practice of deliberate indifference to those conditions and the harms the men have suffered as a result of those conditions.

184.    Defendants DeMarco, Caracappa, and Meyerricks breached their duty of care owed to persons detained in the SCCF by permitting the deplorable conditions at the SCCF to persist.  This breach was the direct and proximate cause of the harms suffered by the men detained in the SCCF.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**(Deliberate indifference to past, current, and ongoing unconstitutional conditions at the Suffolk County Correctional Facilities)**
**(Fourteenth Amendment to the United States Constitution)**

185.    Plaintiffs restate and reallege Paragraphs 1 through 184 as though fully set forth herein.

186.    Defendants have subjected and continue to subject the named Plaintiffs and all class members who were detained in the SCCF as pretrial detainees to cruel and inhumane prison conditions that damaged them and which pose an unreasonable and unjustifiable risk of harm to their health, and have manifested and continue to manifest a pattern of deliberate indifference to this damage and risk of harm.  The challenged conditions violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

### SECOND CAUSE OF ACTION

**(Deliberate indifference to past, current, and ongoing unconstitutional conditions at the Suffolk County Correctional Facilities)**
**(Eighth Amendment to the United States Constitution)**

187.    Plaintiffs restate and reallege Paragraphs 1 through 184 as though fully set forth herein.

188.    Defendants have subjected and continue to subject the named Plaintiffs and all class members who were detained in the SCCF as sentenced prisoners to cruel and inhumane prison conditions that damaged them and which pose an unreasonable and unjustifiable risk of harm to their health, and have manifested and continue to manifest a pattern of deliberate

indifference to this damage and risk of harm.  The challenged conditions violate the Eighth

Amendment to the United States Constitution.

## THIRD CAUSE OF ACTION

**(Deliberate indifference to past, current, and ongoing unconstitutional conditions at the Suffolk County Correctional Facilities)**
**(Due Process Clause of the New York State Constitution)**

189.    Plaintiffs restate and reallege Paragraphs 1 through 184 as though fully set forth

herein.

190.    Defendants have subjected and continue to subject the named Plaintiffs and all

class members who were detained in the SCCF as pretrial detainees to cruel and inhumane prison

conditions that damaged them and which pose an unreasonable and unjustifiable risk of harm to

their health, and have manifested and continue to manifest a pattern of deliberate indifference to

this damage and risk of harm.  The challenged conditions violate the Due Process Clause of the

New York State Constitution.

## FOURTH CAUSE OF ACTION

**(Negligence and Ministerial Negligence)**

191.    Plaintiffs restate and reallege Paragraphs 1 through 184 as though fully set forth

herein.

192.    Defendants DeMarco, Caracappa, and Meyerricks, at all relevant times, oversaw

the enforcement of the laws and regulations of New York State and Suffolk County to protect the

health, welfare, and safety of persons detained in the SCCF on a daily basis.  The individual

Defendants failed to intervene to ensure properly functioning correctional facilities or to ensure

37

that the facilities met the most minimal of standards for humane conditions as required by the laws and regulations of New York State and Suffolk County.

193.    The aforementioned acts and omissions of Defendants DeMarco, Caracappa, and Meyerricks amounted to negligence and ministerial negligence, which directly and proximately caused the harms suffered by the named Plaintiffs and all class members who were exposed to the conditions described in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request this Court to:

a.    Declare that subjecting the Plaintiffs to the conditions described herein violates the Eighth and Fourteenth Amendments to the United States Constitution and the Due Process Clause of the New York State Constitution and constitutes negligence and ministerial negligence under New York State law;

b.    Enjoin Defendants, and their successors, from subjecting the men in the SCCF to unsanitary, unhealthy, and unsafe conditions, and require that a remedy be formulated, subject to the Court's approval and modification, if necessary, to end the inhumane conditions at the SCCF;

c.    Award Plaintiffs who have been exposed to the conditions described herein at the SCCF reasonable actual and compensatory damages against Defendants, jointly and severally, to compensate Plaintiffs for the deprivation of their constitutional rights and all consequences thereof;

d.    Award Plaintiffs who have been exposed to the conditions at the SCCF described herein reasonable punitive damages against each of the individual Defendants;

e.    Award Plaintiffs who have been exposed to the conditions at the SCCF described herein damages for the denials of their right to be free from cruel and unusual punishment and right to due process;

f.    Retain jurisdiction in this case until the unlawful conditions, practices, policies, acts, and omissions complained of herein no longer exist and this Court is satisfied that they will not recur;

g.    Award Plaintiffs attorneys' fees and costs; and

h.    Grant such other such relief that this Court deems just and proper.


Dated: April 5, 2012
       New York, New York

                                        Respectfully submitted,

                                        SHEARMAN & STERLING LLP

                                        */s/ Daniel H. R. Laguardia*
                                        Daniel H.R. Laguardia
                                        Melissa Godwin
                                        Edward Timlin
                                        Jeena Shah
                                        599 Lexington Avenue
                                        New York, New York 10022
                                        Tel:  212-848-4000
                                        Email: daniel.laguardia@shearman.com

                                        *Counsel for Plaintiffs*


                                        NEW YORK CIVIL LIBERTIES UNION
                                        Corey Stoughton
                                        Taylor Pendergrass
                                        125 Broad Street
                                        New York, New York 10004
                                        Tel:  212-607-3300
                                        Email:  cstoughton@nyclu.org

                                        *Of Counsel*