UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
MACK BUTLER, DESHAUN SIMS, CLYDE LOFTON,
PAUL ALVER, KEVIN KING, and RICKEY LYNCH,
on behalf of themselves and all others
similarly situated,

                    Plaintiffs,          <u>MEMORANDUM & ORDER</u>
                                         11-CV-2602(JS)(ST)

          -against-


SUFFOLK COUNTY,[1]


                    Defendant.
----------------------------------------X
APPEARANCES
For Plaintiffs:     Daniel Hector Rees LaGuardia, Esq.
                    John F. Cove Jr., Esq.
                    Alexis Scott Berkowitz, Esq.
                    Edward Garth Timlin, Esq.
                    Elizabeth Francoise Johnson, Esq.
                    George B. Adams, Esq.
                    Melissa Jane Godwin, Esq.
                    Sheila Jain, Esq.
                    Shearman & Sterling LLP
                    599 Lexington Avenue
                    New York, New York  10022

                    Erin B. Harrist, Esq.
                    New York Civil Liberties Union
                    125 Broad Street, 19th Floor
                    New York, New York  10004

---

[1]  In its March 19, 2013 Memorandum and Order, <u>see</u> 289 F.R.D. 80 (E.D.N.Y. 2013) (docketed herein at ECF No. 375), (hereafter, the "2013 Order"), the Court (1) explained that former-Defendant Vincent F. DeMarco ("DeMarco") was the Sheriff of Suffolk County, and that former-Defendants Joseph T. Caracappa ("Caracappa") and John P. Meyerricks ("Meyerricks") were undersheriffs and DeMarco's deputies, <u>see</u> <u>id.</u> at 89, and (2) dismissed the claims against DeMarco, Caracappa, and Meyerricks, <u>see</u> <u>id.</u> at 103.  Accordingly, because DeMarco, Caracappa, and Meyerricks have been dismissed from this Action, the Clerk of the Court is directed to amend the caption as stated, above.

```
For Plaintiffs
(cont'd):            Anthony J. Licatesi, Esq.
                     Rubin & Licatesi PC
                     591 Stewart Avenue
                     Garden City, New York  11530

For Defendant:       Brian C. Mitchell, Esq.
                     Arlene S. Zwilling, Esq.
                     Suffolk County Attorney's Office
                     H. Lee Dennison Building, Fifth Floor
                     100 Veterans Memorial Highway
                     P.O. Box 6100
                     Hauppauge, New York  11788
```

SEYBERT, District Judge:

This is a prisoners' conditions-of-confinement class action suit (hereafter, the "Action"). The Consolidated Amended Class Action Complaint ("Consolidated Amended Complaint" or "CAC") seeks, <u>inter alia</u>, declaratory relief, injunctive relief, and damages on behalf of post-conviction inmates and pretrial detainees[2] allegedly subjected to inhumane conditions while housed in the Riverhead Correctional Facility (the "Riverhead Facility") and the Yaphank Correctional Facility (the "Yaphank Facility," and together with the Riverhead Facility, the "Suffolk County Correctional Facilities", the "Facilities", or "SCCF"). (<u>See generally</u> CAC, ECF No. 334.) The Plaintiff classes claim that the SCCF were severely overcrowded and that, as a result, inmates were exposed to human feces and sewage, leaks and flooding of dormitory

---

[2] For convenience and unless otherwise noted, herein, the Court will refer to post-conviction inmates and pretrial detainees collectively as "inmates".

and cell floors, poor air quality, extreme temperatures and inadequate heat in living areas, mold, rust, peeling paint, and vermin. (<u>See</u> Pl. 56.1 Stmt., Ex. 1, ECF No. 469-1, ¶¶ 3, 9, 11, <u>attached to</u> County June 7, 2018 Letter, ECF No. 469.)  Before the Court are the parties' cross-motions for summary judgment.  (Pl. Mot., ECF No. 478;[3] County Mot., ECF No. 483.[4])  For the following reasons, Plaintiffs' Summary Judgment Motion and the County's Cross-Motion are both **DENIED**.

[Remainder of page intentionally left blank.]

---

[3]  <u>See also</u> the Plaintiffs' Supporting Memorandum of Law (hereafter, "P-Support Memo") (ECF No. 479), and Reply (hereafter, "P-Reply") (ECF No. 486).  The County's Opposition (hereafter, "C-Opp'n") is incorporated in its Support Memorandum (hereafter, "C-Support Memo") of its Cross-Motion.  (<u>See</u> C-Support Memo, Ex. 29, ECF No. 483-29, <u>attached</u> to County Mot.)

[4]  <u>See also</u> the County's Support Memorandum and Reply (hereafter, "C-Reply") (ECF No. 490-9).  The Plaintiffs filed a separate opposition to the County's Cross-Motion (hereafter, "P-Opp'n") (<u>see</u> ECF No. 488).

FACTUAL BACKGROUND[5]

I.   The County, the Sheriff's Office, the SCCF, and the Named Plaintiffs

Defendant Suffolk County (the "Defendant" or "County"), one of four counties located on Long Island in New York, operates the SCCF through the Suffolk County Sheriff's Office (the "Sheriff's Office").  (Pl. 56.1 Stmt. ¶¶ 15-16.)  The Suffolk County Sheriff--an elected County official--oversees the Sheriff's Office.  (Pl. 56.1 Stmt. ¶ 16.)

---

[5] Unless otherwise stated, the factual background is derived from the parties' Local Civil Rule 56.1 Statements.  (See Pl. 56.1 Stmt., Ex. 1, ECF No. 469-1; County 56.1 Resp., Ex. 2, ECF No. 469-2, both attached to County June 7, 2018 Letter.)  Internal quotation marks and citations from those Statements have been omitted.  A standalone citation to a Rule 56.1 Statement denotes that either the parties or the Court has determined the underlying factual allegation is undisputed.  Further, citation to a party's Rule 56.1 Statement incorporates by reference the party's citation(s), if any.
        Plaintiffs' exhibits are identified by number (see ECF Nos. 480-1 through 480-136) and are attached to the Declaration of Hanchu Chen, Esq., an associate with Shearman & Sterling, LLP, Plaintiff's counsel (see ECF No. 480).
        The County's exhibits are identified by letter (see ECF Nos. 473-2 through 473-19, and ECF Nos. 483-4 through 483-28).  Those exhibits that are associated with ECF No. 473 were submitted in support of the County's letter request to expand the issues to be discussed at a scheduled pre-motion conference, and not as exhibits to a declaration.  (See County's June 25, 2018 Letter (docketed as a Letter Motion to Compel).)  Conversely, those exhibits associated with ECF No. 483 were attached to the Declaration of Arlene S. Zwilling, Esq., the County's counsel (see ECF No. 483-3).
        Hereafter and unless otherwise noted, the Court will reference exhibits by their respective number or letter only.  Relatedly, as to page citation:  Where the notation "ECF p. [x]" is used, the Court cites to the pagination generated by the Electronic Case Filing ("ECF") system; otherwise, page citation is to the internal pagination of the cited document.

The Sheriff's Office is responsible for operating and preparing the budget for the SCCF.  (Pl. 56.1 Stmt. ¶¶ 17-18.) The County allocates funds for the Sheriff's Office and the SCCF through annual operating and capital budgets; the SCCF operating budget funds routine costs, including supplies needed for operating the Facilities.  The SCCF capital budget funds major projects, including renovations and construction.  (Pl. 56.1 Stmt. ¶¶ 19-21.)  The Sheriff's Office prepares the SCCF's operating budget requests, which are submitted for review and approval by the Suffolk County Executive and Suffolk County Legislature.  (Pl. 56.1 Stmt. ¶ 22.)  The Sheriff's Office, with input from the Suffolk County Department of Public Works ("DPW"), prepares capital budget requests for the SCCF, which are also submitted for review and approval by the Suffolk County Executive and Suffolk County Legislature.  (Pl. 56.1 Stmt. ¶ 23; County 56.1 Resp. ¶ 23.)

The Riverhead Facility, located at 100 Center Drive, Riverhead, New York, consists of a maximum-security wing and a medium-security building.  (Pl. 56.1 Stmt. ¶¶ 24-25.)  It is arranged in cell blocks that house inmates in individual cells. (Pl. 56.1 Stmt. ¶ 26.)  The Riverhead Facility was designed to hold a maximum of 769 inmates.  (Pl. 56.1 Stmt. ¶ 27.)

The Yaphank Facility, located at 69 Yaphank Avenue, Yaphank, New York, consists of dormitories (or "dorms") that were originally constructed in 1959, and additional housing units added

in 1982, 1986, 1987, and 2013.  (Pl. 56.1 Stmt. ¶¶ 28-29.)  Inmates are housed in dorms and "pods".   (Pl. 56.1 Stmt. ¶ 30.)   That Facility was designed to hold a maximum of 504 inmates.  (Pl. 56.1 Stmt. ¶ 31.)   At the Yaphank Facility, there is also the DWI Alternative Facility, a double trailer that holds fifty-four inmates.  (Pl. 56.1 Stmt. ¶ 32.)[6]

Plaintiff Mack Butler ("Butler") was detained at the Riverhead Facility for periods between 2011 and 2013, (Pl. 56.1 Stmt. ¶ 9; County 56.1 Resp. ¶ 9); Plaintiff Dashaun Sims ("Sims") was detained in the Riverhead Facility for periods between 2010 and 2012, (Pl. 56.1 Stmt. ¶ 10; County 56.1 Resp. ¶ 10); Plaintiff Clyde Lofton ("Lofton") was detained in the Yaphank Facility for periods between 2009 and 2013, (Pl. 56.1 Stmt. ¶ 11; County 56.1 Resp. ¶ 11); Plaintiff Paul Alver ("Alver") was detained in the Yaphank Facility for periods between 2011 and 2012, (Pl. 56.1 Stmt. ¶ 12; County 56.1 Resp. ¶ 12); Plaintiff Rickey Lynch ("Lynch") was detained in the Yaphank Facility in 2010 and in the Riverhead Facility in 2010 and 2011, (Pl. 56.1 Stmt. ¶ 13; County 56.1 Resp.

---

[6] Without any citation supporting its position, the County objects to Plaintiffs' discussion of this facility asserting that "the DWI Alternative Facility in Yaphank is not a subject of this case." (County 56.1 Resp. ¶ 32.)  At this juncture, that contention is disputed.  The parties are referred to Part IV of the DISCUSSION section of this Memorandum & Order, entitled "The County's Claim of Excluded Facilities" (see infra at 128-30), for further discussion and instruction regarding this issue.

¶ 13); plaintiff Kevin King ("King," and collectively with Butler, Sims, Lofton, Alver, and Lynch, the "Named Plaintiffs") was detained in the Riverhead Facility for periods between 2010 and 2012, (Pl. 56.1 Stmt. ¶ 14; County 56.1 Resp. ¶ 14.)

II.   Procedural History Through Certification of Class Action[7]

On May 27, 2011, Lynch and nineteen other inmates detained at SCCF, commenced this Action, pro se, on behalf of themselves and all others similarly situated against Suffolk County, Vincent DeMarco as Sheriff of Suffolk County, and various John Doe Defendants, seeking damages arising out of the allegedly unconstitutional conditions in the jail.   (See generally Compl., ECF No. 1.)  The Plaintiffs filed an Amended Complaint on June 17, 2011, adding an additional eight plaintiffs who were detained at the SCCF.  (See generally Am. Compl., ECF No. 49.)  On June 23, 2011, the Court granted Plaintiffs' applications to proceed in forma pauperis but denied the request to proceed as a class action given that class representatives were proceeding pro se.  (See June 2011 Order, ECF No. 62.)

On October 7, 2011, the Court granted the then-Plaintiffs'[8] motion to join an additional four plaintiffs for a

---

[7]  Much of this procedural history, familiarity with which the Court assumes, appears in the Court's 2013 Order.  See 289 F.R.D. at 86-87.

[8]  The initial Complaint was filed by Rickey Lynch on behalf of himself and purportedly as class representative of other inmates

total of thirty-one plaintiffs asserting claims for damages arising out of the conditions at the SCCF. (Oct. 7, 2011 Mem. & Order, ECF No. 244 (granting Joinder Mot., ECF No. 67).) On November 22, 2011, based upon its review of the original Complaint and the Amended Complaint, the Court granted Plaintiffs pro bono counsel (Nov. 22, 2011 Mem. & Order, ECF No. 286 (directing "the Court's pro se office . . . to seek the appointment of pro bono counsel for Plaintiffs forthwith").) Thereafter, Shearman & Sterling LLP was appointed pro bono counsel; its attorneys began filing Notices of Appearance in December 2011. (See, e.g., ECF Nos. 310, 311, 312; see also ECF No. 323 (letter from Shearman & Sterling on behalf of all plaintiffs to the Court); Jan. 23, 2012 Consolidation Order (the "2012 Consolidation Order"), ECF No. 327 (addressing Shearman & Sterling's appointment as pro bono counsel in granting consolidation motions); ECF No. 328 (cover letter from the Court to Rickey Lynch, denying Lynch's request for copy of docket because counsel has been appointed to all plaintiffs).)

In the interim, the Court started to receive an influx of substantially similar complaints from individuals incarcerated at the SCCF that sought damages arising out of the alleged unsanitary conditions in the facility. Specifically, by

---

of SCCF. (See Compl., ECF No. 1.) Rickey Lynch also filed the Amended Complaint; again, it was on behalf of himself, but also as the purported class representative of additional then-current and former inmates of SCCF. (See ECF No. 67.)

January 23, 2012, the Court received fifty-nine complaints asserting: (1) the existence of unhealthy, unsanitary, and hazardous conditions at the SCCF, including the presence of black mold, fungus, soap scum, and rust in the shower areas of the SCCF, drainage problems causing back-ups of sewage and rusty water, and ventilation problems; (2) injuries resulting from these conditions including headaches, breathing problems, skin rashes, itching, swelling, and infections; and (3) that their grievances and/or complaints about these conditions were ignored. (See 2012 Consolidation Order.) Given the similarities of the allegations, the Court consolidated all fifty-nine actions into this Action.[9]

On April 5, 2012, the Named Plaintiffs, through counsel, filed the Consolidated Amended Complaint seeking to proceed as a class action on behalf of all similarly situated plaintiffs. (See generally CAC.) The Consolidated Amended Complaint asserts four claims: (1) on behalf of the pretrial detainees at the SCCF for a violation of the Fourteenth Amendment's prohibition against cruel and inhuman treatment; (2) on behalf of all sentenced prisoners at

---

[9] Shearman & Sterling's appointment was extended to all plaintiffs in this consolidated Action. (See 2012 Consolidation Order.) Moreover, the Court directed the Clerk of the Court to consolidate any future complaints alleging unsanitary conditions at the SCCF into the present Action. Any plaintiff that did not wish to proceed as part of this consolidated Action was directed to inform the Court in writing within thirty days of receiving a copy of the 2012 Consolidation Order. (See id. 17-18.)

the SCCF for violation of the Eighth Amendment's prohibition against cruel and inhumane treatment; (3) on behalf of the pretrial detainees in the SCCF for violation of the New York Constitution's due process clause; and (4) on behalf of all plaintiffs for negligence and ministerial negligence arising under New York common law.  (See id. at 36-38.)

Thereafter, the County and others moved to dismiss the Consolidated Amended Complaint; the Named Plaintiffs moved for class certification.  (See Mot. to Dismiss, ECF No. 344; Mot. to Certify, ECF No. 347.)  On March 19, 2013, the Court granted in part and denied in part Defendants' dismissal motion and granted the Named Plaintiffs' class certification motion.  See generally 2013 Order, 289 F.R.D. at 103.  As relevant here, the Court denied as premature Defendants' argument that the Named Plaintiffs failed to exhaust their administrative remedies prior to filing suit regarding the conditions they complained of at SCCF.  See id. at 92-93.  The Court further found the Named Plaintiffs adequately pled that they personally suffered physical injury, id. at 93-94, and also declined to dismiss the state law claims, id. at 95-96.  However, the Court dismissed without prejudice claims against the individual defendants, i.e., DeMarco, Caracappa, and Meyerricks, for failure to plead supervisory liability.  Id. at 94-95.  Although the Court granted the Named Plaintiffs leave to file a Second Consolidated Class Action Complaint, id. at 103, they have

10

not done so.  (See Case Docket, in toto.)  On July 1, 2013, the
County answered the Consolidated Amended Complaint.  (Ans., ECF
No. 377.)

In the 2013 Order, the Court certified the following
classes and subclasses:

> (1) an Injunctive Class comprised of all
> persons who, now or at any time in the
> future, are or will be detainees or
> prisoners in the custody of the Suffolk
> County Sheriff's Department and housed in
> the SCCF, with separate subclasses for
> those persons detained in Riverhead and
> Yaphank; and

> (2) a Damages Class comprised of all persons
> who are or were detainees or prisoners in
> the custody of the Suffolk County
> Sheriff's Department and housed in the
> SCCF and who were or will be released
> from the SCCF on or after April 5, 2009,
> with separate subclasses for those
> persons detained in Riverhead and
> Yaphank.

Id. at 103.  The Injunctive Class and its subclasses were
"certified to seek declaratory and injunctive relief only; whereas
the Damages Class and [its] subclasses [were] certified to seek
any and all monetary relief available to the class." Id.[10]  The
Court appointed: (1) Butler and Sims to serve as class
representatives for the Riverhead Injunctive Subclass; (2) Lofton
and Alver to serve as class representatives for the Yaphank

---

[10]  Hereafter, when referred to collectively, the Injunctive Class
and the Damages Class will be known as the "Classes".

Injunctive Subclass; (3) King to serve as class representative for the Riverhead Damages Subclass; and (4) Lynch to serve as class representative for the Yaphank Damages Subclass.  <u>See</u>  <u>id.</u> Hereafter, the Court refers to the Named Plaintiffs, together with members of the certified classes and subclasses, as "Plaintiffs."

Following the <u>2013 Order</u>, discovery proceeded, and on February 10, 2016, Plaintiffs filed a motion to approve class notice and plan of notice. (Class Notice Mot., ECF No. 422.)  On February 22, 2016, the County moved to amend the class definitions set forth in the <u>2013 Order</u>. (Class Am. Mot., ECF No. 424.)  Based upon then-Magistrate Judge Gary R. Brown's June 15, 2016 report and recommendation (hereafter, the "R&R") (<u>see</u> ECF No. 426), on August 29, 2016, this Court granted both motions. (<u>See</u> Adoption Order, ECF No. 428.)  However, and as relevant here, in adopting the R&R, this Court amended the class definitions to exclude all SCCF inmates "who were or have been housed exclusively at the new jail facility in Yaphank, New York" (the "New Yaphank Facility"). (<u>Id.</u> at 3-5.)  Accordingly, **the New Yaphank Facility**, which opened in 2013 (<u>see</u> R&R at 11), **is not subject to this Action**, and <u>those</u> <u>individuals who were or have been housed exclusively at the New</u> <u>Yaphank Facility are not included in the Classes in this Action</u>.

The Classes encompass more than 30,000 individual class members who are or were incarcerated at the SCCF. (Pl. 56.1 Stmt. ¶ 48.)  Since their appointment, Plaintiffs' counsel reports that

in December 2011, it received more than 590 letters from class members inquiring about, and expressing support for, this case. (Pl. 56.1 Stmt. ¶ 49.)

### III. State Standards for New York Jails

Before addressing evidence of the conditions at SCCF, the Court briefly discusses relevant state standards for New York jails.

Title 9 of the New York Codes, Rules and Regulations ("NYCRR") sets forth the minimum standards for jail facilities. (Pl. 56.1 Stmt. ¶ 33.)  Current regulations require that an individual-occupancy housing unit contain a minimum of 60 square feet of floorspace and that a multiple-occupancy housing unit contain a minimum of 50 square feet of floorspace per inmate in the sleeping area.   (Pl. 56.1 Stmt. ¶¶ 34-35); 9 NYCRR §§ 7040.4(a), 7040.5(a).  Current regulations also require each single-occupancy housing unit to contain one bed and mattress, one functioning toilet, and one sink.  (Pl. 56.1 Stmt. ¶ 36(a)); 9 NYCRR § 7040.4(b).  Each multiple-occupancy housing unit shall contain a bed and mattress for each inmate and have at least one functioning toilet and sink for every twelve inmates and at least one functioning shower for every fifteen inmates.  (Pl. 56.1 Stmt. ¶ 36(b)); 9 NYCRR § 7040.5(c).  The New York State Commission of Corrections ("SCOC") is the state regulatory agency charged with

evaluating local and state correctional facilities, including the SCCF.  (Pl. 56.1 Stmt. ¶ 37.)

The maximum design capacity of a jail facility in New York is calculated based upon the state's minimum standards for jail facilities.  When the population of the facility exceeds its approved maximum capacity, the local entity that administers the facility must request a variance from the SCOC to house each additional inmate.  (Pl. 56.1 Stmt. ¶ 38.)  In 2013, the County calculated that, without a variance, it would cost the County approximately $125 per inmate per day to house an inmate at a non-County jail facility.  (Pl. 56.1 Stmt. ¶ 39.)

IV.  <u>Conditions at the SCCF</u>

A.  <u>Historical Overcrowding</u>

Plaintiffs point to newspaper articles dating back to 1982, as well as the County's settlement of a class action in 1987, to highlight the existence -- and the County's awareness -- of historical "overcrowding and neglect" at the SCCF.  (Pl. 56.1 Stmt. ¶¶ 40, 42-43.)  For example, according to reporting in 1982, County officials in the Sheriff's Office, including the then-Sheriff, publicly warned of the effects of overcrowding on the County's prison system, including "delays in health care and feeding."  (<u>Id.</u> ¶ 41.)  In another 1982 article, then-County Executive Peter F. Cohalan reportedly described jail overcrowding as "foremost among the problems facing" the County.  (<u>Id.</u> ¶ 42.)  In 1987, after five

14

years of litigation, the County reportedly agreed to settle a class action brought by former inmates of the SCCF relating to overcrowded conditions at the Riverhead and Yaphank Facilities. (Id. ¶ 43.)  According to an article from 1989, after executing the settlement, a Suffolk County Court Judge confirmed reports of "appalling overcrowded conditions" at the SCCF.  (Id. ¶ 44.)

B.  Plaintiffs' Evidence as to the County's Acknowledgement of Conditions at the SCCF Before and During the Class Period

To show the County's awareness of problems with the SCCF, Plaintiffs point to SCOC mandates, reports of the Suffolk County Legislature's Budget Review Office, a County-commissioned analysis of the SCCF, reports of housing officers in the SCCF, and Plaintiffs' expert report.[11]  Plaintiffs highlight the Suffolk County Legislature's Budget Review Office's yearly Reports, which

---

[11]  To establish the County's long-standing knowledge of the complained-of conditions-of-confinement, in their Rule 56.1 Statement, Plaintiffs included that:  as to SCOC directives, in 1998, the New York Times reported that the SCOC considered the SCCF to be "the most seriously and profoundly overcrowded facility in the state" (Pl. 56.1 Stmt. ¶ 54.a); in December 2002, the New York Times reported that SCOC staff had demanded that the County "literally address the problem," rather than making "a gesture" at reducing overcrowding at the SCCF (id. ¶ 54.b); in 2004, the SCOC ordered two Yaphank Facility dorms closed because of their deterioration (id. ¶ 54.c); and, in a March 2004 letter to the County Sheriff, the SCOC noted the Yaphank Facility's "decrepit physical plant conditions which are presently deteriorating as witnessed by [SCOC] staff on March 11[, 2004], and which constitute unacceptable conditions of confinement and employment in violation of New York State Correction Law and state regulations" (Mar. 2004 Letter, Ex. 33 at 1).

contain the Office's recommendations to the Legislature. (See Caracappa Dep., Ex. 30 186:11-18.) In a May 2004 Report, entitled Review of the 2005-2007 Proposed Capital Program and 2005 Capital Budget, the Budget Review Office noted the "urgent issue[] of inmate overcrowding" in the SCCF. (May 2004 Report, Ex. 34 at 205.) The May 2005 iteration of the Report provides that the Riverhead Facility was "in desperate need of significant maintenance, repair, and upgrading due to both its age and the fact that the facility has experienced significant overcrowding since the 1980's." (May 2005 Report, Ex. 35, at ECF p.7.) It continues that "[t]he heavy wear and tear as a result of this continued overcrowding have greatly taxed the systems' infrastructure," causing "plumbing, heating/cooling, electrical, security and other mechanical system [to be] overloaded and [to] continue to break down." (Id.) According to the May 2006 Report, the Riverhead Facility remained in "desperate need of significant maintenance, repair, and upgrading." (May 2006 Report, Ex. 36 at 216.) The same statement appeared in the 11 subsequent yearly Reports, to wit, the May 2007, May 2008, May 2009, May 2010, May 2011, May 2012, May 2013, May 2014, May 2015, May 2016, and May 2017 Reports. (Pl. 56.1 Stmt. ¶¶ 54.i, j, l, m, o, r, u, w, aa, dd, ff.)

Further, Michael Sharkey ("Sharkey"), who became Chief of Staff to the County Sheriff in 2008 and Chief Deputy Sheriff in

16

2014, testified that in 2009, it was true that "[p]lumbing, heating, electrical, and other mechanical systems ha[d] been overloaded and [were] breaking down" at the SCCF. (Sharkey Dep., Ex. 16 23:19-21, 24:17-19, 77:5-16, 79:18-24.)

The May 2010 Report states that "[o]vercrowding and the deterioration of the [Yaphank Facility] dorms have rendered the facility obsolete." (May 2010 Report, Ex. 40 at 161; Pl. 56.1 Stmt. ¶ 54.n; see also Pl. 56.1 Stmt. ¶ 54.p (same for the May 2011 Report).) In the May 2012 Report, the Budget Review Office noted that the SCOC mandated the construction of a new jail facility to address "chronic overcrowding" at the SCCF and warned that SCCF dorms in the Yaphank Facility would have to be closed or demolished if they were not renovated. (Pl. 56.1 Stmt. ¶ 54.q; County 56.1 Resp. ¶ 54.q.) The May 2012 Report also details that the Yaphank Facility was in "need of major renovations" due to "[o]vercrowding and the deterioration of the dorms." (Pl. 56.1 Stmt. ¶ 54.s; see also id. ¶¶ 54.v, 54.x, 54.bb (same for the May 2013, May 2014, and May 2015 Reports).) According to the May 2016 and May 2017 Reports, the Yaphank Facility remained in "need of continuous infrastructure repairs." (Id. ¶¶ 54.ee, 54.gg.)

On November 9, 2012, Ehasz Giacalone Architects completed a comprehensive analysis of the SCCF at the direction of the Sheriff's Office and the DPW (the "Analysis"). (Pl. 56.1 Stmt. ¶ 54.t; SCCF Comp. Analysis, Ex. 29 at ECF p. 5.) Among other

issues, the Analysis found that the fittings used to connect toilet drain pipe lines in the Riverhead Facility's cellblocks "present[ed] the possibility of backing one toilet up into the other" and that shower components in the Riverhead Facility's cellblocks were "in poor condition, leaking, rusting and inadequate." (Pl. 56.1 Stmt. ¶ 54.t.)

Further, housing officers' reports note issues with the Yaphank Facility. (Pl. 56.1 Stmt. ¶¶ 54.y, 54.z.) In a form dated October 14, 2014, under a section calling for a "list [of] all violations and deficiencies," a Housing Officer for the Yaphank Facility's South 3 Dorm listed "[t]he whole [d]orm." (Oct. 2014 S-3 Dorm Report, Ex. 44 at ECF p. 82 (capitalized in original); see Pl. 56.1 Stmt. ¶ 54.y; County 56.1 Resp. ¶ 54.y.) Under the same section in a form dated October 20, 2014, a Housing Officer for the Yaphank Facility's North 3 Dorm listed "the whole dorm[,] no action can be taken[.] 1 shower[,] 1 sink." (Oct. 2014 N-3 Dorm Report, Ex. 44 at ECF p. 84 (capitalized in original); see Pl. 56.1 Stmt. ¶ 54.z; County 56.1 Resp. ¶ 54.z.)

Finally, Eugene B. Pepper, Plaintiffs' expert, conducted two onsite inspections of the Riverhead and Yaphank Facilities and issued a report (the "Pepper Report"). (Pl. 56.1 Stmt. ¶¶ 54.cc; Pepper Report, Ex. 17.) He concluded that conditions at the SCCF were unsanitary and human habitation at the SCCF placed occupants' health at risk. (See generally Pepper Report.) The County

disputes the veracity of the Pepper Report by citing, in a blanket manner, to the report of its expert, James Balsamo, M.S., M.P.H., M.H.A., R.S. (the "Balsamo Report"). (County 56.1 Resp. ¶ 54.cc; Balsamo Report, Ex. A, ECF No. 473-2, <u>attached to</u> County 56.1 Resp.)

      C.   <u>Conditions at the SCCF During the Class Period</u>

      Plaintiffs allege six conditions at the SCCF that violated their constitutional rights during the class period: (1) persistent and severe overcrowding; (2) exposure to human waste and "ping-pong" toilets in which waste from one toilet backs up into the toilet of an adjoining cell; (3) persistent flooding of dorms and cells and the denial of habitable shelter; (4) denial of adequate ventilation; (5) denial of adequate heat and exposure to extreme temperatures; and (6) denial of basic sanitation. (Pl. 56.1 Stmt. ¶¶ 55, 61.)

      1.   <u>Overcrowding</u>

      As noted in the Sheriff's Office's 2010 Capital Budget Request Form, "[m]assive overcrowding" is "the hallmark of [the County's] correctional facilities."[12] (2010 Capital Budget Req.,

---

[12] As early as 1995, the County requested variances from SCOC to house more inmates in the SCCF than the facilities were designed to accommodate. (Pl. 56.1 Stmt. ¶ 57.b; Cuttita Dep., Ex. 19 102:7-9, 106:21-107:18.) In February 2003, the SCOC granted 107 variances for the Riverhead Facility and capped the daily inmate capacity for the Riverhead Facility at 1,013 inmates and for the Yaphank Facility at 647 inmates, for a combined maximum capacity, with variances, of 1,660. (Pl. 56.1 Stmt. ¶¶ 57.c, 57.d.) These

Ex. 28 at ECF p. 3.)   According to a 2008 Suffolk County jail population study, the Riverhead Facility, the Yaphank Facility, and the DWI Alternative Facility together were designed to hold a maximum population of 1,327 inmates.[13]   (2008 Jail Population Study, Ex. 18 at 5.)

---

variances were contingent on the County's adding more permanent jail space within a short timeframe.  (Id. ¶ 57.e.)

A January 18, 2005 letter indicates that the County regularly used variances to house detainees in the Yaphank Facility's gym to accommodate the excess inmate population at the Yaphank Facility. (Pl. 56.1 Stmt. ¶ 57.jj.)   The County counters that the letter does not pertain to any time after February 1, 2006.  (County 56.1 Resp. ¶ 57.jj.)   Inmates at the SCCF were regularly housed in "a sprung unit" -- known as the "Sprung" -- that is "like a fortified tent" and is located on the grounds at the Yaphank Facility.  (Pl. 56.1 Stmt. ¶ 57.ll; Caracappa Dep. 110:10-111:19; see County 56.1 Resp. ¶ 57.ll, n.7.)   The County objects to this statement, claiming the Sprung is not part of this case.  (County 56.1 Resp. ¶ 57.ll.)   (This objection is discussed in Part IV of the DISCUSSION section of this Memorandum & Order, entitled "The County's Claim of Excluded Facilities" (see infra at 128-30).) Additionally, the County used substitute jail orders to house-out inmates in other counties.  (Pl. 56.1 Stmt. ¶ 57.mm; Sharkey Dep. 58:22-61:5.)   In 2007, the cost to the County for housing-out inmates was $6,252,995.  (Pl. 56.1 Stmt. ¶ 57.nn.)

[13]   The Riverhead Facility was intended to hold 769 inmates, the Yaphank Facility had cell space for 504 inmates, and the DWI Alternative Facility on the Yaphank Facility's grounds was intended to hold 54 inmates.  (Pl. 56.1 Stmt., ¶¶ 27, 31, 32.) The County does not dispute Plaintiffs' 769-count or 504-count. (County 56.1 Resp. ¶¶ 27, 31.)   However, it "objects" to the 54-count on the basis that "the DWI Alternative Facility in Yaphank is not a subject to this case."  (Id. at ¶ 32.)   This objection is addressed in Part IV of the DISCUSSION section of this Memorandum & Order, entitled "The County's Claim of Excluded Facilities" (see infra at 128-30).

Between 2004 and 2007, the inmate population at the SCCF "significant[ly] increase[d]" and by 2007, 2008, and 2009 averaged 1,752, 1,696, and 1,663 on a daily basis, respectively. (Pl. 56.1 Stmt. ¶¶ 57.g, 57.i, 57.k; id. ¶ 57.h (noting 1,884 individuals held at the SCCF on October 25, 2007).) In September 2008, sixty inmates at the Riverhead Facility were housed in "pod" units designed to hold thirty detainees. (Id. ¶ 57.j.) Without citation, the County objects to this statement alleging that "Riverhead pods are not a subject of this case."[14] (County 56.1 Resp. ¶ 57.j.)

The Sheriff's Office's 2010 Capital Budget Request Form further states that, as of August 2009, the County's "Correctional System [was] barely functioning" because of persistent overcrowding. (See 2010 Capital Budget Req., Ex. 28, at ECF p. 3.) The same form provides that as of August 2009, "[o]vercrowding[ ] and the advanced state of deterioration of two dormitories[ ] has rendered [the SCCF] sufficiently unfit and unsafe [so] as to qualify it for substitute jail orders" (id.), which govern the custody transfer of inmates from one county jail to another (known as "housing-out") and require prior approval of the SCOC. (Pl. 56.1 Stmt. ¶ 57.n; County 56.1 Resp. ¶ 57.1; 9

_____

[14] This objection is discussed in Part IV of the DISCUSSION section of this Memorandum & Order, entitled "The County's Claim of Excluded Facilities" (see infra at 128-30).

NYCRR § 7210.5(a).)  Chief Deputy Sheriff Sharkey testified that this language appeared in a budget request to secure funding, and that the budget request was phrased "in a manner that you'll . . . most likely get your funding."  (County 56.1 Resp. ¶¶ 57.l, 57.m; Sharkey Dep. 57:21-52:20, 137:2-138:16.)

In 2010, the average daily inmate population at the SCCF was 1,731.  (Pl. 56.1 Stmt. ¶ 57.o.)  According to the May 2010 Suffolk County Legislature Budget Review Office Report, the estimated annual cost to transport and house-out inmates was approximately $24 million.  (Id. ¶ 57.p.)

In 2011, the average daily inmate population at the SCCF was 1,767.  (Id. ¶ 57.q.)  That year, the SCOC granted 511 inmate housing variances for the SCCF, which as of October 26, 2011, accounted for more than half of the 1,049 variances granted to all New York county jails.  (Id. ¶¶ 57.r, 57.s; County 56.1 Resp. ¶ 57.s.)  In its May 2011 Report, the Suffolk County Legislature's Budget Review Office estimated that without the variances, it would have cost the County $24 million in annual operating expenses to transport and house-out inmates.  (Pl. 56.1 Stmt. ¶ 57.t.)

In 2012, 2013, and 2014 the average daily inmate population at the SCCF was 1,688, 1,558, and 1,442, respectively. (Id. ¶¶ 57.u, 57.y, 57.bb.)  In 2012, the SCCF again received 511 inmate housing variances, including variances to house up to thirty-eight inmates on one side of the Riverhead Facility's gym.

22

(Id. ¶¶ 57.v, 57.w.)  In 2013 and 2014, the SCOC granted the SCCF 373 and 379 inmate housing variances, respectively.  (Id. ¶¶ 57.z, 57.cc.)  In the May 2012, May 2013, and the May 2014 Reports, the Budget Review Office estimated that without the variances, it would have cost the County $24 million annually to transport and house-out inmates.  (Id. ¶¶ 57.x, 57.y, 57.z, 57.aa, 57.dd.)  In 2015, the SCOC granted the SCCF 152 inmate housing variances for the Riverhead Facility.  (Id. ¶ 57.ee.)  In its May 2015 Report, the Budget Review Office estimated that without these variances, it would have cost the County approximately $5 million annually for substitute jail housing.  (Id. ¶ 57.ff.)

According to Variance Application Forms, to accommodate the excess inmate population at the Riverhead Facility, the County "double-celled" inmates in cells designed for individual occupancy.  (Variance App. Forms, Ex. 48, at ECF pp. 8, 10.) Further, when the Riverhead Facility's cells were full, inmates were housed in the day area.  (Pl. 56.1 Stmt. ¶ 57.ii; County 56.1 Resp. ¶ 57.ii.)  Similarly, letters from the SCOC to the Sheriff's Office indicate that SCCF detainees in the Riverhead Facility were housed in the gym.  (Apr. 2012 Letter, Ex. 54; Aug. 2013 Letter, Ex. 55 ("The above noted Variance [authorizing the County to house inmates in the Riverhead Facility's gym] was not intended to be permanent housing space.  However, failure to complete housing

renovations in a timely manner has effectively converted this variance space to permanent space.").)

Denying Plaintiffs' assertions that Plaintiffs endured persistent and severe overcrowding, the County states "that the SCCF has never housed more inmates than permitted by the SCOC." (County 56.1 Resp. ¶¶ 56-60.)  It further avers that "at present, the SCCF houses fewer inmates than permitted by the SCOC [in] 2012."  (Id.)[15]

### 2.   Exposure to "Ping-Pong" Toilets and Human Waste

According to Plaintiffs, SCCF construction issues have created a sanitary system prone to persistent back-flushing of human waste, "including from 'ping-pong' toilets in which waste from one toilet backs-up into the toilet of an adjoining cell." (Pl. 56.1 Stmt. ¶ 61.)  In that regard, Named Plaintiff King testified that he "used to have to put a plastic bag around my toilet so when I woke up in the morning, the feces wouldn't be directly in my face."  (King Dep., Ex. 10, at 191:3-6.)  While the County baldly denies this, it admits that inmates "sometimes cover their toilets with plastic bags and other items for various

---

[15]  However, the cited deposition testimony does support that the inmate population at the SCCF has "dropped dramatically," with the decrease beginning in 2012 or 2013 (four or five years before the 2017 deposition).  (County 56.1 Resp. ¶¶ 56-57; DeMarco Dep., Ex. 120, ECF No. 480-120, 42:24-44:8.)  DeMarco estimated that at the time of his 2017 deposition, there were between 500 and 600 inmates housed in the Riverhead Facility.  (DeMarco Dep. 43:5-11.)

reasons." (County 56.1 Resp. ¶ 70 (citing deposition testimony of SCOC Field Officer Cuttita who testified that inmates would also cover toilets in plastic to claim them as their own).)

a.   The Riverhead Facility

In a Sheriff's Office Grievance Processing Unit Decision Form dated August 15, 2011, the Grievance Coordinator acknowledged an inmate's grievance that in the Riverhead Facility "every day my toilet is filled with other inmates['] feces, due to plumbing issues." (Pl. 56.1 Stmt. ¶ 62 (citing Aug. 11, 2011 Maffetone Grievance, Ex. 59).) In another form dated September 2, 2011, the Grievance Coordinator responded to a similar complaint and noted that "[t]he back-flushing problem is an on going [sic] issue. There is a design flaw i[n] the Facility septic system. . . . [O]ccasionally there is a commingling of waste from the adjoining cell. This causes waste to intrude into the next cell's toilet." (Id. (citing Sept. 2011 Zeigler Grievance, Ex. 60).)

According to the 2012 Analysis by Ehasz Giacalone Architects, "[t]oilet drains in [the Riverhead Facility's] cell areas for adjacent cells combine (in pairs) and connect to vertical waste risers," and "[f]ittings used to connect lines present the possibility of backing one toilet up into the other." (Pl. 56.1 Stmt. ¶ 63 (citing SCCF Comp. Analysis at ECF p.34).) Thus, the ping-pong-toilet effect is the result of the design of the Riverhead Facility's plumbing system. (Id.) Caracappa testified

that the SCCF's plumbing system, some of which was built in the 1950s, cannot handle significant clogs or "massive flushing." (Id. ¶¶ 64-65; Caracappa Dep. at 106:24-107:8.)  He also testified that the plumbing system "can handle just [ ] regular functioning [ ] as long as it's not abused or sabotaged," for example, by inmates clogging their toilets with bedding or by all inmates simultaneously flushing their toilets.  (County 56.1 Resp. ¶ 65; Caracappa Dep. at 105:2-21, 107:16-22.)  Further, the Pepper Report provides that as of December 16, 2015, the plumbing system in the Riverhead Facility presented a "strong possibility of wastewater overflow or backflow from toilets in inmate cells."  (Pl. 56.1 Stmt. ¶ 66.)  According to Pepper, as of the same date, mold and algae growth were found in "clean" Riverhead Facility toilets, which would occur only with a higher-than-trace level of organic matter -- such as fecal matter -- in the water.  (Id. ¶ 69.)  This presented a "strong indication" of ping-pong toilets, which are a public health hazard.  (Pl. 56.1 Stmt. ¶¶ 69, 71.)

There are multiple reported instances between 2009 and 2014 where toilets in the Riverhead Facility overflowed, flooded, clogged, were broken, "backed up," or "backflushed" waste from one inmate's toilet to another's.  (Pl. 56.1 Stmt. ¶¶ 72.a-72.pp.) Several notable reports that Plaintiffs highlight include the following examples.  On June 6, 2011, Named Plaintiff Lynch filed a grievance complaining that his toilet "keep[s] backflushing

26

feces and urine from another cell['s] toilet." (June 2011 Lynch Grievance, Ex. 64.) In a grievance form dated August 30, 2011, an inmate asked for relief from "the problems with the toilet in the cells that see[p]s other inmate[s'] body waste into the next cells of the other inmate," noting that he had been "complaining for about 9 months." (Pl. 56.1 Stmt. ¶ 72.q.) Inmates submitted similar grievances on September 2, September 7, and September 18, 2011. (Id. ¶¶ 72.s, 72.u, 72.x.) The County admits that these issues were reported as characterized, but "otherwise denie[s]" the Reports without citation. (County 56.1 Resp. ¶¶ 72.a-72.pp.)

b.   The Yaphank Facility

Similarly, Plaintiffs point to numerous instances between 2009 and 2014 where toilets and urinals in the Yaphank Facility were reported to have overflowed, leaked, flushed continuously or otherwise incorrectly, backed up, flooded the floors, clogged, emanated odors or were broken. (Pl. 56.1 Stmt. ¶¶ 73.a-73.ii.) For example, the June 26, 2009 Dorm Inspection Report noted more than ten broken, backed-up, or inoperable toilets, including one block with only one working toilet. (Id. ¶ 73.e.) As with the Riverhead Facility, the County agrees that the Reports state what Plaintiffs claim regarding the toilets, but baldly "otherwise denie[s]" the Reports. (County 56.1 Resp. ¶¶ 73.a-73.ii.)

3.   Leaks and Flooding

Plaintiffs claim that leaking roofs and broken plumbing have caused inmates at the SCCF to suffer regular flooding of dorm, bunk, and cell areas, rendering those areas uninhabitable. (Pl. 56.1 Stmt. ¶ 77; see also id. ¶¶ 77.a-77.ii (noting Reports between 2009 and 2014 that detailed leaks from ceilings, roofs, toilets, air-conditioning units, and showers, among other sources, at the SCCF and primarily with respect to the Yaphank facility); County 56.1 Resp. ¶¶ 77.a-77.ii.)   The County acknowledges that Plaintiffs accurately characterized most Reports, but--without citation--"otherwise denie[s]" them.   (County 56.1 Resp. 77.a-77.ii.)

Along with reports of leaks, the Pepper Report notes that most of the floor soil-drain lines observed in showers and utility closets at both the Yaphank and Riverhead Facilities were clogged with a buildup of organic debris, soil, and soap residue. (Pl. 56.1 Stmt. ¶¶ 77.jj-77.kk.)   He reports such accumulated matter serves as a breeding ground for fly larvae and from which drain flies emanate.  (See Pepper Report at 21, 31.)

4.  Air Quality and Ventilation

According to Plaintiffs, the heavy buildup of mold, dust, and debris in ventilation shafts and vents exposed inmates at the SCCF to inadequate ventilation and "very poor" air quality. (Pl. 56.1 Stmt. ¶ 82.)   For instance, it was reported that on

28

December 20, 2010, the air quality in Yaphank Dorm South 1 was "poor" with "mold and rust visible on [the] ceiling and duct work." (Pl. 56.1 Stmt. ¶ 82.m (quoting Feb. 9, 2011 Dorm Inspection Report (South-2 Dorm); alteration in original); County 56.1 Resp. ¶ 82.m.)  These reports of poor air quality are based primarily on the SCCF's Dorm Inspection Reports.  (See Pl. 56.1 Stmt. ¶¶ 82.a-s, 82.u-dd.)

Initially, the County notes that Plaintiffs do not define the term "poor air quality" and their expert, Pepper, did not inspect for "air quality".  (County 56.1 Resp. at 28 n.8.)  It also baldly contends that "[v]arious unpleasant phenomena" can "render air quality 'poor,' but do not impose significant health threats."  (Id.)  For most of these the SCCF's Dorm Inspection Reports, the County admits that they contain the information Plaintiffs claim, but "otherwise denie[s]" them without citing to any evidence.  (See generally County 56.1 Resp. ¶¶ 82.a-82.dd.)

Plaintiffs also discuss Pepper's findings on air quality and ventilation in the SCCF as of December 2015.  (Pl. 56.1 Stmt. ¶¶ 82.ee-82.ii.)  As to the Riverhead Facility, Pepper opined that "[a]ir flow and volume [were] insufficient, often failing to remove excess moisture in critical areas where bacteria and mold grow[ and] failing to maintain an even temperature"; "[v]entilation grills and ducts [were] plugged with dust or debris"; shower rooms had "no ventilation"; and the showers rooms' air flow did not meet

29

required standards.  (Pepper Report at 13-14.)  As to the Yaphank Facility, Pepper found that there were "[h]eavy dust accumulations . . . on the shower area ceiling vents and at the ceiling heating unit in the dorm area," which "restrict[ed] proper air flows."  (Id. at 25.)  While the County admits these are Pepper's opinions, without citation to contrary evidence, it denies the opinions are correct.  (See County 56.1 Resp. ¶¶ 82.ee-82.ii.)

### 5.  Extreme Temperatures

According to Plaintiffs, they endured extreme temperatures while detained at the SCCF, including dorms that were "excessively cold."  (Pl. 56.1 Stmt. ¶ 87.)  Plaintiffs again highlight Dorm Inspection Reports (and one inmate grievance) from the period between 2009 and 2014, (Pl. 56.1 Stmt. ¶¶ 87.a-87.v), and the County again agrees that the Reports contain the information that Plaintiffs represent but baldly denies those assertions.  (County 56.1 Resp. ¶¶ 87.a-87.v).  The Reports and grievance note that at times, areas of the SCCF dorms were "extremely cold" or "freezing," had no heat, or were being air conditioned even though it was winter.  (See generally Pl. 56.1 Stmt. ¶¶ 87.a-87.v.)  Further, according to some Reports, at other times it was excessively hot in the dorms.  (Pl. 56.1 Stmt. ¶¶ 87.q-87.s, 87.v.)

30

6.   <u>Unsanitary Conditions, Food, and Water</u>

Plaintiffs aver that they were exposed to dangerous and unsanitary conditions while housed at the SCCF, including mold, bacteria, chemical pesticides, cold and spoiled food, brown and rusty water, and insects and mice.  (Pl. 56.1 Stmt. ¶ 92.)  In support, Plaintiffs point to deposition testimony, Suffolk County Department of Health Services ("DHS") Reports, SCOC letters, inmate grievances, Dorm Inspection Reports, and an internal inspection report, (Pl. 56.1 Stmt. ¶¶ 92.a-92.v), as well as to the Pepper Report, (Pl. 56.1 Stmt. ¶¶ 92.w-92.ccc).  Again, for the most part, the County admits that Plaintiffs' characterization of the evidence is accurate, but without citing contradictory evidence, correspondingly "otherwise denie[s]" Plaintiffs' numbered statements of fact.  (<u>See</u> <u>generally</u> County 56.1 Resp. ¶¶ 92.a-92.ccc.)

a.   <u>General Cleanliness and Cleaning Supplies</u>

Plaintiffs call attention to evidence regarding the unclean conditions at the SCCF and the lack of cleaning supplies. For instance, Alver testified that in the Yaphank Facility, between September 2011 and May 2012, showers were clogged and "brown water" came out of showerheads.  (Alver Dep., Ex. 8, at 31:18-22, 135:25-136:3; Pl. 56.1 Stmt. ¶ 92.n.)  Further, according to a September 2013 Dorm Inspection Report from the Yaphank Facility, the showers in the dorms needed to be power washed because they

31

were "filthy with soap scum and black moldy debris in cracks."
(Sept. 2013 Report, Ex. 96, at ECF p. 3.)

Moreover, Plaintiffs highlight the opinions and
observations noted in Pepper's December 2015 Report. Pepper
opined that "unsanitary" conditions at the SCCF impede the ability
of inmates to maintain proper personal hygiene, as well as promote
the occurrence and spread of disease. (Pl. 56.1 Stmt. ¶¶ 92.a,
92.w.) For example, he found "[s]ignificant presence of hazardous
mold, dried soil accumulation, and bodily fluid (e.g. urine) splash
accumulations." (Pepper Report at 6.)

Further, King testified that in the Riverhead Facility,
from the summer to the winter of 2010, inmates lacked cleaning
supplies for "weeks or a month at a time." (King Dep. 79:4-6,
80:24-25, 81:19-23.) Similarly, in his December 2015 Report,
Pepper noted that inmates at the SCCF lacked personal protection
equipment, like goggles and gloves, needed to safely clean dorms
and cells. (Pl. 56.1 Stmt. ¶ 92.ff.)

b. Food, Water, and Kitchen Conditions

Plaintiffs also put forth evidence regarding unsafe or
unsanitary food and water they were served at the SCCF, as well as
issues with kitchen cleanliness. For example, Butler testified
that: in the Riverhead Facility between February 2011 and
March 2011, he was served spoiled milk, cold or not enough food,
and hard and moldy bread (see Butler Dep., Ex. 4, 78:11-18, 101:11-

102:16, 126:20-127:16); between April 2011 and October 2011, there was mold on food slots through which inmates in the Riverhead 4 East cells received their food, and the only cleaning product given to inmates to clean mold was "a little stack of County soap" (id. at 105:14-19, 108:19-109:6; Pl. 56.1 Stmt. ¶¶ 92.h-92.i); and, the drinking water was brown and rusty, and he filed a grievance about the water in May 2011.  (Id. at 112:9-15, 113:23-114:13.)   King similarly testified that in the Riverhead Facility, he: was regularly served food that was cold and undercooked (King Dep. 184:14-186:8); and, has experienced problems when officers-served food, including "boot prints on [his] bread" and hair and spit in his food.  (Id. at 186:9-16.)   In response and without specific citation to any evidence, the County "[a]dmit[s] only that [the] plaintiff[s] [ ] make[ ] th[ese] claim[s] which [they] must prove; otherwise denied."  (County 56.1 Resp. ¶¶ 92.d, 92.f.)

Plaintiffs further present evidence that the DHS cited the SCCF on several occasions for issues with sanitation and its food preparation facilities.  For example, with respect to aspects of the Riverhead Facility's food stock and water system, an August 2009 DHS Inspection Report notes several "critical items" that "relate directly to factors which lead to foodborne illness." (Aug. 2009 DHS Report, Ex. 87, at 1.)   A November 2010 DHS Inspection Report states that there were: "potentially hazardous foods" in the walk-in refrigerator; "accumulations of debris" on

33

"the meat slicers and can[-]opener blades"; and, no faucet or handles on the handwash sink. (Nov. 2010 DHS Report, Ex. 88, at 1-2 (original text capitalized).) A November 2011 DHS Inspection Report provides that, among other issues, "condenser fan blades and/or covers were covered with accumulated dust/grime in the milk and bread walk-in refrigerator." (Nov. 2011 DHS Report, Ex. 94, at 2 (original text capitalized).) DHS again cited the Riverhead Facility for critical violations following December 2012 and January 2014 inspections, including for "uncleanable black residue" on kitchen floors in 2012. (Pl. 56.1 Stmt. ¶¶ 92.s, 92.v; Jan. 2014 DHS Report, Ex. 97, at 1.) The County does not dispute the DHS's various citations but baldly states such citations "did not prohibit the kitchen[s] from continued operation[s]". (County 56.1 Resp. ¶¶ 92.c, 92.e, 92.m, 92.s, 92.v.)

Finally, Plaintiffs call attention to Pepper's additional findings. For example, Pepper opines that the condition of the SCCF kitchens and kitchen equipment "provides a suitable environment for the growth and proliferation of disease[-]causing organisms" (Pl. 56.1 Stmt. ¶¶ 92.x-y (quoting Pepper Report at 7)); that "food contact surfaces of equipment used in the preparation, storage and dispensing of food" were "not clean and sanitary," and did "not meet basic food service standards" (id. at ¶ 92.z (quoting Pepper Report at 7)); and, that food temperatures for food served to inmates did "not meet food code standards" (id.

34

at ¶ 92.cc (citing Pepper Report at 7)).  Without citing any evidence, the County continues to deny that Pepper's opinions are correct.  (See County 56.1 Resp. ¶¶ 92.x-z, 92.aa-cc, 92.ee.)

       c.   <u>Pests and Vermin</u>

Moreover, Plaintiffs highlight their exposure to insects and vermin while housed at the SCCF.  According to SCCF Dorm Inspection Reports highlighted by Plaintiffs, officers saw mice in the dorm areas in March and June 2012 and October 2014.  (Pl. 56.1 Stmt. ¶¶ 92.q-r, 92.u; County 56.1 Resp. ¶¶ 92.q-r, 92.u.) Further, according to the Pepper Report, there were fruit fly and drain fly infestations in the cells and dorms of the SCCF.  (Pl. 56.1 Stmt. ¶ 92.rr (citing Pepper Report at 6).)  In the Yaphank Facility, Pepper noted that there were house flies in the toilet and dorm areas and that drain flies were "breeding and living in the heavy organic matter buildup."  (Id. at ¶¶ 92.ss-tt (quoting Pepper Report at 27).)  As to the Riverhead Facility, Pepper found that control of vermin and vectors[16] was a "significant problem[ ]."  (Id. at ¶ 92.uu (quoting Pepper Report at 17).)  The County denies Plaintiffs' statements that are based upon the Pepper Report.  (See County 56.1 Resp. ¶¶ 92.rr-uu.)

---

[16]    "Vectors"--usually, insects--are "living transporters and transmitters of infections agents" "known to transmit a wide range of human disease," while vermin "are noxious, disgusting or objectional birds or other animals" that "are indicators of unsanitary conditions."  (Pepper Report at 17.)  Vermin become vectors when they transmit human disease.  (See id.)

d.   Bedding Materials and Laundry

Finally, relying on the Pepper Report, Plaintiffs claim that their bedding supplies were stained, worn, and broken, and that they had insufficient laundry services.  (See Pl. 56.1 Stmt. ¶¶ 92.vv-yy, 92.aaa-ccc.)  While admitting these statements are based upon the Pepper Report, in an unadorned fashion, the County also denied them as opinions that are incorrect.  (See County 56.1 Stmt. ¶¶ 92.vv-zz, 92.aaa-ccc.)

V.   Plaintiffs' Injuries

Plaintiffs allege that the conditions of confinement at the SCCF caused them to suffer nausea, dizziness, and headaches; skin infections, rashes, and fungal infections; and respiratory and renal issues.

A.   Nausea, Dizziness, and Headaches

Lofton testified that in 2011, while in the Yaphank and Riverhead Facilities, he experienced nausea and diarrhea from the food.  (Pl. 56.1 Stmt. ¶ 101; Lofton Dep., Ex. 6, 118:9-16.)  The County points out that though he was seen by the SCCF medical unit in 2011, he did not complain of nausea or diarrhea.  (County 56.1 Resp. ¶ 101.)  On March 1, 2012, Lofton reported to the SCCF medical unit that he was experiencing migraine headaches three times per week.  (Mar. 2012 Nurse Report, Ex. 107, at ECF p. 2.) However, the County contends that the medical staff recommended that he consult with an optometrist, and the Court notes that

36

Lofton suspected that his vision, or a tooth issue, might have been causing the migraine headaches.  (See County 56.1 Resp. ¶ 109; Mar. 2012 Nurse Report at ECF p. 2.)

Butler testified that while housed in the Riverhead Facility between January 2011 and July 2013, he "was throwing up" from the smell of feces and urine in his cell.  (Pl. 56.1 Stmt. ¶ 102; Butler Dep. 93:19-94:6.)  According to a September 7, 2011 grievance he filed, Butler also experienced "headaches and irritation" from the odor.  (Sept. 2011 Butler Grievance, Ex. 68.) While acknowledging Butler was treated by the SCCF's medical unit more than fifteen times during his stay, the County states Butler never reported vomiting or experiencing headaches, but reported playing basketball and being able to do 100 pullups and 100 pushups.  (County 56.1 Resp. ¶¶ 102, 107.)

On July 11, 2011, while in the Riverhead Facility, Lynch filed a grievance providing that "the feces and urine from another cell['s] toilet[ ] is making me sick, dizzy and disoriented and it seem[s] like this issue is being ignore[d]."  (July 2011 Lynch Grievance, Ex. 104.)  He testified that he continued to experience dizziness following his release from the SCCF.  (See Lynch Dep., Ex. 9, 22:11-15.)  While admitting Lynch received medical care from the SCCF medical unit in 2011, the County states Lynch did not complain of being dizzy or disoriented, nor did Lynch ever complain of dizziness to the N.Y. Department of Corrections for

over three years after entering its custody. (See County 56.1 Resp. ¶¶ 103-04.)

On August 31, 2011, another inmate at the Riverhead Facility grieved that he would woke up dizzy and lightheaded and "throw up in [his] sleep due to the stench of other inmate[s'] urine and feces that has accumulated in [his] toilet" during the night. (Aug. 2011 Miller Grievance, Ex. 105.)

King testified that beginning September 2011, he vomited two to three times per day, "[m]ainly in the morning" upon waking and discovering waste from neighboring cells' toilets in his toilet. (King Dep. 158:3-159:6; Sept. 2011 King Grievance, Ex. 106.) The County highlights that King did not report vomiting to the SCCF medical unit in 2011. (County 56.1 Resp. ¶ 106.)

Alver testified that he began experiencing stomach pain while housed in the SCCF. (See Alver Dep. 88:20-90:6.) The County counters that Alver did not complain of stomach pain to the SCCF medical unit. (See County 56.1 Resp. ¶ 108.)

B.   Skin Infections, Rashes, and Fungal Infections

King testified that he suffered from "rashes over [his] body," which he believes were caused by the living conditions in SCCF, (King Dep. 170:14-18), though the County points out that he did not complain of rashes to the SCCF medical unit. (County 56.1 Resp. ¶ 110 (citing Ex. H).) Additionally, according to medical progress notes from November 2011, King suffered from a rash while

in the Riverhead Facility.  (Pl. 56.1 Stmt. ¶ 116; King Progress Notes, Ex. 111.)

Sims testified that beginning approximately Fall 2012, while in the Riverhead Facility, he developed a "red," "stinging" rash on his back and legs.  (Pl. 56.1 Stmt. ¶ 111; Sims Dep., Ex. 5, at 46:22-48:2.)  Citing Sims' medical chart, the County denies that Sims complained of any skin condition to the SCCF medical unit.  (County 56.1 Resp. ¶ 111 (citing Ex. K).)

Lynch testified that a few weeks or months after arriving at the Riverhead Facility in 2010, he started to suffer from a rash on his buttocks and discoloration on his foot.  (Lynch Dep. 128:7-16.)  According to the County, Lynch complained of a foot fungus to the SCCF medical unit shortly after being admitted to the SCCF in 2010, and the staff noted that it was possibly a preexisting condition.  (County 56.1 Resp. ¶ 112.)  In January 2012, Lynch filed a "sick call request" while housed in the Nassau County Correctional Facility.  (Jan. 2012 Sick Call Request, Ex. 112.)  In the request, he noted that he had been receiving treatment for onychomycosis -- a fungal infection of the toenails and fingernails (Lynch Dep. 19:17-20, 20:24-21:2) -- while in the SCCF "due to the [SCCF's] unsanitary shower conditions." (Jan. 2012 Sick Call Request).  The County responded that the "exhibit pertains to the Nassau County Correctional Facility" without explaining that it concerned a condition Lynch

experienced while at the SCCF.  (County 56.1 Resp. ¶ 117.)  Yet, the County's records confirm that Lynch had onychomycosis while at the SCCF.  (See Lynch Med. Record, Ex. U, at ECF p. 6).

According to progress notes from Butler's visits to the medical unit, beginning March 2011, he suffered from a painful rash on his ankles, buttocks, and back while in Riverhead.  (See Butler Progress Notes, Ex. 108.)  Similarly, in August 2011, a Riverhead Facility inmate grieved that he had itches on his back that he believed to be caused by the showers, and the grievance was marked "[r]esolved" after the inmate was seen by the medical unit staff "regarding what he claims is a '[r]ash' located on his back."  (Aug. 2011 Maffetone Grievance, Ex. 109.)  In September 2011, another Riverhead Facility inmate grieved that his requests to be seen by the medical unit were being ignored and he was suffering from "rashes and hard skin on [his] back and feet from the water in the showers," as well as "fungus in the shower that[']s mak[]ing [his] feet itch."  (Sept. 2011 D. Butler Grievance, Ex. 110.)

C.   Respiratory and Renal Issues

Lynch testified that, between July 2010 and August 2011, while he was in the SCCF, he experienced daily shortness of breath, which he suspected was caused by dust or inadequate ventilation.  (Lynch Dep. 36:21-37:13.)  The County responds that Lynch did not report breathing difficulties to the SCCF medical unit.  (County

40

56.1 Resp. ¶ 118 (citing Ex. F[17]).)  Lynch also testified that he has kidney damage from high creatinine levels, which doctors have opined was caused by contaminated water and/or medicine he was prescribed for his foot fungus while in the Riverhead Facility. (Lynch Dep. 19:24-20:17, 23:4-12, 24:3-26:8.)  The County denies this, alleging that "it appears that plaintiff Lynch was not treated for kidney damage by [] the [SCOC] for over 3 years after going into its custody." (County 56.1 Resp. ¶ 119 (citing Ex. G[18]).)  Lynch's SCOC medical record contains clinical reports from October 2011, October 2012, January 2013, and May 2014 noting high creatinine levels.  (See Lynch SCOC Med. Record, Ex. V at ECF pp. 44, 48, 52, 54.)

Butler testified that he experienced respiratory problems while housed in Riverhead.  (Butler Dep. 137:11-16.) Acknowledging that Butler had been treated by the SCCF's medical unit more than fifteen times, the County states Butler did not complain of respiratory issues. (County 56.1 Resp. ¶ 120 (citing Ex. I[19]).)

---

[17]  Exhibit F (ECF No. 483-9) is the "Incarceration Audit" for Mack Butler.

[18]  Exhibit G (ECF No. 483-10) is the "Incarceration Audit" for Clyderaheem Lofton.

[19]  Exhibit I (ECF No. 483-12) is the "Incarceration Audit" for Kevin King.

D.   Causation

To support a causal link between Plaintiffs' health issues and the conditions of confinement at the SCCF, Plaintiffs highlight the expert report of Joseph Bick, M.D. (Pl. 56.1 Stmt. ¶¶ 121-32 and n.2; see generally Bick Report, Ex. 113.)   In preparing his Report, Dr. Bick considered the Consolidated Amended Complaint, the depositions of Alver, Butler, and King, and the Pepper Report. (Bick Report at 3.)   The County notes that Dr. Bick did not personally inspect the SCCF. (County 56.1 Resp. at 46 n.11.)   For most of the opinions upon which Plaintiffs rely in their Rule 56.1 Statement, the County "[a]dmits only that [the assertion] is Dr. Bick's opinion," but without evidentiary support, "otherwise denie[s]" the assertions.

VI.   The County's Repairs to the SCCF

On January 1, 2017, Plaintiffs served interrogatories on the County, with the first interrogatory asking the County to identify "all construction, renovation, and upgrading activities (other than routine cleaning or maintenance) undertaken in the Riverhead and Yaphank Correctional Facilities since January 1, 2009." (Pl. 56.1 Stmt. ¶ 142.)   The County responded to the first interrogatory by referring to the transcripts of its witnesses, including Demarco, Caracappa, Ewald,[20] and Sharkey. (Pl. 56.1

---

[20]   (See infra at 61 (describing Ewald as Warden of the SCCF from 2006 to 2016).)

Stmt. ¶ 143.)  According to Plaintiffs, those witnesses identified the following non-routine repairs or renovations that were undertaken at the Riverhead Facility or Yaphank Facility since January 1, 2009:

A. In approximately 2009, the Riverhead Facility pods were converted to direct supervision units (Pl. 56.1 Stmt. ¶ 144.a);
B. In approximately 2013 or 2014, the air handlers for the Riverhead Facility's cooling system were replaced (id. at ¶ 144.b);
C. On multiple occasions, the roofs at the Yaphank and Riverhead Facilities were repaired (id. at ¶ 144.c);
D. The Riverhead Facility's lighting system was improved (id. at ¶ 144.d); and
E. Beginning in 2013, there were ongoing renovations to the Yaphank Facility dorms (id. at ¶ 144.e).

In response, the County does not highlight any repairs or improvements it may have made to the SCCF.  Instead, and failing to cite any evidence, the County states only that "at the time of their respective depositions, each of the witnesses identified the listed repairs and renovations in addition to others; otherwise denied."  (County 56.1 Resp. ¶ 144.)

Thus, Plaintiffs maintain that the County did not take any actions regarding: overcrowded conditions-of-confinement throughout the class period; the existence of ping-pong toilets and back-flushing at the Riverhead Facility throughout the class period; the existence of back-flushing at the Yaphank Facility

from the start of the class period until the start of dorm
renovations in 2013; the persistent leaks and flooding caused by
broken plumbing throughout the class period; inadequate
ventilation throughout the class period; inadequate heat and
exposure to extreme temperatures at the Riverhead Facility from
the start of the class period until the replacement of air handlers
in 2014; inadequate heat and exposure to extreme temperatures at
the Yaphank Facility throughout the class period; the pervasive
presence of mold and vermin in living areas throughout the class
period; and, decrepit and unsanitary food-service facilities
throughout the class period. (Pl. 56.1 Stmt. ¶¶ 145.a-i.) The
County responds that "[t]he exhibits to Plaintiffs' Rule 56.1
Statement fail to establish that th[ese] assertion[s] [are]
correct," but does not point to any actions it may have taken
regarding those conditions. (County 56.1 Resp. ¶¶ 145.b-i.)
Instead, the County offers the SCOC's February 2018 study entitled
"The Worst Offenders: Report: The Most Problematic Local
Correctional Facilities of New York State." (County 56.1 Resp.
¶ 4; Worst Offenders Report, Ex. M (sealed).) The Report covers
"the five local jails that are deemed the 'worst offenders' for
being in violation of state law," of which the SCCF was not one of
the listed facilities. (Worst Offenders Report at 2.)
Additionally, the County notes that the SCOC's December 2017
"Minimum Standard Evaluation" of the SCCF found "[v]irtually none"

of the complained-of conditions to be present.  (County 56.1 Resp. ¶ 7.)

VII. <u>Grievances and Exhaustion</u>

The County highlights that (1) none of the Named Plaintiffs has filed a grievance concerning conditions at the Yaphank Facility; (2) Sims, King, and Lynch did not file any grievances prior to commencing suit; and (3) the only pre-suit grievance filed by any of the Named Plaintiffs concerned breakfast served in a prison tier on March 25, 2011.  (County 56.1 Resp. ¶¶ 1-3.)

Plaintiffs claim that inmates who requested grievance forms were denied the forms and were threatened or retaliated against for filing grievances.  (Pl. 56.1 Stmt. ¶ 97.)  In support, they primarily rely upon the deposition testimony and sworn declarations of the Named Plaintiffs.  For example, King testified that in June and July 2009, he was "pulled off of [his] tier and handcuffed" by correction officers at the Riverhead Facility in retaliation for filing a complaint regarding conditions at the SCCF.  (King Dep. 19:18-26:13.)  The County counters that King did not file any grievances in 2009.  (County 56.1 Resp. ¶ 97.a.)  Additionally, according to King, in 2010, he was locked in his cell for approximately one week in retaliation for retrieving grievance forms from the law library after officer initially denied them to him.  (King Dep. 139:7-140:3.)  The County disputes this

45

testimony, citing its records that do not show that King "was [ ]
on lock-in in 2010." (County 56.1 Resp. ¶ 97.b.) King testified
that in the Winter of 2010-2011, officers turned on the air
conditioning on the third and fourth floors of the Riverhead
Facility in retaliation for inmates filing grievances. (King
Dep. 181:2-183:20; Pl. 56.1 Stmt. ¶ 97.c.) He also testified that
he was locked in his cell for four days in June 2011 after writing
a grievance. (King Dep. 167:3-168:18.) The County purports to
deny this, pointing out that "King was not in administrative
segregation at any time in 2010 nor did he file any grievances in
2010." (County 56.1 Resp. ¶ 97.d (emphasis added).)

Lynch testified that around August 2011, he was
terminated from his position at the law library after filing a
grievance and a lawsuit about conditions in the SCCF. (Lynch Dep.
39:12-40:10.) Another inmate reported in August 2011 that he was
threatened by correction officers after filing a grievance. (Pl.
56.1 Stmt. ¶ 97.f.)

According to Butler's October 2012 Declaration, on many
occasions while he was detained in the Riverhead Facility,
beginning January 2011, he was denied grievance forms. (Butler
Decl., ECF No. 367, ¶¶ 1, 4.) The County counters that Butler
successfully filed nine grievances in 2011, some of which he
appealed. (County 56.1 Resp. ¶ 97.g.) In his Declaration, Butler
claims that during the same time, officers refused "to accept

grievance on the basis that another inmate has already grieved about the same condition." (Butler Decl. ¶ 9.) The County responds: "Objection; the adequacy of the SCCF's Inmate Grievance Program is not a subject of this action." (County 56.1 Resp. ¶ 97.h (without citation to evidence).)

Alver testified that from September 2011 to May 2012, while he was detained in the Yaphank Facility, he was denied grievance forms or told that they were not available. (Alver Dep. 35:8-22, 36:24-38:24, 39:13-40:9.) According to Lofton's October 2012 Declaration, beginning September 2011, on multiple occasions while detained at the Yaphank Facility, he was told not to file grievances and was refused grievance forms. (Lofton Decl., ECF No. 369, ¶¶ 1, 4-5.) Moreover, he testified that during the period from 2011 to 2013, he was sometimes pressured by correction officers to sign off that grievances were resolved. (Lofton Dep. 108:23-112:6.) He further stated that during the same time, correction officers would scream at inmates who filed grievances and place them in confinement areas by themselves. (Id. at 127:20-129:8.)

Citing grievance forms and responses, Plaintiffs further allege that the County did not take any effective actions in response to inmate grievances, including with respect to ping-pong toilets. (Pl. 56.1 Stmt. ¶ 100.) On August 11, 2011, a Riverhead inmate, Michael A. Maffetone ("Maffetone"), filed a grievance

stating that: (1) he had made "numerous requests to medical for [ ] 'itches' on [his] back and shoulder that [he] believe[d] [was] due to the shower"; (2) he had unsuccessfully "asked many times for bleach and other cleaning supplies" for his cell; and (3) "every day [his] toilet [was] filled with other inmates['] feces[ ] due to plumbing issues," causing him to "breath[e] in feces every morning in [his] cell."  (Pl. 56.1 Stmt. ¶ 100.a (citing Maffetone Grievance at ECF p. 3.)  On August 15, 2011, the grievance was returned as "[r]esolved."  (Id. at ECF p. 2.)  While the form documented that the inmate had been seen by medical unit staff for his claimed rash, it made no mention about Maffetone's other complaints.  (Cf. id. at ECF p. 2, with id. at ECF p. 3.)

On August 25, 2011, at the time he was a Riverhead Facility inmate, Lynch filed a grievance complaining that the toilet in his cell was "still backflushing" and asking that it be fixed.  (Pl. 56.1 Stmt. ¶ 100.b (citing Aug. 25, 2011 Lynch Grievance, Ex. 102, at ECF p. 2.)  On the same form, a Sheriff's Office housing sergeant "acknowled[ged] these repairs are needed." On August 29, 2011, the grievance was returned as "[r]esolved." (Id. at ECF pp. 3-4.)  The form noted that backflushing was an ongoing issue caused by a design flaw in the septic system but that "[m]aintenance would adjust the pressure in the system and [the problem] would dissipate."  (Id. at ECF p. 3.)

On September 2, 2011, another Riverhead Facility inmate, Wesley Jones, filed a grievance claiming that "his toilet 'back-flushes'[ and] waste from other cells floats in to his toilet." (Pl. 56.1 Stmt. ¶ 100.c (citing Sept. 2011 Jones Grievance, Ex. 66).)  The grievance was returned "[r]esolved" with the Grievance Coordinator acknowledging:  the "problem is an on going issue," because "[t]here is a design flaw i[n] the Facility septic system" that "causes waste to intrude into the next cell's toilet."  (Id. (stating further that "[m]aintenance would adjust the pressure . . . and it would dissipate").)

### CURRENT PROCEDURAL POSTURE[21]

On September 4, 2018, Plaintiffs moved for summary judgment.  (See P-Support Memo.)  On October 9, 2018, the County cross-moved for summary judgment.  (See C-Support Memo.)  After the parties' respective summary judgments were fully briefed, on September 19, 2019, the Court issued an electronic order terminating those pending motions and directing further briefing regarding potential substitution of class representatives, to wit:

> In its summary judgment motion, the County argues that Plaintiffs' claims are unexhausted and must be dismissed pursuant to the Prison Litigation Reform Act ("PLRA").  The County points out that none of the Representative Plaintiffs filed grievances regarding conditions at the Yaphank Facility and that

---

[21]  Much of the procedural history is recounted above.  The remainder concerns only the briefing of the cross-motions pending before the Court.

while one Representative Plaintiff filed a pre-suit grievance concerning the Riverhead Facility, he did not grieve the conditions about which Plaintiffs complain in this action. (County Br., [ECF No.] 483-29, at 15.) In response, Plaintiffs contend that the exhaustion requirement does not apply to their claims, that exhaustion was excused because the grievance process was a "simple dead end," that exhaustion was excused because inmates were hindered and intimidated from grieving, and as relevant here, that class members other than the Representative Plaintiffs (with the limited exception of Sims (Pl. Opp., [ECF No.] 488, at 4-5 & n.3)) either properly exhausted under the PLRA or were excused from exhausting because they "are not incarcerated (or [] were not incarcerated at the time of joining the class action)." (See Pl. Opp. at 4-6, 13-15, 22.) Upon review of several complaints that were consolidated into this action, the Court notes that other inmates purport to have filed grievances prior to filing suit. (E.g., Compl., Case No. 11-CV-5569, [ECF No.] 1, at 2 (Yaphank Facility inmate claiming that he filed a grievance but was not given a response); Compl., Case No. 11-CV-4562, [ECF No.] 1, at 2 (Riverhead Facility inmate claiming that he "[f]iled numerous grievances about the conditions").) The Court does not pass on the parties' arguments at this juncture. Rather, to the extent certain class members fully exhausted administrative remedies or "are not incarcerated (or [] were not incarcerated at the time of joining the class action) and are therefore not subject to the exhaustion requirement," the Court directs Plaintiffs to file a motion . . . proposing those class members as substitute class representatives.

(Sept. 19, 2019 Elec. ORDER.)  Hereafter, the Court refers to the

motion it directed be filed as the "Substitution Motion".  The

Substitution Motion has been fully briefed (see ECF No. 500; see

also Sub-Support Memo, ECF No. 501; Sub-Opp'n, ECF No. 513; Sub-Reply, ECF No. 514).  It will be ruled upon in a separate order.

DISCUSSION

I.   Summary Judgment

    A. The Standard, Generally

Summary judgment will be granted where the movant demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A genuine factual issue exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Kee v. City of N.Y., 12 F.4th 150, 158 (2d Cir. 2021) (same) (citation and quotation marks omitted).  In determining whether an award of summary judgment is appropriate, the Court considers the "pleadings, deposition testimony, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits." Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011).

The movant bears the burden of establishing that there are no genuine issues of material fact.  CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP, 735 F.3d 114, 123 (2d Cir. 2013). Once the movant makes such a showing, the non-movant must proffer specific facts demonstrating "a genuine issue for trial."  Giglio v. Buonnadonna Shoprite LLC, No. 06-CV-5191, 2009 WL 3150431, at

*4 (E.D.N.Y. Sept. 25, 2009) (internal quotation marks and citation omitted).  Conclusory allegations or denials will not defeat summary judgment.  Id.  However, in reviewing the summary judgment record, "'the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'"  Sheet Metal Workers' Nat'l Pension Fund v. Vadaris Tech. Inc., No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)).

"The same [summary judgment] standard applies where, as here, the parties filed cross-motions for summary judgment . . . ."  Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001) (citing Terwilliger v. Terwilliger, 206 F.3d 240, 244 (2d Cir. 2000)).  "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."  Id., 249 F.3d at 121 (citing Schwabenbauer v. Bd. of Educ., 667 F.2d 305, 314 (2d Cir. 1981)).

B. Consideration of the Summary Judgment Record

1. Generally

A district court is "under no obligation to engage in an exhaustive search of the record" when considering a motion for summary judgment.  Jones v. Goord, 435 F. Supp. 2d 221, 259 (S.D.N.Y. 2006) (citing Amnesty Am. v. Town of W. Hartford, 288 F.3d 467, 470–71 (2d Cir. 2002)); see also Fed. R. Civ. P.

56(c)(3); Lee v. Alfonso, 112 F. App'x 106, 107 (2d Cir. 2004). A party opposing a motion for summary judgment must "specifically respond to the assertion of each purported undisputed fact . . . and, if controverting any such fact, [must] support its position by citing to admissible evidence in the record." Baity v. Kralik, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (quoting Risco v. McHugh, 868 F. Supp. 2d 75, 86 n.2 (S.D.N.Y. 2012)); see also Fed. R. Civ. P. 56(c)(1)(A)–(B); Kalola v. Int'l Bus. Machines Corp., No. 13-CIV-7339, 2017 WL 5495410, at *4 (S.D.N.Y. Jan. 9, 2017) ("Plaintiff cannot expect the Court to comb the record to find evidence not highlighted in [Plaintiff's] motion papers—summary judgment is not a game of hide and seek.").

Green v. Mount Sinai Health Sys., Inc., No. 17-CV-3999, 2019 WL 4392691, at *3 (S.D.N.Y. Sept. 12, 2019). "Accordingly, to the extent that [a party] assert[s] arguments without citations to the record, the Court need not consider them." Id.

    2. Rule 56.1 Statements

When moving for summary judgment, in addition to complying with Federal Rule of Civil Procedure 56, the parties must comply with Local Rule 56.1 of the United States District Courts of the Southern and Eastern Districts ("Local Rule 56"). See J. Seybert Ind. Rule III.A ("**Strict compliance with this Court's Motion Practices, the Federal Rules of Civil Procedure, and the Local Rules of the Eastern District of New York is required. Submissions not in compliance will not be considered by the Court.**" (bold emphasis in original)), available at https://www.nyed.uscourts.gov/pub/rules/JS-MLR.pdf; see also id.

at Rule III(G) & (G)(2).  As the Second Circuit has instructed, the Local Rule 56 "requirement is strict".  T.Y. v. N.Y. City Dep't of Educ., 584 F.3d 412, 417 (2d Cir. 2009); see also Genova v. County of Nassau, 851 F. App'x 241, 243 (2d Cir. 2021) (same) (citing T.Y., 584 F.3d at 418).  Among other things, Local Rule 56.1(c) states:

> Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a corresponding numbered paragraph in the statement required to be served by the opposing party.

Local Rule 56.1(c).  To specifically controvert a statement of material fact, a nonmovant is required to do so with specific citation to admissible evidence.  See Local Rule 56(d); see also Ezagui v. City of N.Y., 726 F. Supp. 2d 275, 285 n.8 (S.D.N.Y. 2010) (noting statements which a nonmovant does "not specifically deny-with citations to supporting evidence-are deemed admitted for purposes of [movant's] summary judgment motion") (collecting cases); see also Universal Calvary Church v. City of N.Y., No. 96-CV-4606, 2000 WL 1745048, at *2 n.5 (S.D.N.Y. Nov. 28, 2000).  As the Second Circuit has observed, "'where there are no[] citations or where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion.'" Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 74 (2d Cir. 2001)

(quoting Watt v. N.Y. Botanical Garden, No. 98-CV-1095, 2000 WL 193626, at *1 n.1 (S.D.N.Y. Feb. 16, 2000); further citations omitted), abrogated on other grounds by Gross v. FBL Fin. Servs., 557 U.S. 167 (2009).  Further, "[i]n the instances where [a party] cites to entire exhibits, without greater specificity, the Court need not consider them."  Genova v. County of Nassau, No. 17-CV-4959, 2020 WL 813160, at *9 n.1 (E.D.N.Y. Feb. 19, 2020) (adopting report and recommendation), aff'd, 851 F. App'x 241 (2d Cir. 2021) ("[Parties] who ignore their obligations under Local Rule 56.1 do so at their own peril."); see also Amnesty Am., 288 F.3d at 470-71 ("[B]ecause nothing in the federal rules mandates that district courts conduct an exhaustive search of the entire record before ruling on a motion for summary judgment, district courts are entitled to order litigants to provide specific record citations."); EC ex rel. RC v. County of Suffolk, 882 F. Supp.2d 323, 338 n.5 (E.D.N.Y. 2012) ("Mere reference, for example, to an entire deposition is not 'specific'.").

Relatedly, it is not the role of the Court to search the summary judgment record for evidence supporting a nonmovant's opposition.  See N.Y.S. Teamsters Conf. Pension & Ret. Fund. v. Express Servs., Inc., 426 F.3d 640, 648-49 (2d Cir. 2005) (recognizing authority of district courts to institute local rules governing summary judgment submissions, which permits courts "to efficiently decide" such motions "by relieving them of the onerous

task of 'hunt[ing] through voluminous records without guidance from the parties'" (further citations omitted)); Ford v. Ballston Spa Cent. Sch. Dist., Nos. 05-CV-1198, 05-CV-1199, 2008 WL 697362, at *3 (N.D.N.Y. Mar. 13, 2008) (same); Ohlson v. Cadle Co., No. 04-CV-3418, 2008 WL 4516233, at *5 (E.D.N.Y. Sept. 30, 2008) (admonishing counsel for failing "to provide any pinpoint citations to the deposition transcript or to direct the Court's attention to any particular testimony, apparently satisfied to have this Court hunt like a pig looking for truffles buried in the transcript" (citing as comparison, United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.")). "Indeed, the requirements of Local Rule 56.1 were instituted, in part, to obviate burdening the courts with the onerous task of hunting through voluminous records for evidence supporting a nonmovant's opposition." Genova, 2020 WL 813160, at *9 n.1 (citing Patacca v. CSC Holdings, LLC., No. 16-CV-0679, 2019 WL 1676001, at *17 (E.D.N.Y. Apr. 17, 2019) (ruling it is "not the role of the Court to search the summary judgment record for evidence supporting" a party's position) (citations omitted)). As is well-settled, "in ruling on a summary judgment motion[,] the court need consider only the cited materials in the parties' submissions." Pennington v. D'Ippolito, 855 F. App'x 779, 782 (2d Cir. 2021) (internal citations and alterations omitted).

### 3. Admissibility of Expert Reports

"Courts in this Circuit have uniformly held that unsworn expert reports do not satisfy the admissibility requirements of Fed. R. Civ. P. 56(e), and cannot be used to defeat a summary judgment motion without additional affidavit support." Houser v. Norfolk S. Ry. Co., 264 F. Supp. 3d 470, 475 (W.D.N.Y., 2017) (quoting Berk v. St. Vincent's Hosp. & Med. Ctr., 380 F. Supp. 2d 334, 352 (S.D.N.Y. 2005); further citation omitted); see also Hollman v. County of Suffolk, No. 06-CV-3589, 2011 WL 2446428, at *13 (E.D.N.Y. June 15, 2011) (same; quoting Houser); Condoleo v. Guangzhou Jindo Container Co., Ltd., 427 F. Supp. 3d 316, 322 (E.D.N.Y. 2019) (ruling, where expert did not "declare[] the truth and correctness of his" report, expert's report "remains an inadmissible hearsay document that is not properly considered on a motion for summary judgment").

### 4. Consideration of Affidavits

There are "three components required of an affidavit used to oppose a summary judgment motion; pursuant to Rule 56(c)(4), such an affidavit "must [1] be made on personal knowledge, [2] set out facts that would be admissible in evidence, and [3] show that the affiant . . . is competent to testify on the matters stated." Campbell v. Rite Aid Corp., No. 18-CV-1799, 2020 WL 5554645, at *5 (E.D.N.Y. Sept. 17, 2020) (quoting Fᴇᴅ. R. Cɪᴠ. P. 56(c)(4)) (emphasis added in Campbell). "However, where an

affiant may lack personal knowledge of the facts set forth in h[is] declaration, if the averments are based on 'clearly referenced . . . documents and deposition transcripts' that are 'clearly identifiable' and have been produced during discovery, the court may find the declaration admissible." Peters v. Molloy Coll. of Rockville Ctr., No. 07-CV-2553, 2010 WL 3170528, at *2 (E.D.N.Y. Aug. 10, 2010) (quoting Pharmacy, Inc. v. Am. Pharm. Partners, Inc., No. 05-CV-0776, 2007 WL 2728898, at *1 (E.D.N.Y. Sept. 14, 2007)). Alternatively, when considering a motion for summary judgment, a court may "simply decline to consider those aspects of a supporting affidavit that do not appear to be based on personal knowledge or are otherwise inadmissible," id. (further citations omitted), or "where an affidavit is not based on personal knowledge, it may be stricken." Mugno v. Societe Internationale de Telecommunications Aeronautiques, Ltd., No. 05-CV-2037, 2007 WL 316573, at *8 (E.D.N.Y. Jan. 30, 2007) (citations omitted).

The Court addresses the County's Cross-Motion first.

## II. The County's Cross-Motion for Summary Judgment

### A. The Parties' Positions

The basis upon which the County cross-moves for summary judgment is Plaintiffs' purported failure to comply with the Prisoner Litigation Reform Act of 1995 (the "PLRA"), 42 U.S.C. § 1997e(a), by not exhausting the requisite administrative remedies available to them at the Facilities. (See C-Support Memo

at 15.)   The County argues that "it is undisputed that class plaintiffs filed no grievance about conditions in Yaphank, and no grievance about conditions in Riverhead before bringing this lawsuit . . . ."[22]   (Id. at 20.)   It contends that Plaintiffs rely upon the Supreme Court's third Ross limitation scenario, i.e., the thwarting by prison administrators of inmates taking advantage of a grievance process, to demonstrate their excuse from exhaustion. (See id. at 19 (citing Ross v. Blake, 578 U.S. 632, 644 n.3 (2016).) But, because of Plaintiffs' failure to file any grievances concerning conditions in the SCCF before bringing this case and failure to show they are excused from exhaustion requirements, the County maintains Plaintiffs' claims should be dismissed.   (Id. at 20.)   In their opening Support Memo, the County does not address

---

[22]   The County concedes that Butler's March 25, 2011 complaint regarding his breakfast satisfies the applicable exhaustion requirements and is not subject to summary dismissal.   (See C-Support Memo at 20.)   However, other than the Butler March 2011 food-related complaint, the County does not address Plaintiffs' food-related or vermin-related complaints in the context of its failure-to-exhaust arguments that form the basis of its Cross-Motion.   In the absence of any argument supporting its exhaustion defense as to all other food-related and all vermin-related complaints, the County has not met its burden of establishing its exhaustion defense as to those specific complaints.   See generally Hubbs v. Suffolk County Sheriff's Dep't, 788 F.3d 54, 59 (2d Cir. 2015); see also, e.g., Johnston v. Maha, 460 F. App'x 11, 15 (2d Cir. 2012) ("The defendants have the burden of showing that there is no genuine issue of material fact as to exhaustion that would preclude summary judgment."); Michalski v. Corr. Managed Health Care, No. 3:15-CV-0571, 2016 WL 6208250, at *2 (D. Conn. Oct. 21, 2016) ("Thus, defendants have the burden of proving that [plaintiff] has not exhausted claims prior to filing this action.").

those claims brought by Plaintiffs after their release from custody (see C-Support Memo); but, in its Reply, the County concedes the exhaustion requirement is inapplicable to such claims. (See C-Reply at 10.).

In opposition, Plaintiffs raise two overarching arguments: (1) they did exhaust their administrative remedies (see P-Opp'n at 13-15.); and (2) in any event, they are excused from the PLRA's exhaustion requirement (see id. at 15-21). More particular as to being excused from exhaustion requirements, Plaintiffs contend administrative remedies were not available, since the grievance process was a "simple dead end" (i.e., the first identified Ross limitation) (see id. at 15-18), and they were hindered and intimidated from grieving (i.e., the third identified Ross limitation) (see id. at 18-21).

First, Plaintiffs contend that they are relieved from exhaustion because, as clearly stated in the SCCF grievance procedures, "issues 'that are outside of the Warden's control' are not grievable." (P-Opp'n at 13 (citing SCCF Inmate Handbook, Ex. 1, at 16).) Indeed, according to Plaintiffs, the deposition of Charles Ewald, Warden of the SCCF from 2006 to 2016, forecloses any argument that the Plaintiffs are subject to PLRA exhaustion since Ewald "admitted . . . that it was 'not [his] decision' whether to refurbish or rebuild the jails in response to overcrowding and deterioration." (Id. (quoting Ewald Dep., Ex.

60

13, at 187:13-24); cf. C-Reply at 9 n.10 (conceding "any alleged overcrowding of the SCCF is patently within the control of the County, as distinct from that of the Warden").)

Second, Plaintiffs argue that their grievances which the County posits were "resolved" actually were not. Rather, highlighting three examples of toilet-related complaints, Plaintiffs contend that the SCCF's grievance process was a "simple dead end." (P-Opp'n at 15-16.) They further press their "dead end" argument relying upon a mold-related complaint, which grievance was designated as "accepted and resolved" but which placed the "resolution" upon the inmate, i.e., stating that it is the inmate's responsibility to maintaining a clean living space and shower area. (Id. at 17-18; see also id. at 18 ("The County's response otherwise offered no relief or remedy for the grieved condition.").)

Finally, Plaintiffs contend that the PLRA's exhaustion requirement does not apply to claims made by former detainees and inmates of the SCCF, i.e., those no longer in custody. (See P-Opp'n at 21-22.) They assert:

> even if the court were to find that the plaintiffs (named or unnamed) were required to exhaust their administrative remedies and that none did so, the damages class could proceed through new class representatives, chosen from among the hundreds of active class members, who are not incarcerated (or who were not incarcerated at the time of joining the class

> action) and are therefore not subject to the
> exhaustion requirement.

(Id. at 22 (footnote omitted; collecting cases).)

### B.   The PLRA, Generally

The PLRA states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a) (emphasis added); see also Ross, 578 at 635; Hubbs v. Suffolk County Sheriff's Dep't, 788 F.3d 54, 59 (2015).  "'[A]vailable' grievance procedures are those actually 'capable of use to obtain some relief for the action complained of.'"  Miller v. Annucci, No. 17-CV-4698, 2021 WL 4392305, at *6 (S.D.N.Y. Sept. 24, 2021) (quoting Ross, 578 U.S. at 642).

"The PLRA requires 'proper exhaustion,' which means 'using all steps that the [prison grievance system] holds out, and doing so properly (so that the [prison grievance system] addresses the issues on the merits).'"  Riles v. Buchanan, 656 F. App'x 577, 579 (2d Cir. 2016) (quoting Woodford v. Ngo, 548 U.S. 81, 90 (2006); emphasis in original; brackets in Riles); see also Williams v. Prianto, 829 F.3d 118, 122 (2d Cir. 2016) (stating the PLRA "requires proper exhaustion, which means using all steps that the prison grievance system holds out" (cleaned up)).  Indeed, the

62

Supreme Court has instructed "that 'proper' exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court." Osborn v. Harris, No. 20-CV-0673, 2021 WL 1131413, at *4 (N.D.N.Y. Jan. 15, 2021) (citing Woodford, 548 U.S. at 90-103), report and recommendation adopted, 2021 WL 1124575 (N.D.N.Y. Mar. 24, 2021). Moreover, "it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." Jones, 549 U.S. at 218; see also Dickinson v. York, 828 F. App'x 780, 782 (2d Cir. Oct. 5, 2020) (summary order) (same (quoting Jones)). "'Untimely or otherwise procedurally defective administrative grievance[s] or appeal[]s' fail to satisfy PLRA's exhaustion requirements." Kendall v. Cuomo, No. 1:12-CV-3438, 2017 WL 4162338, at *3 (S.D.N.Y. Sept. 19, 2017) (quoting Woodford, 548 U.S at 83–84); Riles, 656 F. App'x at 579 (same); see also Miller, 2021 WL 4392305, at *5 ("Indeed, the PLRA demands 'strict compliance with the grievance procedure . . . , or else dismissal must follow inexorably.'" (quoting McCoy v. Goord, 255 F. Supp. 2d 233, 246 (S.D.N.Y. 2003) (cleaned up)).

        In conjunction with the PLRA's strict mandatory exhaustion requirements,[23] in Ross, the Supreme Court

---

[23]    "[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion."

> held that the only limit to the PLRA's
> exhaustion requirement "is the one baked into
> its text: An inmate need exhaust only such
> administrative remedies as are 'available.'"
> [578 U.S. at 648]. The Supreme Court
> enumerated three nonexhaustive circumstances
> in which grievance procedures would be
> unavailable. First, "an administrative
> procedure is unavailable when (despite what
> regulations or guidance materials may promise)
> it operates as a simple dead end—with officers
> unable or consistently unwilling to provide
> any relief to aggrieved inmates." [Id.] at
> [643]. Second, "an administrative scheme
> might be so opaque that it becomes,
> practically speaking, incapable of use. In
> this situation, some mechanism exists to
> provide relief, but no ordinary prisoner can
> discern or navigate it." Id. [at 643-44].
> Finally, "when prison administrators thwart
> inmates from taking advantage of a grievance
> process through machination,
> misrepresentation, or intimidation[,]" the
> administrative process is rendered
> unavailable. Id. at [644].

Hill v. Tisch, No. 02-CV-3901, 2016 WL 6991171, at *4 (E.D.N.Y.

Nov. 29, 2016); see also Williams, 829 F.3d at 123-24 (holding

that Ross "fram[es] the exception issue entirely within the context

of whether administrative remedies were actually available to the

aggrieved inmate"); accord Grafton v. Hesse, 783 F. App'x 29, 30

(2d Cir. 2019) (summary order) (identifying the same "three

circumstances in which an administrative remedy is unavailable").

 "The failure to exhaust is an affirmative defense that

must be raised by the defendants." Osborn, 2021 WL 1131413, at *3

---

Ross, 578 U.S. at 639; see also Riles, 656 F. App'x at 580 (same
(quoting Ross)).

(citing Jones v. Bock, 549 U.S. 199, 216 (2007); further citation omitted); see also Grullon v. City of New Haven, 720 F.3d 133, 141 (2d Cir. 2013) (same (citing Jones, 549 U.S. at 216)).  "[I]t is defendants' burden to establish that plaintiff failed to meet the exhaustion requirements."  Id.  (citing Key v. Toussaint, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009)).  Defendants are to do so "by pointing to legally sufficient sources such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute."  Anderson v. Spizziota, No. 11-CV-5663, 2016 WL 11480707, at *8 (E.D.N.Y. Feb. 12, 2016) (quoting Hubbs, 788 F.3d at 59 (cleaned up)), report and recommendation adopted, 2016 WL 1275044 (E.D.N.Y. Mar. 31, 2016).  "Once a defendant meets this burden, a plaintiff may attempt to establish that 'administrative remedies may nonetheless be deemed unavailable' by proving other factors excuse his failure to exhaust."  Id. (quoting Hubbs, 788 F.3d at 59 (further citation omitted)).  "[W]hether an administrative remedy was available to a prisoner in a particular prison or prison system is ultimately a question of law, even when it contains factual elements."  Hubbs, 788 F.3d at 59 (citing Snider v. Melindez, 199 F.3d 108, 114 (2d Cir. 1999)).  However, where there is a disputed issue of material fact regarding a plaintiff's failure to exhaust, a court may hold a hearing before deciding whether the plaintiff exhausted or was excused from exhausting the PLRA's exhaustion requirements.  See

Medina v. Nassau County Sheriff's Dep't, No. 11-CV-0228, 2013 WL
4832803, at *7 n.8 (E.D.N.Y. Sept. 10, 2013).

    C.    <u>Analysis</u>

        1.    <u>Regarding Claims by Those Not in Custody</u>

        As the County acknowledges (<u>see</u> C-Reply at 10), case law
is clear that the PLRA's exhaustion requirement does not apply to
conditions-of-confinement claims made by individuals no longer in
custody, <u>i.e.</u>, claims made after one is released from custody.
<u>See, e.g.</u>, <u>In re Nassau County Strip Search Cases</u>, No. 99-CV-2844,
2010 WL 3781563, at *4 (E.D.N.Y. Sept. 22, 2010) ("The purpose of
the PLRA patently was to curb the litigiousness of detainees
<u>presently in custody</u>." (emphasis added)); <u>McBean v. City of N.Y.</u>,
260 F.R.D. 120, 142 (S.D.N.Y. 2009) ("[L]itigants . . . who file
prison condition actions after release from confinement are no
longer 'prisoners' . . . and, therefore, need not satisfy the
exhaustion requirements of th[e] provision." (quoting <u>Greig v.
Goord</u>, 169 F.3d 165, 167 (2d Cir. 1999))); <u>cf.</u> <u>Jackson v. Fong</u>,
870 F.3d 928, 936 (9th Cir. 2017) (in recognizing that "[t]he PLRA
expresses Congress' preference for prison officials to have a fair
chance to address matters internally before a prisoner may turn to
the courts," further recognizing that "after a prisoner's release,
there is no internal process left to undermine," thereby holding
that where plaintiff "was not a prisoner when he filed his
operative third amended complaint, [he] . . . cannot be subject to

a[] [PLRA] exhaustion defense"). Therefore, those who complained about conditions-of-confinement after their release from custody are not precluded from this Action because of a lack of exhausting administrative remedies.

### 2. Regarding Claims Not Within Warden's Control

The undisputed record evidence demonstrates that the County has been cognizant of the overcrowding state-of-affairs in the SCCF since well before the institution of this Action. (See, e.g., Ex. 23 (Charlie LeDuff, A Jail Waiting to Explode?; In Suffolk, Warnings from Guards and Guarded, N.Y. Times, June 15, 1999); Ex. 32 (John Rather, State Pressures Suffolk to Build Jail, N.Y. Times, Feb. 22, 2004); Ex. 28 (County's "2010-2012 Capital Program Request Form" at 3 ("Today, Suffolk County's Correctional System is barely functioning. Massive overcrowding continues to be the hallmark of our correctional facilities. Overcrowding, and the advanced state of deterioration of two dormitories has rendered our Correctional System sufficiently unfit and unsafe as to qualify it for substitute jail orders.")); Ex. 38 (County's "Review of Proposed Capital Program 2009-2011, Capital Budget 2009" at 176-77 (re: Riverhead Facility, stating it "is in desperate need of significant maintenance, repair and upgrading due to both its age and the fact that the facility has experienced significant overcrowding since the 1980's" and "[t]he heavy wear and tear as a result of this continued overcrowding has greatly taxed the

systems' infrastructure" resulting in "plumbing, heating/cooling, electrical, security and other mechanical systems . . . be[ing] overloaded and continu[ing] to break down"); Ex. 15 (County's "Review of Proposed Capital Program 2010-2012, Capital Budget 2010" at 179 (re: Yaphank Facility, stating "[o]vercrowding and the deterioration of the dorms have rendered the facility obsolete"), and at 180 (re: Riverhead Facility, stating it "must continue to be maintained and renovated" and "cannot continue to be neglected as it has been in the past")); and, Ex. 40 (County's "Review of Proposed Capital Program 2011-2013, Capital Budget 2011" at 161 (re: Yaphank Facility, stating "[o]vercrowding and the deterioration of the dorms have rendered the facility obsolete"), and at 165 (re: Riverhead, stating continued overcrowding taxes infrastructure systems and leads to their continuing to break down)).) As the Plaintiffs aptly assert, "[t]he County itself described the conditions of the Facilities as in 'desperate need of significant maintenance, repair and upgrading,' and admitting that plumbing systems were 'overloaded and continua[ally] break[ing] down' as early as 2005." (P-Opp'n at 21 (quoting May 2005 Report, Ex. 35, at ECF p. 7) (brackets and emphasis in original); see also May 2005 Report, Ex. 35, at ECF p.7 ("The heavy wear and tear as a result of this continued overcrowding have greatly taxed the systems' infrastructure. As a result, plumbing, heating/cooling, electrical, security and

68

other mechanical systems have been overloaded and continue to break down." (emphasis added).)

The County's own records demonstrate that the chronic overcrowding at the SCCF exacerbated systemic infrastructure problems and was the root cause of many of the Plaintiffs conditions-of-confinement complaints (see generally Pls. 56.1 Stmt. ¶¶ 55-60), i.e., the "ping-pong" toilets and exposure to human waste (see generally id. ¶¶ 61-76); leaking and broken plumbing, including showers, causing flooding (see generally id. ¶¶ 77-81); clogged drainpipes causing flooding; leaking ceilings and roofs causing flooding; poor air quality and insufficient ventilation issues (see generally id. ¶¶ 82-86); and, related extreme temperatures, which could not be regulated (see generally id. ¶¶ 87-91). In other words, these complaints emanated from the severe overcrowding of the SCCF. Moreover, as the Plaintiffs contend, "the County has supplied no business records of renovations, no records of relevant repairs, and no contemporaneous communications regarding improvements" that would have addressed these complaints. (P-Opp'n at 6 (citing Pl. 56.1 Stmt. ¶¶ 139-150; County 56.1 Resp. ¶¶ 139-150).) To require Plaintiffs to have exhausted administrative remedies regarding their overcrowding-related conditions-of-confinement complaints would be to give legitimacy to the illusion that the Warden could have provided relief to the Plaintiffs regarding those complaints.

Yet, Warden Ewald testified otherwise (see Ewald Dep. 187:13-24 (Warden testifying it was not his decision whether to refurbish or rebuild the jails in response to overcrowding and deterioration)), and the SCCF's Handbook explicitly discloses that "[i]ssues that are outside the Warden's control" "WILL NOT BE SUBJECT OF A GRIEVANCE" (Ex. 1 at ECF p. 16; see also Ex. L at ECF p. 59 (regarding a June 11-12, 2014 follow-up evaluation of the Facilities, in SCOC's Sept. 10, 2014 "Minimum Standard Evaluation Response Assessment", stating that "issues such as broken toilets, showerheads not properly functioning[,] are outside the Sheriff's Department's authority and fall on the [Department of Public Works]").)

In any event, the undisputed evidence demonstrates that to the extent the Plaintiffs tried to grieve these overcrowding-related conditions-of-confinement, resolutions were illusory. By way of example, Plaintiffs proffered three "ping-pong" toilet grievances. First, is the grievance of Maffetone, that raised several issues, i.e.: (a) the denial of several requests for medical attention for a rash, (b) the denial of several requests for cleaning supplies, and (c) that "every day [his] toilet [was] filled with other inmates[s'] feces, due to [a] plumbing issue" causing him to have to breathe its noxious stench. (See P-Opp'n at 6 (citing Aug. 11, 2011 Maffetone Grievance).) The Maffetone Grievance was marked "Resolved" with the notation that Maffetone

was seen by medical unit staff for his rash, "[t]he decision form made no mention of providing cleaning supplies or of repairs or improvements to the plumbing system." (Id. (citing Aug. 11, 2011 Maffetone Grievance).)

Two similar "back-flushing" toilet complaints were made soon thereafter. Named-Plaintiff Lynch filed a grievance on August 25, 2011 (see P-Opp'n at 6-7[24]); while it was also marked "Resolved", notably, it also included a response that "[t]here is a design flaw i[n] the Facility septic system" and "occasionally there is a commingling of waste from the adjoining cell . . . caus[ing] waste to intrude into the next cell's toilet." (Aug. 25, 2011 Lynch Grievance.) Less than a week later, inmate Wesley Jones filed a similar "back-flushing" toilet complaint. (See P-Opp'n at 7 (citing Sept. 2, 2011 Jones Grievance).) "The County again returned the grievance as resolved, acknowledging that 'back-flushing [was] an ongoing issue' caused by 'a design flaw in the Facility septic system.'" (Id. at 7.) Yet, as Plaintiffs aptly contend, "[t]o date, the County has not brought forth any evidence of any action it took to actually resolve the admitted design flaw at Riverhead that allows for 'back-flushing.'" (Id.)

---

[24] While they cite the correct Grievance Number, R-2011-434, Plaintiffs incorrectly cite to Ex. 103 for said grievance; it is properly identified as Ex. 102.

There is also the non-toilet-grievance example of class-member Kenneth Williams, who complained of black mold, rust, peeling paint, and "mold . . . mixed with dust;" the grievance was marked "[a]ccepted and resolved", but the purported resolution was to have Williams clean his living area and the shower area.  (See id. at 17 (citing Sept. 6, 2011 Williams Grievance, Opp'n-Ex. 4[25] ("Inmates . . . are responsible to maintain a clean living space and shower areas.")).)  Yet, ironically, another undisputed common grievance by Plaintiffs was the lack of cleaning supplies.  (See Pl. 56.1 Stmt. ¶¶ 92.d, 92.i.)

As the Supreme Court teaches, where grieving is simply a "dead end", the exhaustion requirement is excused.  See Carter v. Revine, No. 3:14-CV-1553, 2017 WL 2111594, at *9 (D. Conn. May 15, 2017) ("The exhaustion requirement . . . may be excused when the remedy is not available in practice even if it is 'officially on the books.'" (citing Ross, 578 U.S. at 640-42)).  In other words, "an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'"  Ross, 578 U.S. at 642 (quoting Booth, 532 U.S. at 738).  Thus, even if the identified overcrowding-related complaints were within the Warden's control,

---

[25]  Attached to the Declaration of George B. Adams, Esq. (see ECF No. 489), an associate with Shearman & Sterling, LLP, Plaintiff's counsel, which Declaration was submitted in support of Plaintiffs' Opposition (see ECF No. 488).

the Plaintiffs would be excused from exhaustion requirements in this instance since, as the record demonstrates, making such grievances was simply a dead end.  (Cf. Pl. 56.1 Stmt. ¶¶ 100.a-100.c, with County 56.1 Resp. ¶¶ 100.a-100.c; see also, e.g., Pl. 56.1 Stmt. ¶¶ 97.a-97.n; cf. County 56.1 Resp. ¶¶ 97.a-97.n.[26]) Indeed, the Supreme Court reiterated, that "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates."  Ross, 578 U.S. at 643 (emphasis added).

### 3.   Regarding Claims Within Warden's Control

There are several categories of grievances and complaints that appear to have been within the Warden's control, to wit, those regarding: the food (e.g., being cold, undercooked, of insufficient portion); the lack of cleaning supplies; and, the presence of insects and vermin (hereafter, the "Warden-Covered Grievances").  As such, in the ordinary course, the Warden-Covered Grievances are subject to the grievance procedures.  However, other than the County acknowledging Named-Plaintiff Butler's fully

---

[26]  To the extent the County denies certain statements of facts put forth by Plaintiffs, citing without specificity to entire exhibits (see County 56.1 Resp. ¶¶ 97.a, 97.b, 97.d, 97.g), that is unavailing.  In any event, even if credited, those denials do not present material disputed facts that would preclude ruling in favor of Plaintiffs on this issue.

exhausted grievance regarding "the March 25, 2011 breakfast served Tier 4SE" (C-Support Memo at 15), the parties do not address these other Warden-Covered Grievances in the context of the County's Cross-Motion.

"The defendant[] ha[s] the burden of showing that there is no genuine issue of material fact as to exhaustion that would preclude summary judgment." Johnston v. Maha, 460 F. App'x 11, 15 (2d Cir. 2021). But, here, the County offers no evidence -- disputed or otherwise -- regarding the Plaintiffs' purported non-exhaustion of the Warden-Covered Grievances. Cf. Pennington, 855 F. App'x at 782 ("[I]n ruling on a summary judgment motion, '[t]he court need consider only the cited materials' in the parties' submissions." (quoting FED. R. CIV. P. 56(c)(3)); Morales v. N.Y.S. Dep't of Labor, Div. of Emp't Servs., 530 F. App'x 13, 14 (2d Cir. 2013) (same); see also Knight v. Nassau County, No. 17-CV-0958, 2019 WL 3817392, at *4 (E.D.N.Y. Aug. 14, 2019) ("Relatedly, it is not the role of the Court to search the summary judgment record for evidence supporting a party's motion or opposition thereto." (citing N.Y.S. Teamsters, 426 F.3d at 648-49) (collecting cases). Moreover, in the absence of the County advancing any meaningful arguments that it is entitled to summary judgment in its favor because the Plaintiffs failed to exhaust their Warden-Covered Grievances, the County is deemed to have waived its exhaustion defense as to those claims. See, e.g., Banks v. County of

Westchester, 168 F. Supp. 3d 682, 693 n.3 (S.D.N.Y. 2016) (noting failure-to-exhaust defense may be waived where not raised by defendant in its motion to dismiss) (collecting cases); see also Santos v. City of N.Y., No. 10-CV-3159, 2012 WL 554436, at *5 n.5 (S.D.N.Y. Jan. 19, 2012) (same), report and recommendation adopted, 2012 WL 565987 (S.D.N.Y. Feb. 21, 2012).

Additionally, the County's reliance on a failure-to-exhaust defense is unavailing as to the Warden-Controlled Grievances because the record evidence establishes that the SCCF failed to provide an effective grievance system since inmates were denied or prevented from obtaining grievance forms and were threatened or retaliated against for grieving.  Indeed, the County has admitted or is deemed to have admitted,[27] inter alia, correction officers issued threats, refused to accept grievances, and pressured inmates to sign off that grievances had been resolved. (See Pl. 56.1 Stmt. ¶¶ 97.a-97.n; cf. County 56.1 Resp. ¶¶ 97.a-97.n.)  As such, here, the County's reliance upon the affirmative

---

[27] Where it did not explicitly dispute them, Defendant is deemed to have admitted Plaintiffs' relevant Rule 56.1 Statements (see Pl. 56.1 Stmt. ¶¶ 97.a-97.n.) because, in responding to said 56.1 Statements, it failed to cite to specific evidence refuting the Statements or cited to entire exhibits without specificity.  As the Court discussed, supra, that is insufficient to properly dispute a statement of fact, and in the absence of properly disputing a statement of fact, it is deemed admitted.

defense of failure-to-exhaust is unavailing to establish its entitlement to summary judgment in its favor.[28]

Even if that were not so, at least as to Plaintiffs' food-related grievances of being served inadequate, spoiled and moldy food, that claim would not be precluded by a failure-to-exhaust affirmative defense since there is no dispute that Named Plaintiff Butler exhausted applicable remedies as to that claim. (See, e.g., County 56.1 Add'l Stmt., ECF No. 469-2, ¶ 3; see also C-Opp'n at 4, n.3, 5.) See Barfield v. Cook, No. 18-CV-1198, 2019 WL 3562021, at *7 (D. Conn. Aug. 6, 2019) ("[A] number of courts have invoked a doctrine known as 'vicarious exhaustion,' holding that the PLRA's exhaustion requirement is satisfied as long as at least one member of the proposed prisoner class has exhausted applicable remedies. [The Court] agree[s] with these courts and conclude[s] that, because Defendant does not contest that [representative members] have satisfied the PLRA's exhaustion requirement, the requirement is satisfied as to all class members."); see also id. at *8 (collecting cases regarding a class

---

[28] If the Court were to have found materially disputed facts regarding whether Plaintiffs had exhausted their administrative remedies prior to commencing this Action, warranting an evidentiary hearing, because neither party advanced the argument that the SCCF's grievance procedure is "so opaque that it [is], practically speaking, incapable of use" Ross, 578 U.S. at 643, said hearing would be limited to whether the SCCF's grievance procedure was a simple dead end, see id. at 642, or whether Plaintiffs were thwarted in their attempts to grieve, see id. at 644.

member's exhaustion of administrative remedies being sufficient to satisfy the PLRA's exhaustion requirement for a class of prisoners).

In sum, upon the record presented, the County has not established that it is entitled to a failure-to-exhaust defense because: (a) Plaintiffs' claims regarding the Non-Warden-Controlled Grievances are not subject to exhaustion; and (b) the County is deemed not to have disputed Plaintiffs' contentions that (i) the SCCF's grievance system was no more than a dead end or that (ii) Plaintiffs were thwarted in their attempts to grieve.

III. <u>The Plaintiffs' Summary Judgment Motion</u>

    A. <u>The Parties' Positions</u>

At its core, the persistent overcrowding at the SCCF and the consequences of that overcrowding form the foundation for this Action.  The Plaintiffs contend that by "the County's own records and the testimony of its own employees," "a decades-long history of chronic overcrowding and neglect at the SCCF," has been established and "which together have created conditions that are 'unsafe for inmates and staff' and 'unacceptable for human habitation,' thereby depriving inmates and detainees of 'dignity . . . , humanity and decency.'" (P-Support Memo at 3 (quoting <u>Estelle v. Gamble</u>, 429 U.S. 97, 102 (1976)) (footnote omitted).) Therefore, they seek to "hold Suffolk County liable for its decades-long policy of knowing neglect and indifference to

dangerous and inhumane conditions of confinement at the SCCF, which violated inmates' and detainees' rights under the Eighth and Fourteenth Amendments of the United States Constitution and the due process clause of the New York Constitution.[29]" (Id. at 14.) Plaintiffs contend that because "[t]he record of overcrowding, neglect, and disrepair at the SCCF is undisputed and, indeed, affirmatively conceded by the County" (id.), they are summarily entitled to a judgment of "declaratory relief regarding the County's liability with respect to the unconstitutional conditions of confinement in the [SCCF] during the class period." (Id. at 1; see also, e.g., CAC (bringing causes of action for deliberate indifference to past, current, and ongoing unconstitutional conditions at the SCCF pursuant to the Eighth Amendment, Fourteenth Amendment, and Due Process Clause of the N.Y.S. Constitution).) Accordingly, Plaintiffs move for: "(i) a judgment on the issue of the County's liability for conditions in its Correctional

---

[29]  Plaintiffs maintain that since the due process clauses of the Fourteenth Amendment and the New York State Constitution are intended to protect the same fundamental rights of an individual, "conditions that violate Fourteenth Amendment rights also violate the New York Constitution." (P-Support Memo at 15 (citing Cent. Sav. Bank v. City of N.Y., 280 N.Y.9, 10 (1939); Oneida Indian Nation of N.Y. v. Madison County, 665 F.3d 408, 427 n.13 (2d Cir. 2011)). The County does not dispute this position, and the Court agrees with Plaintiffs. See generally Hernandez v. United States, 939 F.3d 191, 205 (2d Cir. 2019) (concluding there was no reason to distinguish between a due process claim under the federal constitution and a due process claim under the New York state constitution).)

Facilities; (ii) injunctive relief; (iii) a declaration of entitlement to damages for Plaintiffs; and (iv) an award of Plaintiffs' costs and attorneys' fees."  (Id.)

Plaintiffs acknowledge that to succeed on these claims pursuant to Section 1983, they "must establish (i) that the conditions at the SCCF fell to levels that violate Constitutional protections, and (ii) that the County knew about those violations and . . . inflicted such violations through its policies or practices." (P-Support Memo at 14 (citing Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 690 n.55 (1978); further citation omitted).)  In that vein, Plaintiffs argue that "[i]nmates and detainees confined at the SCCF endured, and continue to endure, unsanitary, unconscionable, and unrelenting conditions of confinement that deprived them of safe and sanitary living conditions and seriously endangered their health and safety." (Id. at 19; see also id. at 21-25 (addressing persistent and severe overcrowding); id. at 25-29 (addressing the dangerous and unsanitary conditions as a result of overcrowding and the County's neglect).)  They maintain "that the County knew of these conditions for decades and believed that overcrowding and deterioration at the SCCF was so severe that—without desperately needed renovations—both the Yaphank and Riverhead [F]acilities risked being closed permanently by the State Commission of Corrections." (Id. at 20.)  Yet, despite this knowledge, "County officials also

79

did nothing about them, thereby knowingly and deliberately rendering the SCCF 'unfit and unsafe' for the inmates and detainees confined inside them." (Id.) They contend that because the County was "deliberately indifferent to the dangerous and unsanitary conditions at the SCCF, which deprived inmates and detainees of safe and habitable shelter," the Court should find the County violated Plaintiffs' Eight Amendment rights. (Id. at 36.) Relatedly, Plaintiffs argue that because the County had actual knowledge of the persistent dangerous and unsanitary conditions-of-confinement at the SCCF, but refused to take reasonable measures to abate them, that such confinement amounted to punishment and, therefore, violated the detainees' rights under the Fourteenth Amendment and the due process clause of the New York State Constitution. (See id. at 37 and n.63.) Moreover, Plaintiffs encourage the Court to find the County liable pursuant to Monell for these constitutional violations, arguing that, because the County knew for years of the significant overcrowding and the need for immediate funding and repairs to address overcrowding and other dangerous conditions at the SCCF, but repeatedly failed to take appropriate action, that such neglect "is attributable to a widespread custom or practice of Suffolk County which cannot be brushed aside." (Id. at 42; see also id. at 39 ("[A] municipal policy may be 'reflected in either action or inaction,' such that a municipality's 'policy or inaction in light of notice that its

80

program will cause constitutional violations is the functional equivalent of a decision . . . to violate the Constitution.'" (quoting Cash v. County of Erie, 654 F.3d 324, 334 (2d Cir. 2011)).)   As such, Plaintiffs assert they are entitled to injunctive relief (see id. at 42-45), compensatory damages (see id. at 45-46), and nominal damages (see id. at 46).[30]

In opposition, the County contends the living conditions in the SCCF are not unconstitutional and, therefore, Plaintiffs are not entitled to relief pursuant to Section 1983.  (See C-Opp'n at 22.)   More specifically, the County contends that the SCCF is not overcrowded, asserting SCCF: "has been under capacity since mid 2011-2012"; that future projections "show that the population level has stabilized"; and that "[a]t no time has the SCCF housed more inmates than permitted by the SCOS."  (Id. at 23.)   It also maintains that inmates have not been exposed to dangerous and unsanitary conditions.

As to toilets: The County baldly argues that "problems with the toilets . . . are no more frequent, extensive or severe then would normally be expected in a correctional facility that houses 1200—or several hundred more—inmates at a time" and "that

---

[30]   To the extent that the Court finds an award of compensatory and nominal damages is warranted, Plaintiffs request that "the specific amount of damages . . . be determined at a subsequent trial or evidentiary hearing before this Court, by a court-appointed special master, or such other procedure as the Court believes proper."  (Id. at 49 (collecting cases).)

this sort of plumbing problem routinely occurs in properly working fixtures as a result of occasional, heavy, or careless, use and not because of a lack of maintenance."  (Id. at 25; see also id. at 26 (arguing that Plaintiffs' evidence "reflects alleged sporadic exposure to fecal matter some years ago").)

As to persistent leaks and flooding:  The County characterizes these claims as "flawed by puffery".  (Id. at 26.) It also contends that certain of the purported leaks and floods occurred in housing areas that are not a part of this case, i.e., Riverhead pods and the "Sprung".[31]  As to other claimed leaks and floods, those claims "occurred over a period of almost 6 years" and "were reported in areas that no longer exist," having been renovated.  (Id.)  Moreover, in the County's view, "24 leaks over a period of almost 6 years" in a large facility "is a far cry from a 'persistent' problem."  (Id. at 27.)

As to inadequate ventilation:  The County contends that since August 2009, when the last documented report of poor air quality in Riverhead was substantiated, "new air handlers and duct work have been installed in the building."  (Id.; see also id. at 28 (stating Yapank has undergone a "gut renovation").)  Moreover, "the documentary evidence . . . does not show past ventilation

---

[31]  This contention is addressed in Part IV of the DISCUSSION section of this Memorandum & Order, entitled "The County's Claim of Excluded Facilities" (see infra at 128-30).

inadequacies of a magnitude to raise health concerns."   (Id. at 28.)

As to SCCF temperatures:  The County maintains that the Plaintiffs overstate their complaints and, in any event, approximately a third of those complaints "took place in the 'Sprung', a facility not under consideration in this case."[32]  (Id.) It acknowledges that "4 [complaints] relate to the temperature in Riverhead in November-December 2009" but argues that the remaining nine temperature complaints regarding Yaphank were made over a five-year period and, therefore, cannot be perceived as ongoing and significant.  (Id.)

As to kitchen conditions: The County would have the Court give little heed to the Plaintiff's reliance upon the County's DHS Inspection Reports as proof of extremely serious violations because the DHS declines to restrict the operations of SCCF's kitchens.  (See id. at 28-29.)

As to drinking water complaints:  The County argues the dirty-water complaints are "especially hollow" as Plaintiffs have not presented any evidence that "they actually became ill as a result of the supposedly unhealthy water."  (Id. at 29.)  Despite recognizing the water complaints of Named-Plaintiff Alver and inmate Zukoski, the County maintains neither is an expert on

---

[32]  (See supra note 31.)

sanitary conditions.  It also questions the Plaintiff's proffered evidence regarding the presence of harmful microorganisms, asserting "that data was produced by their expert, not an independent tester" and subject to flawed methodology.  (Id.)

Relatedly, the County maintains that inmates have not been injured by their claimed-of unacceptable conditions-of-confinement.  (See id. at 30.)  Indeed, the County asserts that the Named-Plaintiffs' "medical records are objective evidence that their claims are not grounded in reality."  (Id. (citing "exhibits 7-12, Zwilling Declaration"[33]).)  More particularly, the County contends the Plaintiffs have not marshaled evidence supporting their claims of having "developed nausea, dizziness[,] and headaches from exposure to human waste due to purported defects in the SCCF's plumbing that caused backflushing."  (Id. at 30; see also id. at 30-32 (addressing each Named-Plaintiff's alleged symptoms).)  It also argues that the Plaintiffs have not provided evidence of inmates developing dermatological ailments from conditions at the SCCF.  (See id. at 32; see also id. at 32-33

---

[33] In addition to a complete failure to provide any pincites to these exhibits, the Court is unable to locate the exhibits as cited.  It appears the County is referring to paragraphs in the Zwilling Declaration, which paragraphs each identify an exhibit represented to be a Named-Plaintiff's medical unit chart.  (See Zwilling Decl., ECF No. 483-3, ¶¶7-12.)  Accord Ohlson, 2008 WL 4516233, at *5 (admonishing counsel for failing "to provide any pinpoint citations to the deposition transcript or to direct the Court's attention to any particular testimony").

(addressing the claims of King, Sims, and Lynch); but see id. at 34 (acknowledging evidence supporting Butler's claim of a "rash in 2011 while housed in Riverhead," but arguing there is no medical evidence connecting the rash to conditions in the SCCF).)  As to respiratory issues, the County notes that Sims, Lofton, Alver, and King have not asserted experiencing any such issues, and that neither Lynch nor Butler ever reported such issues to the medical unit.  (See id. at 33-34.)  And, regarding Lynch's claim that he was diagnosed with kidney damage in 2011, the County asserts that the record evidence indicates "a possibility that he may have organic kidney disease" and that subsequent medical records "show he has not been treated for kidney damage."  (Id. at 33-34.)

Consequently, the County first argues Plaintiffs cannot establish that the Plaintiff-inmates' Eighth Amendment rights were violated.  (See id. at 35-40.)  It contends Plaintiffs have not shown that their conditions-of-confinement "in the SCCF pose an unreasonable risk of serious damage to inmate health," because Plaintiffs have not supplied "tangible evidence that the austere conditions they claim actually exist," thereby failing to meet the objective prong of the relevant Eighth Amendment analysis.  (See id. at 37.)  Moreover, the County asserts that Plaintiffs cannot meet the subjective prong of the Eighth Amendment analysis, i.e., that the County "ignored an excessive risk to plaintiffs' health knowingly, deliberately and with actual knowledge of the risks"

(id.), because there was no risk of which to be aware and, in any event, the conditions-of-confinement in the SCCF "were timely addressed." (Id. at 38 (arguing further that "[t]he County's work in expanding, modernizing and improving the SCCF, and it[s] plan to continue to do so on an ongoing basis through annual capital budget lines, shows that there has been no knowing and deliberate disregard of inmate needs").) The County also relies upon purported improvements it has made at the Facilities to argue that conditions-of-confinement are now constitutionally sufficient. (See id. at 39.)

The County further contends Plaintiffs have not shown that detainees' Fourteenth Amendment rights were violated (see id. at 40-41). It correctly states that for purposes of the Fourteenth Amendment, the "objective seriousness-of-conditions prong" is analyzed in the same manner as for such claims brought pursuant to the Eighth Amendment arguments, i.e., "that the official[s] have acted with the necessary level of culpability regarding the unconstitutional condition." (Id. at 40-41 (cases omitted).) The County further recognizes that to establish the subjective prong of the Fourteenth Amendment, a detainee-plaintiff must establish the defendant-official's "deliberate indifference," which is defined objectively for a Fourteenth Amendment due process claim. (Id. at 41 (citing Darnell v. Pineiro, 849 F.3d 17, 35 (2d Cir. 2017)). Relying upon its arguments opposing Plaintiffs' Eighth

86

Amendment claim, the County asserts that the complained-of conditions-of-confinement "do not transgress plaintiffs' due process rights."[34]  (Id.)

Finally, the County asserts that Plaintiffs have failed to establish that their constitutional rights were violated by a County custom or policy.  (See id. at 41-45.)  It first contends that "conditions in the SCCF do not infringe plaintiffs' constitutional rights," and, therefore, there is no basis for Monell liability.  (Id. at 42.)  The County then argues that there is no evidence of such a custom or policy and, in any event, "[t]he County Legislature has allocated funds to build a new Yaphank facility, gut[-]renovate the older Yaphank building, and maintain ongoing annual capital budget lines for continuing replacement and

---

[34] The County has not raised any opposition arguments regarding the Plaintiffs' due process claims under the New York constitution. (See C-Opp'n, Point IV, 40-41.)  Therefore, the Court deems the Plaintiffs' state-constitutional due process claim unopposed. See, e.g., Jackson v. Fed. Express, 766 F.3d 189, 195 (2d Cir. 2014) (if a non-moving party submits "a partial response arguing that summary judgment should be denied as to some claims while not mentioning others," that response "may be deemed an abandonment of the unmentioned claims"); Camarda v. Selover, 673 F. App'x 26, 30 (2d Cir. 2016) ("Even where abandonment by a counseled party is not explicit, a court may infer abandonment from the papers and circumstances viewed as a whole." (cleaned up)); Taylor v. City of N.Y., 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." (citation omitted)); Cowan v. City of Mount Vernon, 95 F. Supp. 3d 624, 645 (S.D.N.Y. 2015) ("'Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.'" (citation omitted)).

upgrades at both Riverhead and Yaphank." (Id. at 42.) Moreover, the County advances the position that, even if SCCF conditions-of-confinement "presented a foundational constitutional violation," Plaintiffs have not shown the County's polices were the "moving force" behind those violations. (Id. at 42-43.) That is, the County asserts that while "plaintiffs make much of the public knowledge that conditions in the SCCF were supposedly deficient, . . . they point to nothing to suggest that County policymakers knew that conditions were unconstitutional." (Id. at 43 (emphasis in original).) This, it argues, is significant because a plaintiff must show that a policymaking official was aware of the constitutional injury, or risk thereof, but failed to take appropriate action to prevent it in order to establish the requisite deliberate indifference. (Id. (citing Jones v. Town of E. Haven, 691 F.3d 72, 81 (2d Cir. 2012)).) More than negligence must be shown; a plaintiff is required to show that the official made a conscious choice. (See id. at 43-44 (citations omitted).) In sum, the County posits that "both because [Plaintiffs] demonstrate no underlying violation of their civil rights, and because they do not establish that County policymakers unlawfully abdicated their constitutional responsibilities toward them, [P]laintiffs fail to establish Monell liability on the part of the County." (Id. at 45.)

88

B.   Constitutional Protections for Inmates Pursuant to the
     Eighth and Fourteenth Amendments

> The Constitution requires that prison officials "provide humane conditions of confinement" and "ensure that inmates receive adequate food, clothing, shelter, and medical care." Farmer v. Brennan, 511 U.S. 825, 832 (1994). "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones[.]" Id. (internal quotation marks and citation omitted)."

Anduze v. City of N.Y., No. 21-CV-0519, 2022 WL 4586967, at *9 (S.D.N.Y. Aug. 8, 2022), report and recommendation adopted, 2022 WL 4547420 (S.D.N.Y. Sept. 29, 2022). When evaluating such claims, courts look to "contemporary standards of decency." Id. (citing Darnell, 849 F.3d at 29); see also Hamilton v. Westchester County, No. 18-CV-8361, 2020 WL 917214, at *5 (S.D.N.Y. Feb. 25, 2020) (quoting Sanders v. City of N.Y., No. 16-CV-7426, 2018 WL 3117508, at *6 (S.D.N.Y. June 25, 2018) (stating "[t]here is no 'static test' to determine whether a deprivation is sufficiently serious," but that conditions must be evaluated using contemporary standards of decency (quoting Darnell, 849 F.3d at 29)), aff'd in part, vacated in part on other grounds, remanded, 3 F.4th 86 (2d Cir. 2021). Pursuant to either the Eighth or Fourteenth Amendments, "to set forth a § 1983 claim for conditions of confinement, a plaintiff must show that an individual 'acted with deliberate indifference to the challenged conditions.'" Hamilton, 2020 WL 917214, at *5. As discussed further, infra, "[t]his deliberate

89

indifference test contains an objective prong and a subjective prong." Id. (citing Darnell, 849 F.3d at 29).

    1.   The Eighth Amendment

Pursuant to the Eighth Amendment of the U.S. Constitution, cruel and unusual punishments shall not be inflicted upon an inmate. See U.S. CONST. amend. VIII. Thus, "[t]he Cruel and Unusual Punishments Clause of the Eighth Amendment requires prison officials to 'provide humane conditions of confinement' and 'ensure that inmates receive adequate food, clothing, shelter, and medical care.'" White v. Gutwein, No. 20-CV-4532, 2022 WL 2987554, at *6 (S.D.N.Y. July 28, 2022) (quoting Farmer, 511 U.S. at 832). Indeed, the Supreme Court has made clear that the standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society." Estelle v. Gamble, 429 U.S. 97, 102 (1976) (internal quotation omitted).

Establishing a violation of this clause of the Eighth Amendment based upon claims of deliberate indifference to conditions-of-confinement requires making a dual showing. First, a plaintiff must objectively demonstrate that "the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." Walker 717 F.3d at 125; see also Darnell, 849 F.3d at 29 (establishing objective element of Eighth Amendment claim with showing that alleged deprivation was

90

"sufficiently serious that [prisoner] was denied the minimal civilized measure of life's necessities"); see also Reid v. City of N.Y., No. 20-CV-0644, 2021 WL 3477243, at * 7 (S.D.N.Y. Aug. 6, 2021), report and recommendation adopted, 2021 WL 4177756 (S.D.N.Y. Sept. 14, 2021). To do so:

> "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health," Walker[ v. Schult], 717 F.3d [119,] 125 [(2d Cir. 2013)], which includes the risk of serious damage to "physical and mental soundness," LaReau v. MacDougall, 473 F.2d 974, 978 (2d Cir. 1972). There is no "static test" to determine whether a deprivation is sufficiently serious; instead, "the conditions themselves must be evaluated in light of contemporary standards of decency." Blissett v. Coughlin, 66 F.3d 531, 537 (2d Cir. 1995) (citing Rhodes v. Chapman, 452 U.S. 337, 346, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981)).

Darnell, 849 F.3d at 30; see also Walker 717 F.3d at 125 ("[P]rison officials violate the Constitution when they deprive an inmate of his 'basic human needs' such as food, clothing, medical care, and safe and sanitary living conditions." (citing Rhodes, 452 U.S. at 347)). Moreover, "[e]ach condition 'must be measured by its severity and duration, not the resulting injury,' and the conditions are not subject to 'a bright-line durational or severity threshold.'" Van Hoven v. City of N.Y., No. 16-CV-2080, 2018 WL 5914858, at *7 (S.D.N.Y. Aug. 21, 2018) (quoting Darnell, 849 F.3d at 32)), report and recommendation adopted, 2018 WL 4417842

(S.D.N.Y. Sept. 17, 2018).  Hence, "[a]lthough the seriousness of
the harms suffered is relevant to calculating damages and may shed
light on the severity of exposure [to a condition-of-confinement],
serious injury is unequivocally not a necessary element of an
Eighth Amendment claim." Willey v. Kirkpatrick, 801 F.3d 51, 68
(2d Cir. 2015) (citing Hudson v. McMillian, 503 U.S. 1, 4 (1992)).

     Second, a plaintiff must subjectively show that the
defendant "acted with more than mere negligence," but rather knew
of and disregarded an "excessive risk to inmate health or safety."
Walker, 717 F.3d at 125 (first quoting Farmer, 511 U.S. at 835;
then quoting Jabbar v. Fischer, 638 F.3d 54, 57 (2d Cir. 2012))
(all internal quotation marks omitted).  In other words, "[a]
defendant cannot be found liable under the Eighth Amendment for
denying an inmate humane conditions of confinement 'unless the
official knows of and disregards an excessive risk to inmate health
or safety; the official must both be aware of facts from which the
inference could be drawn that a substantial risk of serious harm
exist, and he must also draw the inference.'" Reid, 2021 WL
3477243, at * 8 (quoting Gunn v. Annucci, No. 20-CV-2004, 2021 WL
1699949, at *8-9 (S.D.N.Y. Apr. 29, 2021)).

     2.  The Fourteenth Amendment

     Pursuant to the Fourteenth Amendment of the U.S.
Constitution, no state shall "deprive any person of life, liberty,
or property without due process of law."  U.S. CONST. amend. XIV,

§ 1.  "When a plaintiff is a pretrial detainee . . . , claims related to conditions of confinement are analyzed under the Due Process Clause of the Fourteenth Amendment."  Anduze, 2022 WL 4586967, at *9.

As with the Eighth Amendment, establishing a violation of a detainee's due process rights under the Fourteenth Amendment based upon claims of deliberate indifference to conditions-of-confinement requires making a dual showing.  See Reid, 2021 WL 3477243, at *7.  First, a plaintiff must satisfy the "objective prong" establishing "that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process."  Darnell, 849 F.3d at 29; see also Reid, 2021 WL 3477243, at *7 (stating that to satisfy the "objective prong" of a Fourteenth Amendment due process claim regarding conditions-of-confinement, a plaintiff must "establish[] that the deprivation was 'sufficiently serious that he was denied the minimal civilized measure of life's necessities'" (quoting Darnell, 849 F.3d at 29)).  Second, a detainee-plaintiff must satisfy the "'subjective prong'—perhaps better classified as a 'mens rea prong' or 'mental element prong'—showing that the officer acted with at least deliberate indifference to the challenged conditions."  Id.  More specifically, the Darnell Court explained:

> to establish a claim for deliberate indifference to conditions of confinement under the Due Process Clause of the Fourteenth

> Amendment, the pretrial detainee must prove
> that the defendant-official acted
> intentionally to impose the alleged condition,
> or recklessly failed to act with reasonable
> care to mitigate the risk that the condition
> posed to the pretrial detainee even though the
> defendant-official knew, or should have known,
> that the condition posed an excessive risk to
> health or safety. In other words, the
> "subjective prong" (or "mens rea prong") of a
> deliberate indifference claim is defined
> objectively.

849 F.3d at 35. Accordingly, "[a]detainee must prove that an

official acted intentionally or recklessly, and not merely

negligently." Id. at 36.

C.   *Monell* Liability

"[I]t is when execution of a government's policy or

custom, whether made by its lawmakers or by those whose edicts or

acts may fairly be said to represent official policy, inflicts the

injury that the government as an entity is responsible under

§ 1983." Monell, 436 U.S. at 694. Thus, "[t]o hold a

[municipality] liable under § 1983 for the unconstitutional

actions of its employees, a plaintiff is required to . . . prove

three elements: (1) an official policy or custom that (2) causes

the plaintiff to be subjected to (3) a denial of a constitutional

right." Brandon v. City of N.Y., 705 F. Supp. 2d 261, 276 (S.D.N.Y.

2010) (first quoting Batista v. Rodriguez, 702 F.2d 393, 397 (2d

Cir. 1983); then citing Kahn v. Oppenheimer & Co., No. 08-CV-

11368, 2009 WL 4333457, at *3 (S.D.N.Y. Dec. 1, 2009)).

94

Specifically as to a "custom", "an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." Bd. of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 404 (1997); see also Miller v. County of Nassau, 467 F. Supp. 2d 308, 314 (E.D.N.Y. 2006) (stating a plaintiff may establish municipal liability by demonstrating that a policy maker "indirectly caused the misconduct of a subordinate municipal employee by acquiescing in a longstanding practice or custom which may fairly be said to represent official policy" (citing Monell, 436 U.S. at 690, and Jeffes v. Barnes, 208 F.3d 49, 61 (2d Cir. 2000)). One may establish a "custom" by showing "[a] practice so consistent and widespread that, although not expressly authorized," its usage is well-known by "a supervising policy-maker". Rowles v. Doe, 558 F. Supp. 3d 66, 71 (W.D.N.Y. 2021) (quoting Brandon, 705 F. Supp. 2d at 276-77 (S.D.N.Y. 2010)); see also Thomas v. Baca, 514 F. Supp. 2d 1201, 1212 (C.D. Cal. 2007) (defining a "custom" as a "longstanding practice . . . which constitutes the standard operating procedure of the local government entity"). Notably, a municipal policy may be "reflected in either action or inaction," such that a municipality's "policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a

decision . . . to violate the Constitution." <u>Cash v. County of Erie</u>, 654 F.3d 324, 334 (2d Cir. 2011) (quoting <u>Connick v. Thompson</u>, 563 U.S. 51, 61 (2011); internal quotation marks omitted); <u>see also</u> <u>Kucharczyk v. Westchester County</u>, 95 F. Supp. 3d 529, 539 (S.D.N.Y. 2015) (same).

      D.   <u>Analysis</u>

          1.   <u>Consideration of the Record Presented</u>

              a. <u>Facts Established Via Plaintiffs' Rule 56.1 Statement</u>

Plaintiffs contend that via their opening brief (<u>see</u> P-Support Memo) and Rule 56.1 Statement, they have "established, through extensive citations to the undisputed record, a notorious, decades-long pattern and practice by Suffolk County of subjecting inmates and detainees at the SCCF to severely overcrowded, unsanitary, and dangerous conditions of confinement in violation of their rights under the Eighth and Fourteenth Amendments of the U.S. Constitution and the Due Process Clause of the New York State Constitution."  (Reply at 1; <u>see also</u> P-Support Memo at 3.)  They assert, "Suffolk County does not . . . rebut the evidence of those conditions."  (<u>Id.</u>)  Indeed, a careful review of the County's Rule 56.1 Response shows it is woefully wanting, especially because it is largely citation free.  (<u>See</u> County 56.1 Resp.)  Moreover, in the very limited instances where the County provides citation to record evidence, it is either: general in nature, lacking pin-

citations (see, e.g., id. at ¶¶ 97.a, 97.b, 97.d, 97.g); insufficient to establish a disputed material fact (see, e.g., id. at ¶¶ 54.cc, 56, 57, 57.l, 57.m, 57.n, 67, 70); or is more appropriately directed to the issue of damages and their calculation (see, e.g., id. at ¶¶ 54.hh, 85, 90, 95, 1-1-04, 106, 108-13, 116, 118-20; see also id., Add'l Stmts. ¶¶ 3, 6, 7). Thus, in the absence of a compliant Local Rule 56.1 Response from the County, much of Plaintiffs' Rule 56.1 Statements of Fact, may be deemed admitted.

b. The Expert Reports

Plaintiffs and Defendant each submitted expert reports in support of their positions. (See Pepper Report, and Bick Report[35] (expert reports submitted by Plaintiffs); Balsamo Report (expert report submitted by Defendant).) However, the Court will not consider those Reports in ruling upon Plaintiffs' Summary Judgment Motion. After carefully reviewing the expert Reports of Pepper, Bick, and Balsamo, the Court finds they do not satisfy the admissibility requirements of Rule 56(e) since none of the experts

---

[35] "Dr. Bick was retained by Plaintiffs to offer expert opinions regarding the health consequences of the conditions within the Suffolk County jails at Riverhead and Yaphank." (P-Support Memo at 11 n.20; see also id. at 11-12 (relying upon the Bick Report as evidence that "the conditions of confinement at the SCCF create a 'significantly increased risk for the acquisition of a broad range of contagious diseases' and other injuries, including those that afflicted plaintiffs" (citing Bick Report)).

have included a declaration, pursuant to 28 U.S.C. § 1746 or otherwise, averring to the truth and correctness of their respective Reports.  (See, e.g., Pepper Report, in toto; Bick Report at 11; Balsamo Report at 34.); see also Houser, 264 F. Supp. 3d at 475; Condoleo, 427 F. Supp. 3d at 322.

Furthermore, the Court has not found any additional affidavit support from the experts at the conclusion of their respective Reports that would rectify the lack of sworn averments. See Houser, 264 F. Supp. 3d at 475.  To the extent the Pepper and Bick Reports were submitted as exhibits to the Chen Declaration, Attorney Chen's averments that he has submitted "true and correct cop[ies]" of those Reports simply addresses the authenticity of the Reports and not the experts' personal knowledge regarding the truthfulness or correctness of the content of their respective Reports. (See Chen. Decl. ¶¶ 17, 113.)  And, regarding the Balsamo Report, as noted (see supra note 5), it was submitted as an exhibit to a Letter Motion to Compel filed by the County, i.e., without any supporting affidavit.  Cf. Local Civil Rule 7.1(a)(3); FED. R. CIV. P. 56(c)(4).  Thus, the Balsamo Report lacks additional affidavit support.

A recent Second Circuit summary order buttresses the Court's ruling.  In Richardson v. Correctional Medical Care, Incorporated, the Second Circuit ruled that a district court abused its discretion when it did not consider an expert's opinion

submitted in an unsupported letter, but where the expert also gave testimonial evidence in a deposition, since by his sworn deposition testimony, the expert verified his expert opinion. See No. 22-0210-CV, 2023 WL 3490904, at *2 (2d Cir. May 17, 2023) (summary order). Here, by contrast, there is no such curative sworn deposition testimony from any of the experts, thereby justifying the Court's exclusion of same. Accord Monahan v. City of N.Y., No. 20-CV-2610, 2023 WL 2138535, at *4 (S.D.N.Y. Feb. 21, 2023) ("Unsworn letters and reports may be admissible only when the opinions expressed in such documents are reaffirmed by deposition testimony." (internal quotation marks omitted) (cited in Richardson)); Phila. Indem. Ins. Co. v. Streb, Inc., 487 F. Supp. 3d 174, 182 n.4 (S.D.N.Y. 2020) (same) (also cited in Richardson).

### c. Warden Franchi's Declaration

To the extent the County relies upon the Declaration of Warden Michael Franchi (see ECF No. 483-2), that reliance is unavailing. (See Reply at 4-5.) As Plaintiffs correctly state, Franchi's "Declaration is entirely conclusory and unsupported by any factual claim of personal knowledge, especially as to before the time he became Warden in 2016." (Id.) Cf. FED. R. CIV. P. 56(c)(4) (instructing that a declaration used to oppose a summary judgment motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated"); see

also Campbell v. Rite Aid Corp., No. 18-CV-1799, 2020 WL 5554645, at *5 (E.D.N.Y. Sept. 17, 2020) (declining to consider affidavit where affiant "ha[d] not established that he was competent to testify to many of the matters averred in his affidavit"). Indeed, in his opening averment, while stating he is the Warden of SCCF, Franchi does not state when he became Warden. (See Franchi Decl. ¶ 1.) Moreover, to the extent Franchi cites to various exhibits, including SCOC Reports, without any pin-citation, the Court need not consider them. (See id., in toto.) Cf. Campbell, 2020 WL 5554645, at *5 (further stating that "where an affiant may lack personal knowledge of the facts set forth in his declaration, if the averments are based on clearly referenced documents and deposition transcripts that are clearly identifiable and have been produced during discovery, the court may find the declaration admissible" (cleaned up; further citation omitted). In any event, Franchi's averments are more properly directed to the issue of damages.

Having articulated these preliminary rulings, the Court turns to Plaintiffs' claims.

2. Consideration of Plaintiffs'
   Conditions-of-Confinement Claims

"Under the debilitate indifference test, '[t]he objective prong is the same under either [the Eighth or Fourteenth Amendment] analysis: It requires that the deprivation at issue

100

be, 'in objective terms, sufficiently serious.'"  Hamilton, 2020
WL 917214, at *5 (quoting Simmons v. Mason, No. 17-CV-8886, 2019
WL 4525613, at *9 (S.D.N.Y. Sept. 18, 2019)).  Therefore, here,
the Court analyzes together the objective-prong of the complained-
of conditions-of-confinement brought pursuant to the Eighth and
Fourteenth Amendments.

        The Court need not view the conditions-of-confinement at
the SCCF in isolation, but may aggregate them.  See Hamilton, 2020
WL 917214, at *5; see also Walker, 717 F.3d at 125.  It considers
the duration and severity of the conditions-of-confinement to
which the Plaintiffs have been exposed to determine whether, alone
or in combination, said conditions violate Plaintiffs'
constitutional rights.  See Willey, 801 F.3d at 68; see also Van
Hoven, 2018 WL 5914858, at *7.

        There is no dispute that Plaintiffs have shown the
Facilities were overcrowded (see P-Reply at 3 (citing 2010 Capital
Budget Request Form at ECF p.3 (stating that "[m]assive
overcrowding" has been a "hallmark" of the SCCF)), leading to
infrastructure systems that were overtaxed and deteriorating.
(See Support Memo at 3-4 and notes 3-5; see also id. at 8-9; Pl.
56.1 Stmt. ¶¶ 54.k, 54.l.)  Yet, that does not compel the automatic
conclusion Plaintiffs were exposed to conditions-of-confinement
which violated their constitutional rights.  While it may likely
be that the overcrowding which led to system strains and

deteriorations   also   caused   exposure   to   unconstitutional conditions-of-confinement, "likely" is not "absolutely".   The Court  must  assess  the  duration  and  severity  of  exposure  to determine   a   condition's   implication   upon   an   inmate's constitutional rights.  For the reasons discussed, <u>infra</u>, upon the present record, the Court cannot conclude as a matter of law that the  exposures  to  the  complained-of  conditions-of-confinement caused Plaintiffs' constitutional rights to be violated.

As  to  "Ping  Pong"  Toilets:   In  assessing  conditions related to toilets, courts have stated that "exposure to human waste  carries  particular  weight".   <u>DeSpain v. Uphoff</u>, 264 F.3d 965,  974  (10th  Cir.  2001).   Indeed,  "[e]xposure  to  human  waste, like  few  other  conditions  of  confinement,  evokes  both  the  health concerns  emphasized  in  [the  Supreme  Court's  decision  in]  <u>Farmer</u>[, 511  U.S.  825  (1994),]  and  the  more  general  standards  of  dignity embodied  in  the  Eighth  Amendment."   <u>Id.</u>  (collecting  cases). Consistent  with  that  sentiment,  the  Second  Circuit  rejected  a district court's "constrained conception of the Eighth Amendment's protections  against  unsanitary  conditions  of  confinement,"  in particular,  "any  bright-line  durational  requirement  for  a  viable unsanitary-conditions  claim"  and  "some  minimal  level  of grotesquerie." <u>Willey</u>, 801 F.3d at 66, 68 (instructing that, while duration  and  severity  of  exposure  are  necessary  considerations,

there is no set minimum for either consideration).[36]  In doing so,
the Circuit Court emphasized that "any analysis must consider both
the duration and the severity of an inmate's experience of being
exposed to unsanitary conditions."   Id. (further underscoring
consideration of other conditions that "exponentially amplify[]
the grotesquerie of the odor of the accumulating waste"); see also

---

[36]  In support of his unsanitary conditions-of-confinement claim,
Willey asserted, inter alia, that he was held in an observation
cell: (1) with a toilet that was turned off for seven days; and
(2) that was not properly ventilated because it was encapsulated
by Plexiglass.  See Willey v. Kirkpatrick, No. 07-CV-6484, 2013 WL
434188, *7 (W.D.N.Y. Feb. 4, 2013).  The district court recognized
Second Circuit case law that "chronic exposure to human waste will
give rise to a colorable claim," of an Eighth Amendment violation.
See id. at *8 (discussing Gaston v. Coughlin, 249 F.3d 156, 165–
66 (2d Cir. 2001) (several consecutive days' exposure to human
feces, urine, and sewage water in front of inmate's cell sufficient
to make an Eighth Amendment claim), and LaReau v. MacDougall, 473
F.2d 974, 977-79 (2d Cir. 1972) (five days' exposure to "a grate-
covered hole in the floor for a toilet, which could only be flushed
from the outside . . . deprived [inmate] of his Eighth Amendment
rights"); then citing Wright v. McMann, 387 F.2d 519, 522, 526 (2d
Cir. 1967) (finding 33-day placement of prisoner in strip cell
which was "fetid and reeking from the stench of the bodily wastes
of previous occupants which . . . covered the floor, the sink, and
the toilet," combined with other conditions, violated Eighth
Amendment)).  Discussing further cases, it found that where an
inmate's exposure to human waste lasted three to four days, circuit
courts were split.  See id. at *9.  Yet, notwithstanding Willey's
claim of seven days' exposure to human waste exacerbated by lack
of ventilation, the district court found the claim could not
withstand summary judgment for three reasons: (1) Willey's
vagueness regarding the duration of the exposure, i.e.,
"'extensive lengths of time' versus 'seven days' versus the time
between December 1, 2005, and January 10, 2006"; (2) "Willey [had]
not claimed that human waste from his toilet overflowed into his
cell"; and (3) Willey did not claim to have suffered any sickness
or other ill effects from the exposure.  Id. at *9 (citations
omitted).  Disagreeing, the Circuit Court vacated the judgment.
Willey, 801 F.3d at 67-68.

Darnell, 849 F.3d at 30 (reiterating Willey's holding that "unsanitary conditions of confinement must be assessed according to two components, severity and duration, on a case-by-case basis"). In repudiating the district court's constricted ruling, the Circuit Court stated that, "[c]ausing a man to live, eat and perhaps sleep in close confines with his own human waste is too debasing and degrading to be permitted," and that such "indecent conditions" in a cell could "seriously threaten[ ] the physical and mental soundness of its unfortunate occupant." Id. at 67 (quoting LaReau, 473 F.2d at 978; internal quotation marks omitted); see also Gaston, 249 F.3d at 166 ("We are unwilling to adopt as a matter of law the principle that it is not cruel and unusual punishment for prison officials knowingly to allow an area to remain filled with sewage and excrement for days on end.").

Here, as to "ping-ponging" toilets and human waste, Plaintiffs present a plethora of the Facilities' Inspection Reports that document, inter alia, broken, clogged, leaking, overflowing and backflowing toilets.[37] (Pl. 56.1 Stmt. ¶¶ 72.a-j, 72.l-o, 72.t, 72.v-w, 72.y-pp (re: Riverhead); id. ¶¶ 73.a, 73.e, 73.g-j, 73.l-o, 73.r-u, 73.z-cc, 73.ee, 73.gg, 73.11u[38] (re:

---

[37] Such evidence is likely relevant to Defendant's knowledge of conditions to which the Plaintiffs were exposed.

[38] Inspection Reports also indicated issues with urinals that were, inter alia, broken, clogged, and flooding. (See Pl. 56.1 Stmt. ¶¶ 73.b-d, 73.f, 73.k, 73.p-q. 73.w-y, 73.cc-dd (re:

Yaphank).[39])    However,    evidence    of    misfunctioning    and nonfunctioning toilets does not mandate the conclusion that all these incidents also necessarily involved exposure to human waste. They may or may not have, but more facts are needed to make that determination.  Moreover, it is unclear from this evidence whether the identified toilets were located in cells, which is the crux of Plaintiffs' "ping pong" toilet condition-of-confinement claim, or communal bathroom facilities, as the location of misfunctioning and nonfunctioning toilets could be a factor in determining the duration and severity of exposure.

    As to those "ping-pong" toilet complaints put forth by the Plaintiffs that were made by inmates, they involve the Riverhead Facilities and not the Yaphank Facilities.  (Cf. Pl. 56.1 Stmt. ¶¶72.a-pp, with id. at ¶¶ 73.a-ii.)  As to the Riverhead-based "ping pong" toilet complaints, they are not enough, alone or considered in conjunction with other complained-

----

Yaphank).)  It is unclear whether urinals were located within cells and whether, like toilets, they were subject to complained-of "ping-ponging" or backflushing issues.

[39]  Plaintiffs' complaints identified in the Number 72 paragraphs relate to the Riverhead Facility and span from January 2, 2009 to October 6, 2014.  (See Pl. 56.1 Stmt. ¶¶ 72, 72.a-72.pp.)  Their complaints identified in the Number 73 paragraphs relate to the Yaphank Facilities and span from April 2, 2009 to December 12, 2014.  (See Pl. 56.1 Stmt. ¶¶ 73, 73.a-72.ii.)  The Court has not considered those subparagraphs regarding incidents that predate the beginning of the class period.

of conditions-of-confinement complaints, to establish as a matter of law constitutional violations.  For example, stating he would "put a plastic bag around my toilet so when I woke up in the morning, the feces wouldn't be directly in my face," Named Plaintiff King's deposition testimony lacks sufficient specificity regarding the duration of his expose to human waste; more is needed to assess his complaint.  (King. Dep. 191:3-6.)  Likewise, Ricky Lake's June 2011 complaint is vague; he requested maintenance repair his toilet that "keep[s] backflushing feces and urine from another cell toilet."  (June 6, 2011 Lynch Grievance.)  This is not enough for the Court to determine whether the duration and severity of Lynch's expose was unconstitutional.  Wesley Jones' September 2011 grievance similarly lacked determinative details: "Inmate Jones claims his toilet 'back-flushes' . . . [and] waste from other cells floats in to [sic] his toilet."  (Sept. 2, 2011 Jones Grievance.)  Again, such bare-boned evidence falls short of that needed to assess the duration and severity of Jones' exposure to human waste such that the Court can say, as a matter of law, that his exposure was unconstitutional.

Conversely, Andrew Zeigler's complaint had more substance; he complained of "problems with the toilet in the cells that sees other inmates [sic] body waste in to the next cells of the other inmates to smell day to day" and that he had been making this complaint for approximately nine months.  (Aug. 30, 2011

106

Zeigler Grievance, Ex. 65; see also corresponding Sept. 2, 2011 Decision of Grievance Coordinator (acknowledging "[t]he back-flushing problem is an ongoing issue").)  This complaint provides durational context, but lacks enough facts to assess as a matter of law the severity of the complained-of exposure.  Cf. Willey, 801 F.3d at 68 (stating less severe exposure can "become cruel and unusual with the prolonged passage of time").  There is also Named Plaintiff Mack Butler's complaint, which is further detailed; he expressed frustration with having to live with breathing in the odors of other inmates' waste, which he had previous complained about and which complaint was marked as resolved, and which exposure Butler claims was causing him headaches and throat pain.  (Sept. 7, 2011 Butler Grievance; see also id. at ECF p.3 (corresponding Returned Grievance Form (noting Butler's prior, related grievance, Grievance No. R-2011-471, was "resolved" and that Butler's toilet was on maintenance's list to adjust)).)  But, again, from Butler's complaint, the Court is unable to determine as a matter of law that its duration and severity warrants finding a constitutional violation of Plaintiffs' rights.  Nor, in the end, does Tariq Burwell's complaint fare any better; succinctly, Burwell complained:

> On numerous occasions I have had other peoples
> feces and urine back up into me toilet bowl.
> This has been a constant occurrence.  I have
> woken in the middle of the evening to a toilet

> bowl full of another person feces which has
> caused me to vomit and feel sick.[40]

(Sept. 18, 2011 Burwell Grievance, Ex. 69.)    While Burwell's
complaint is troubling, the Court finds his reference to "numerous
occasions" and "a constant occurrence [sic]" not sufficiently
precise that, as a matter of law, the Court can determine that the
duration of his human waste exposure rose to the level of a
constitutional violation of his condition-of-confinement rights.
While these complaints are not enough to award Plaintiffs summary
judgment as a matter of law, they raise issue of facts that should
be put forth fore a jury for further consideration.

    Furthermore, Plaintiffs' own evidence raises an issue of
fact regarding the conditions of toilets in the Yaphank Facility.
In a May 2012 Sanitation Review by the SCOC, as to the Yaphank
Facility, the Chairman wrote:

> During the visit there were still several
> toilets through the facility that had plastic
> bags covering them.   When questioning the
> Deputy Warden and Sergeant as to the reason
> for the covering of the toilets they informed
> Commission staff:   "the inmates cover the
> toilets"[.]    Commission staff questioned
> several inmates as to the covering of the
> toilets and the inmates claimed that water
> leaks from the base of the toilet and
> therefore they do not want to walk in other
> inmates [sic] excretions.   Commission staff
> flushed the toilets several times during this
> visit and did not notice any water leaks from
> around the base of the toilet fixtures.   It

---

[40]  While capitalization has been corrected in this quoted language,
no spelling and punctuation corrections have been made.

> appears that the covering of the toilets is a supervision issue with housing area officers. The Department needs to enforce the policy that the housing unit officers are in charge of the housing areas as well as operating and maintaining them.  It is not the proper role of inmates housed in these areas to "police" the areas and to make and enforce their own policies."

(Letter from T. Beilein, Chairman, SCOC, to Sheriff Demarco (May 4, 2012) (hereafter, the "SCOC May 2012 Sanitation Review"), Ex. 122, at 2-3 (emphasis in original).)  Hence, upon the record presented, whether the conditions of the toilets in the Yaphank Facility in inmates' cells were such that they violated the Plaintiffs' constitutional rights remains an issue of fact that cannot be determined as a matter of law, but should be presented to a jury for its determination.[41]

---

[41]  The Court recognizes that record evidence shows that during the class period, Named Plaintiffs claim that, due to their exposure to human waste, they experienced: nausea and diarrhea (see Pl. 56.1 Stmt. ¶ 101 (re: Lofton during 2011 in both Riverhead and Yaphank); repeated vomiting from the smell of feces and urine (see id. ¶¶ 102 (re: Butler from Jan. 2011 to July 2013 in Riverhead), 105 (re: Miller on Aug. 31, 2011 in Riverhead), 106 (re: King since Sept. 2011 in Riverhead, vomiting two-three times per day); dizziness (see id. ¶¶ 103 (re: Lynch on July 11, 2011 in Riverhead), 105 (re: Miller on Aug. 31, 2011 in Riverhead)), as well as headaches (see id. ¶¶ 107 (re: Butler on Sept. 7, 2011 in Riverhead), 109 (re: Lofton in Mar. 2012 in Yaphank, experiencing regular headaches) and stomach pain (see id. ¶ 108 (re: Alver from Sept. 2011 until May 2012 in Yaphank, suffering stomach pain)). Yet, "[a]lthough the seriousness of the harms suffered is relevant to calculating damages and may shed light on the severity of an exposure, serious injury is unequivocally not a necessary element of an Eighth Amendment claim."  Willey, 801 F.3d at 68 (citing Hudson, 503 U.S. at 4).  Hence, this evidence underscores that the record presented establishes material issues of fact which require

As to Poor Ventilation, Exposure to Extreme Temperatures, and Inadequate Heat: It is undisputed there is record evidence establishing vents were clogged with dust and debris, which inhibited proper air flow. (See P-Support Memo at 27 n.43.) Plaintiffs' claims of poor ventilation spans: throughout the entire year of 2009; for a period from the last quarter of 2010 through the first quarter of 2011; and, the last five months of 2014.[42] (See Pl. 56.1 Stmt. ¶¶ 82.c-k, 82.m-s, 82.u-dd.) There is also record evidence that in the Yaphank Facility, in April 2012, there was "a nearly complete lack of air movement in the bathroom areas," which "will again promote mold and mildew, a process accelerated by the coming warm weather." (SCOC May 2012 Sanitation Review at 2.) However, for the same time period, that was not the case at the Riverhead Facility. (See id. at 3 (stating

---

further consideration to determine if the complained-of "ping-pong" toilets to which the Plaintiffs were exposed violated their constitutional rights.

[42] As a result of chronic lack of proper ventilation and exposure to poor air quality, Plaintiffs contend they suffered from--and continue to suffer from--respiratory and renal issues. (See id. at ¶¶ 118 (re: Lynch between July 2010 and Aug. 2011 in both Riverhead and Yaphank, experiencing a daily inability to breathe), 120 (re: Butler from Jan. 2011 until July 2013 in Riverhead, experiencing respiratory issues).) As the Court stated in examining Plaintiffs' "ping-pong" toilet claims, this evidence "may shed light on the severity of [the] exposure, [but] serious injury is unequivocally not a necessary element" of a condition-of-confinement constitutional claim. (See supra note 41 (quoting Willey, 801 F.3d at 68).)

NYSCOC "staff was pleased with the sanitation condition of the Riverhead facility").)

Despite some evidence addressing the instances when "poor" or "very poor" air quality was observed in the Facilities, what the Facilities' Dorm Inspection Reports provide are snapshots in time; it is of limited value in assessing the duration and severity of that complained-of condition. Furthermore, said Reports are for different units within the Facilities; therefore, it is difficult to determine the duration of the complained-of condition for any one unit. In addition, while the Reports are those of the Facilities, there is validity in the County's contention that the terms "poor" and "very poor" are amorphous. (See C-Opp'n at 27-28 ("most of the reports concerning air are of 'poor air quality', a broad and amorphous term that presumably includes various unpleasant phenomena such as humidity, body odor, food smells and scents of toiletries and cleaning chemicals that may be present despite proper ventilations").) Moreover, those Reports do not evince complaints by the inmates, but, rather, awareness of poor air quality by the Defendant, which is more appropriately considered when examining the subjective prong of the conditions-of-confinement analysis, as well as may also be relevant to Plaintiffs' Monell claim. In sum, on the present summary judgment record, issues of fact remain to be resolved

regarding the duration and severity of the complained-of poor ventilation in the Facilities.

Similarly and relatedly, due to, inter alia, dirty and clogged vents inhibiting air flow, Plaintiffs claim appropriate temperatures were not maintained in the Facilities, causing exposure to extreme temperatures. (See P-Support Memo at 27 n.44; see also id. at 8; Pl. 56.1 Stmt. 87, 87.a-v, 88, 89.) And, as for being exposed to extreme cold temperatures, they contend that such exposure was made worse by the Facilities not providing additional blankets to inmates. (See P-Support Memo at 27 n.44 ("These freezing temperatures were further exacerbated by the County's failure—and at times outright refusal—to provide additional blankets to detainees." (citations omitted).) While it is undisputed that the record evidence shows various instances when different units throughout the Facilities were, e.g., "very cold", "freezing", "too cold", had "no heat" or, conversely, were "extremely hot" and "very hot", that evidence is based upon inspections conducted by Defendant's staff and not inmates' complaints. (See Pl. 56.1 Stmt. ¶¶ 87.a-I, 87.k-v.) Further, even assuming, arguendo, such evidence is sufficient to establish severity, it does not address the duration of inmates' exposure to such extreme temperatures, thereby impeding a determination as a matter of law that said exposure was unconstitutional.

Plaintiffs have put forth evidence of inmate complaints regarding exposure to extreme temperatures. For example, inmate complaints consist of: (1) Tariq Burwell's general and cursory complaint that the Riverhead unit in which he was housed in December 2011 still had the air conditioner running (see P-Support Memo at 27 n.44; Pl. 56.1 Stmt. ¶87.j (citing Dec. 5, 2011 Burwell Grievance,[43] Ex. 85)); (2) Named Plaintiff Alver's general deposition testimony that (i) the facilities were "freezing in the wintertime" and "hot as hell in the summer", (ii) he was issued two sheets and one blanket, and (iii) he was permitted to wear whatever clothes issued to him when sleeping (Alver Dep., Ex. 8, at 188:9-189:13); and (3) Named Plaintiff Butler's deposition testimony that he never filed a grievance about being cold or requesting a second blanket, even though he testified he requested a second blanket "all the time" and "every time the winter months come around" (Butler Dep., Ex. 4, at 115:12-117:7). Such vague, general evidence is not sufficient to determine as a matter of law that the complained-of extreme temperature to which Plaintiffs claim they were exposed rose to a level of constitutional violation.

---

[43] Plaintiffs misdate the Grievance as "February 5, 2011". The Grievance appears to be hand-dated December 5, 2011, and time-stamped December 7, 2011. (See Ex. 85 at ECF p.2.) The Court finds this discrepancy immaterial.

Furthermore, there is also deposition testimony of Named Plaintiff King regarding his belief that guards turned on blowers in December 2010 and January 2011 and that those blowers that did work -- which King estimated to be about half of the blowers -- expelled "freezing cold air" on the third and fourth floor of the tier where he was housed, but also that the temperature controls were out of his sight.  Construed most favorably to the Defendant, this testimony creates a disputed issue of fact whether the air temperature to which King was exposed were unconstitutionally extreme.  Additionally, King also testified that the tier's air temperature was comfortable in the summer, but also "[t]here's nothing comfortable in Riverhead Correctional Facility on the fourth floor."  (King Dep. 179:11-184:13.)  While this apparently inconsistent response of King's could have well been meant to be flippant or sarcastic, without being able to assess his demeanor while testifying, the Court cannot make such a credibility determination, which determination, in any event, is reserved for the jury.  See generally Fincher v. Depository Tr. & Clearing Corp., 604 F.3d 712, 725 (2d Cir. 2010) ("[A]s a general rule, a district court may not discredit a witness's deposition testimony on a motion for summary judgment, because the assessment of a witness's credibility is a function reserved for the jury."); Zeng v. N.Y.C. Hous. Auth., No. 22-0138-CV, 2023 WL 4553416, at *4 (2d Cir. July 17, 2023) (summary order) (vacating grant of summary

judgment where district court made credibility determinations regarding plaintiff's sworn statements that "should have been reserved for the jury" (citing, inter alia, Fincher)).

There is also evidence that the Riverhead unit in which Tariq Burwell was housed in December 2011, when Burwell complained about the unit's temperature, had its temperature increased from 69-degrees Fahrenheit to 72-degrees Fahrenheit based on a similar complaint made before Burwell's (see Burwell Grievance at ECF p.3). This evidence places in dispute Plaintiffs' claims of exposure to extreme temperatures.

In sum, upon the record presented, Plaintiffs' evidence regarding extreme temperatures -- and the related implicit complaint of inadequate blankets – present disputed issues of material fact that should be presented to the trier of fact; the record evidence is insufficient to determine as a matter of law whether the complained-of extreme temperatures expose the Plaintiffs to an unconstitutional condition-of-confinement.

As to Persistent Flooding of Dorms and Cells: The record evidence demonstrates that the overtaxing of the Facilities' plumbing systems led to leaking showers and sinks, which caused flooding of dorms, cells, and other areas of the Facilities. (See Pl. 56.1 Stmt. ¶¶ 77.s, 77.x.)  Similarly, competent evidence shows that leaking roofs did likewise.  (See id. ¶¶ 77, 77.d, 77.g, 77.i, 77.j, 77.m-r, 77.u, 77.w, 77.z, 77.aa, 77.bb, 77.ff, 77.hh, 78,

82.t.[44])   Courts have found a lack of sanitation that violates inmates' constitutional rights where inmates were subjected to cells with floors covered in water from flooded toilets and rain leaks and other offensive conditions.   See, e.g., Gates v. Cook, 376 F.3d 323, 333-34 (5th Cir. 2004).

Upon review of the present record evidence, the Court cannot say as a matter of law that the complained-of leaks and consequential floods rose to the level of constitutional violations.   While Plaintiffs assert that "inmates at the SCCF endured regular flooding of dorm and cell areas throughout the class period that tendered these areas uninhabitable," (Pl. 56.1 Stmt. ¶ 77 (emphasis deleted)), the record does not support the conclusion of uninhabitability.   It is true Plaintiffs have presented evidence of many instances of flooding in the Facilities from the beginning of the class period, including incidents that have affected cells and dorm areas; however, there is insufficient evidence regarding the duration and severity of the floods and the corresponding duration and severity of the complained-of adverse effects of the floods.   Indeed, while cells and dorms suffered leaks and floods, those conditions could have been rectified in a timely manner allowing inmates access to habitable cells and dorms.

---

[44] The evidence shows that the leaking and flooding issues occurred from at least the beginning of January 2009 through the end of December 2014.   The Court considers only those leaks and floods as of the beginning of the class period.

116

Similarly, even if a leak or flood caused a cell to be temporarily uninhabitable, that does not necessarily mean an inmate was denied an adequate place to recreate and/or sleep.  Nor, at this juncture, is there sufficient evidence associating this complained-of condition with other conditions-of-confinement that, in combination, support a finding of a deprivation of one of life's necessities in violation of Plaintiffs' constitutional rights.  Instead, the record evidence raises material disputed questions of fact as to duration and severity of the complained-of leaks and floods which preclude granting Plaintiffs' summary judgment based upon this claim of exposure to an unconstitutional condition-of-confinement.

As to Other Alleged Unsanitary Conditions:  Unsanitary Food; Polluted Water; and Exposure to Vermin:[45]  Plaintiffs also

---

[45]  In their Rule 56.1 Statement, Plaintiffs put forth statements that the conditions of their mattresses and the laundry services available to them in the Facilities are conditions-of-confinement which violate their constitutional rights.  (See Pl. 56.1 Stmt. ¶¶ 92.vv-zz (regarding mattresses and linens); see also id. ¶¶ 92.aaa-ccc (regarding laundry service).)  However, they have not put forth any inmate complaints as to those alleged complaints.  Instead, they rely upon the Pepper Report to advance those complained-of conditions.  (See supra at 36.)  Since the Court has already ruled it will not consider the Pepper Report in ruling upon Plaintiffs' Summary Judgment Motion, there is currently insufficient evidence to consider the mattress-based and laundry-based condition-of-confinement complaints.  (Moreover, Plaintiffs have not developed any mattress-based and laundry-based arguments that would support granting them summary judgment.  (See Support Memo, in toto.))  Thus, upon the basis of the mattress-based and laundry-based supposed claims, Plaintiffs' Summary Judgment Motion is denied without prejudice to pursue said claims at trial.

complain of being subjected to unsanitary foods and food preparations. To support their food-related condition-of-confinement complaint, Plaintiffs put forth, <u>inter alia</u>, the deposition testimony of Named Plaintiffs Butler and King. (<u>See</u> Pl. 56.1 Stmt. ¶¶ 92.f, 92.o, 92.p.)

As to Butler, when questioned about the nature of his February to March 2011 food complaints, he responded, "it was something where I couldn't eat it." (Butler, Dep. 102:4-7.) When pressed to remember what it was that Butler could not eat, the following exchange occurred:

> A:  Well, the milk was spoiled, or if it was cold or if it wasn't enough.
>
> Q:  Just focusing on the milk, you believe the milk was spoiled?
>
> A:  It was one of those; either the milk was spoiled, the food was cold, or it wasn't enough food.

---

The Court further notes that in their Rule 56.1 Statement, Plaintiffs called attention to the lack of cleaning supplies in the Facilities. (<u>See</u> Pl. 56.1 Stmt. ¶ 92.ff; <u>see also</u> <u>supra</u> at 32.) Yet, they rely upon that alleged condition in support of their position that the County knowingly and deliberately neglected dangerous and unsanitary conditions at the Facilities by failing to take effective measures to remedy the complained-of conditions, <u>i.e.</u>, the second prong of the conditions-of-confinement analysis. (<u>See</u> Support Memo at 35 n.61 (citing, <u>inter alia</u>, Lynch Dep. and Aug. 1, 2011 Williams Grievance, Ex. 130).) As discussed, <u>infra</u>, because the Court finds disputed issues of fact must be resolved as to the threshold, objective prong of the applicable analysis, the Court declines to address the lack-of-cleaning-supplies claim at this time.

> Q:   It wasn't enough, meaning that you still were hungry after you ate whatever the portion was?
>
> A:   I think it was a situation where the portion was so small that I didn't even take it.

(Id. at 102:8-22.)   Butler further testified that he "complained about the food all the time."   (Id. at 124:19-20.)   As is undisputed, Butler ultimately filed a written complaint, on March 25, 2011, regarding the food, claiming a small portion of breakfast cereal and that "the milk was warm, possibly spoiled" and "[t]he bread was hard." (Id. at 125:24-127:12 (quoting Butler's grievance (see Ex. 89)); see also id. at 127:13-15 (further quoting Butler's grievance (see Ex. 89), claiming "[s]poiled, warm milk" and "[h]ard bread (molded)").)

       As to King, he testified that "[a] lot of times [food] would be ice cold." (King Dep. 184:14-17.)   He explained that he meant food "wasn't fully cooked and that it wasn't heated to where food is supposed to be heated." (Id. at 184:22-24.)   King testified that, as to uncooked food: "worst is the chicken, it's the worst"; he "had chicken with blood in it on [his] tray"; and, having it served that way occurred "every other time we ate chicken". (Id. at 185:3-7.)   According to King, other items, such as hamburgers and hot dogs, were also sometimes uncooked. (See id. 185:8-12, 16-19.)   King also claimed that "everything" would be served cold. (Id. 185:20-21.)   King further testified that

119

when correction officers served food, he has had "boot prints on [his] bread", "saliva looking spit in [his] food", and "hair in his food". (Id. 186:15-16.)

Some of Butler's and King's respective deposition testimony is vague, general, and inexact. Moreover, limited to evaluating deposition responses provided in print, the Court is unable to gauge the veracity with which Butler and King responded to inquiries. Notwithstanding some broad responses, though, the proffered deposition testimony does present triable issues of fact as to the duration and severity of the complained-of condition. Yet, that testimonial evidence needs to be vetted for its veracity, which must be done after observing the demeanor of the testifying witnesses. Since this is the purview of the jury, and not the Court, summary judgment is not appropriate on the present record. See, e.g., Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir.1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.").

In addition to Butler's and King's testimonial evidence, Plaintiffs also presented evidence of inmates grieving about instances of cold, inadequate, and undercooked food. (See Pl. 56.1 Stmt. ¶ 92.k (re: Riverhead – on July 9, 2011, three inmates grieved of cold and inadequate food (citing Exs. 90-92)); ¶ 92.l (re: Yaphank – on Oct. 20, 2022, inmate complained of being served

cold and undercooked food (citing Ex. 93)).)  As to the July 9, 2011 Riverhead-related complaints, Plaintiffs proffered Exhibits 90 through 92 to support their claim.  Those Exhibits are virtually identical letters from the Grievance Supervisor to Counsel Members of the Citizens' Policy and Complaint Review Council reporting the results of an investigation into the inmates' complaints; the Grievance Supervisor stated:  "The floor supervisor on that shift was contacted.  [He] said the inmates refused the food cart on 07- 09-2011 for insufficient portions or cold food."  (Ex. 90 at 1; see also Exs. 91-92 (same).)  In accordance with Facility practice, upon the inmates' refusal of the food cart, both the floor supervisor and the tier officer asked each inmate personally if the inmate wanted a meal.  (See id.)  All inmates declined each offer.  (See id.)  Thereafter, "[t]he food cart was returned to the kitchen and checked by the Chief Cook and the line cook . . . who "stated the portions meet with the standards set forth by the Suffolk County Department of Health's Standards."  (Id.)  "The Chief Cook also stated food temperature was . . . within the proper range according to the kitchen log book."  (Id. at 2 (further stating log book page included[46]).)

    As to the October 20, 2011 Yaphank-related complaint, Plaintiffs proffered Exhibit 93 to support their claim.  It is a

---

[46]  The referenced log book page was not included with Exhibits 90-92 and are, therefore, is not part of the summary judgment record.

grievance of Dennis Thomason who generally complained: food portions are too small; dinners are never hot; there is only one hot breakfast per week, but it is "never hot"; and the food is either undercooked (giving as an example, chicken) or overcooked. (Ex. 93 at 1.)  Responding to Thomason's grievance, the Grievance Officer stated: "Inmate Thomason has not requested an action to satisfy this grievance.  His requested action was an opinion of what crew made better food.  This grievance is being returned for clarification of a viable resolution." (Id. at 2 (further indicating "[t]he specific relief sought is unclear").)

The Court finds Plaintiffs' grievance evidence is not as decisive as they would have it portrayed.  It does not establish as a matter of law that the Plaintiffs' food-related complaints demonstrate constitutional violations of conditions-of-confinement; rather, at best, they raise disputed issues of fact regarding duration and severity which should be presented to the jury.

Plaintiffs also rely upon Inspection Reports prepared by the DHS to establish their exposure to an unconstitutional condition.  (See Pl. 56.1 Stmt. ¶¶ 92.c, 92.e, 92.m, 92.s, 92.v (citing select DHS Reports reporting various violations); cf. Ex. O, ECF No. 483-18 (DHS Reports from 2009 through 2018 for the Facilities).)  Indeed, it is well-established that "[i]nmates have a right to food served under conditions that do not present an

immediate danger to the inmate who consumes it." Capps v. Atiyeh, 559 F. Supp. 894, 914 (D.C. Or. 1983). Nonetheless, "[g]enerally, a simple health code violation does not offend the constitution." Id. (citing Bell v. Wolfish, 441 U.S. 520, 543 n.27)

In Capps, the inmates' expert "found many sanitation standard violations, including dirty utensils and pots, vermin, improper storage, and inadequate sanitizing equipment."  559 F. Supp. at 913 (stating further that the expert's findings were confirmed by inmate testimony).  "However, [the expert] was unable to express whether these violations rendered the food unfit for human consumption."  Id. (citation omitted).  Hence, the Capps Court found the inmates had not shown "that the institutions' food services [we]re below minimum constitutional standards."  Id.  It also stated there was a lack of evidence that the food was not nutritional and "little evidence the food [wa]s not palatable." Id. at 914.  Upon the record evidence presented, this case is sufficiently analogous.

While Plaintiffs have presented evidence regarding concerning and persistent sanitation issues present in the Facilities' kitchens, e.g., improperly working hand sinks together with a lack of hand soap; food improperly stored; leaking sinks causing puddling water, the Court cannot say that, as a matter of law, the complained-of conditions rise to the level of a constitutional violation.  Nor, in this instance, do the health

123

inspection violations identified in the DHS Reports, change that conclusion. Rather, it appears those Reports may be more appropriately directed to Defendant's knowledge of conditions that expose Plaintiffs to serious risks of harm to their health and, if Plaintiffs prove a constitutional violation, may assist them in establishing a policy in support of their Monnell claim.

Plaintiffs also complain about the condition of the water in the Facilities, i.e., complaints of brown and rusty water and water that tasted "gross". (See Pl. 56.1 Stmt. ¶¶ 92.b, 92.j, 92.n.) The Safe Drinking Water Act ("SDWA"), 42 U.S.C. § 300, "authorizes the United States Environmental Protection Agency (US EPA [(hereafter, the "EPA")]) to set national health-based standards for drinking water to protect against both naturally-occurring and man-made contaminants that may be found in drinking water." EPA, Overview of the Safe Drinking Water Act, https://www.epa.gov/sdwa/overview-safe-drinking-water-act (last visited Feb. 16, 2023). The EPA also issues "[s]econdary drinking water standards [that] are non-regulatory guidelines for aesthetic characteristics, including taste, color, and odor." EPA, Secondary Drinking Water Standards: Guidance for Nuisance Chemicals, https://www.epa.gov/sdwa/secondary-drinking-water-standards-guidance-nuisance-chemicals (last visited Feb. 16, 2023). "They are established as guidelines to assist public water systems in managing their drinking water for aesthetic

considerations, such as taste, color, and odor" and "are not considered to present a risk to human health at the [secondary maximum contaminant levels]." Id. Upon the record presented, other than aesthetic-related complaints, Plaintiffs have failed to present evidence that the water in the Facilities present conditions-of-confinement that violate their constitutional rights. Therefore, upon the summary judgment record, Plaintiffs' sporadic condition-of-water claims fail to satisfy, as a matter of law, the objective prong of the conditions-of-confinement analysis; at most it presents a disputed question of fact to be presented to and determined by a jury.

Similarly, Plaintiffs complain of exposure to vermin that they argue violates their constitutional rights. (See Pl. 56.1 Stmt. ¶¶ 92.q, 92.r, 92.u, 92tt, 92.uu.) However, the limited sightings of mice and flies reported in Dorm Inspection Reports and not based upon complaints by Plaintiffs (see supra at 35[47]), without more, does not support an objective finding that said exposure violated the Plaintiffs' conditions-of-confinement. Cf., e.g., Gray v. Hardy, 826 F.3d 1000, 1007 (7th Cir. 2016) (finding pest infestation resulting in exacerbated asthma, "skin

---

[47]   Moreover, Plaintiffs rely heavily upon the Pepper Report to support this complained-of condition.  As the Court has already ruled (see supra at 97-99), at this juncture, the Pepper Report is not being considered.

breakouts", and psychological harm sufficient serious); White v. Monahan, No. 07-CV-0437, 2013 WL 587511, at *7-9 (N.D. Ill. Feb. 14, 2013) (finding five-year exposure to roaches, mice, bees, and wasps that resulted in near-daily insect bites sufficiently serious); see generally Benjamin v. Fraser, 161 F. Supp. 2d 151, 173 (S.D.N.Y. 2001) (observing distinction "between 'vermin activity' and 'vermin infestation'" since "vermin activity may not be defined as infestation unless all stages of growth of the organism are present"), aff'd in part, vacated in part, 343 F.3d 35 (2d Cir. 2003). While such sightings are unpleasant, in this case as to this complained-of condition, the vermin activity does not rise to the level of objective offensiveness warranting a finding of an Eighth or Fourteenth Amendment violation. Indeed, upon the record presented, the complained-of exposure falls well-short of the type of vermin activity that would evince a constitutional violation. Cf., e.g., Smith v. Dart, 803 F.3d 304, 312 (7th Cir. 2015) (finding allegations of "mere presence of laundry list of pests" without contact with plaintiff's person or property or claims of physical, psychological, or property damages not sufficiently serious). Hence, Plaintiffs are not entitled to summary judgment based upon their vermin-based condition-of-confinement complaint.

In sum, notwithstanding its voluminous nature, upon the summary judgment record presented, the Court finds Plaintiffs have

not demonstrated that there are no genuine disputes as to the material facts regarding the first, objective prong of the conditions-of-confinement analysis. Rather, the Court has highlighted genuine factual issues regarding the complained-of conditions-of-confinement upon which a reasonable jury could find for the County.[48] Therefore, Plaintiffs are not entitled to judgment as a matter of law.[49]

Given this conclusion regarding the threshold, objective prong of the applicable deliberate indifference test, the Court finds it unnecessary to proceed to consider the subjective prong of the test. In turn, unless it is determined that Plaintiffs

---

[48] Much of Plaintiffs' evidence addresses the subjective prong of their conditions-of-confinement claims, i.e., the officials' knowledge of and deliberate indifference to said conditions. Relatedly, the County has put forth evidence that more appropriately addresses the issue of damages if it is ultimately determined that the County is liable to the Plaintiffs on their conditions-of-confinement claims. Yet, that puts the proverbial cart before the horse.

[49] The Court does not take lightly the disappointment it anticipates both Plaintiffs and the County will experience given today's ruling. However, considering the serious nature of Plaintiffs' claims and the serious consequences to which the County may be exposed, upon the record presented, the Court finds it necessary to deny the Summary Judgment Motions and have the disputed material facts presented to a jury to assess the evidence, especially the demeanor and credibility of witnesses, in order to decide those issues. See, e.g., VanMormer v. Gruppo Rizzi, S.R.L., No. 5:03-CV-1121, 2007 WL 2091224, at *4 (N.D.N.Y. July 20, 2007) ("Summary judgment becomes improper when credibility of a witness is crucial to the case." (citing Arnstein v. Porter, 154 F.2d 464, 471 (2d Cir. 1946)).

have suffered a violation of their constitutional rights, consideration of their Monell claim is premature.

IV.   The County's Claim of Excluded Facilities

The County consistently maintains that the following four housing areas or facilities are not part of this Action:

A. The housing areas known as "pods";
B. The DWI facility in Yaphank;
C. The stressed membrane facility in Yaphank (a/k/a the "Sprung"); and
D. The "New" Yaphank facility, which began operating in April 2013.

(See, e.g., Franchi Decl. ¶ 2, n.1.)  Warden Franchi fails to cite any authority supporting this averment.  (See id.)  Likewise, the County does not support this position in its Counterstatements or briefings.  Moreover, excepting the New 2013 Yaphank Facility, this position conflicts with the law of this case, in particular the Court's order certifying the two classes.

First, there is the Injunctive Class, pursuant to which class members are seeking injunctive and declaratory relief and which is composed of:

[a]ll persons who, now or at any time in the future, are or will be detainees or prisoners in the custody of the Suffolk County Sheriff's Department and housed in the Suffolk County Correctional Facilities located in Riverhead, New York and Yaphank, New York.

2013 Order, 289 F.R.D. at 96 (citing CAC ¶ 21).  Plaintiffs Butler, Sims, Lofton, and Alver were accepted as class representatives for the Injunctive Class.  See id.; see also id. at 100.

128

Second, there is the Damages Class, pursuant to which class members are seeking monetary relief and which is composed of:

> All persons who are or were detainees or prisoners in the custody of the Suffolk County Sheriff's Department and housed in the Suffolk County Correctional Facilities ("SCCF") located in Riverhead, New York and Yaphank, New York, and who were or will be released from the SCCF on or after April 5, 2009.

Id. (citing CAC ¶ 22). Plaintiff King was accepted as the class representative for the Damages Class. See id.; see also id. at 100.

In February 2016, the County moved for an amendment to the Class definitions "to exclude from the certified classes all inmates of the [SCCF] who were or have been housed exclusively at the new jail facility at Yaphank that opened in 2013 (the "new facility")." (County's Class Am. Support Memo, ECF No. 424-1, at 2; see also Pls.' Support Memo to Approve Class Notice, ECF No. 423, at ECF p.7 ("The County plans to move to amend the class definitions to exclude all persons who were or have been housed exclusively at the new jail facility at Yaphank that opened in 2013. Plaintiffs would not oppose the motion.").[50]) That request

---

[50] (Compare Pls.' Support Memo to Approve Class Notice, ECF No. 423, at ECF p.8 ("The County has also indicated that it may move to exclude all persons who were or have been housed exclusively in the pod-style housing at Riverhead. Plaintiffs would oppose such a motion.").) The Court has found no evidence that the County

129

was granted.  (<u>See</u> Adoption Order.)  Thus, Plaintiff's alternative notice (ECF No. 423-2) was approved, which excluded from the Class definition "all persons who were or have been housed exclusively in the facility that opened in Yaphank in 2013."  (<u>Id.</u> at ¶1(c).) In all other respects, the Class definition has remained the same. Thus, the Court is unable to discern upon what the County relies when it asserts that housing pods, the Yaphank DWI facility, and the Sprung are not part of this Action.  However, it will afford the County a short opportunity to support this assertion.

<u>CONCLUSION</u>

Accordingly, **IT IS HEREBY ORDERED** that the Plaintiffs' Summary Judgment Motion (ECF No. 478) is **DENIED**, and the County's Cross-Motion (ECF No. 483) is also **DENIED**;

**IT IS FURTHER ORDERED** that <u>before October 6, 2023,</u> counsel are to meet and confer in good faith in order to propose how best to proceed with this Action; while the parties are encouraged to formulate a consensual plan, the Court will consider different proposed courses of action.  The parties' proposal(s) is(are) to be filed <u>by no later than October 13, 2023</u>. **THE PARTIES ARE ON NOTICE:**  The final decision regarding how to proceed with

---

moved for this exclusion.  <u>See, e.g.</u>, County's Amend Support Memo, ECF No. 424-1, <u>in toto</u>.

this Action is within the Court's discretion.  See, e.g., Dietz v. Bouldin, 579 U.S. 40, 41 (2016);

IT IS FURTHER ORDERED that, thereafter, an in-person STATUS CONFERENCE shall be held at 10:30 a.m. on Friday, October 20, 2023, in Courtroom Number 1034 of the Central Islip Federal Courthouse to address how to proceed with this Action;

IT IS FURTHER ORDERED that, as to the County's claim of excluded facilities, by no later than September 22, 2023, by way of letter (not to exceed five pages), the County is to identify its authority for claiming this position.  The Plaintiffs shall have until September 29, 2023 to file a responsive pleading (not to exceed five pages), if any.  If the Court deems it necessary, this matter may be addressed at the STATUS CONFERENCE.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:     August 9, 2023
           Central Islip, New York

131