UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
MACK BUTLER, DESHAUN SIMS,
CLYDE LOFTON, PAUL ALVER,
KEVIN KING, and RICKEY LYNCH,
on behalf of themselves and all
others similarly situated,

                           Plaintiffs,        <u>MEMORANDUM & ORDER</u>
                                               11-CV-2602(JS)(ST)

      -against-

SUFFOLK COUNTY,

                           Defendant.
----------------------------------------X

APPEARANCES
For Plaintiffs:      Daniel H.R. LaGuardia, Esq.
                      John Nathanson, Esq.
                      Elizabeth J. Stewart, Esq.
                      Benjamin Klebanoff, Esq.
                      ALLEN OVERY SHEARMAN & STERLING US LLP
                      599 Lexington Avenue
                      New York, New York  10022

                      Christopher T. Dunn, Esq.
                      Amy Belsher, Esq.
                      Gabriella Larios, Esq.
                      Veronica R. Salama, Esq.
                      NEW YORK CIVIL LIBERTIES UNION
                      125 Broad Street
                      New York, New York  10004

For Defendant:      E. Christopher Murray, Esq.
                      Michelle A. Klein, Esq.
                      Elizabeth S. Sy, Esq.
                      Caitlyn M. Gibbons, Esq.
                      RIVKIN RADLER LLP
                      926 RXR Plaza
                      Uniondale, New York  11556

SEYBERT, District Judge:

       The instant class action case is premised upon Plaintiffs' complaints related to alleged conditions-of-confinement to which they had and have been subjected while pretrial detainees and/or inmates of the Suffolk County Correctional Facilities (hereafter, the "Action"). The Court assumes the parties' familiarity with the factual background giving rise to this Action. See generally Butler v. Suffolk County, No. 11-CV-2602, 2023 WL 5096218 (E.D.N.Y. Aug. 9, 2023) (ECF No. 527) (hereafter, the "Summary Judgment Order"); Butler v. Suffolk County, No. 11-CV-2602, 2023 WL 5095432 (E.D.N.Y. Aug. 9, 2023) (ECF No. 528) (hereafter, the "Substitution Order"); Butler v. Suffolk County, 289 F.R.D. 80 (E.D.N.Y. 2013) (ECF No. 375) (hereafter, the "Certification Order") (granting class certification; establishing an Injunctive Class (with subclasses) and a Damages Class (with subclasses)).[1] Accordingly, in this Memorandum & Order, the Court proceeds to rule upon the County's Omnibus Motion In Limine and Daubert Motion (the "Omnibus Motion"), which Plaintiffs oppose. (See ECF No. 609; see also Support Memo, ECF No. 611; Support Decl., ECF No. 610; Opp'n, ECF No. 636; Opp'n

---

[1] Familiarity with terms of art defined in the Summary Judgment Order, Substitution Order, and Certification Order is assumed. Herein, the Court may use said terms of art. For convenience, the Court reiterates it will refer to pretrial detainees and post-conviction inmates simply as "inmates". (See, e.g., Summary Judgment Order, 2023 WL 5096218, at *1 n.2.)

Decl., ECF No. 637; Reply, ECF No. 640; and, Reply Decl., ECF No. 639.)  More specifically, the Omnibus Motion is comprised of five motions in limine ("MILS"; singularly, "MIL") and a single Daubert motion.  The MILs seek the exclusion of:

1.  references to Plaintiffs' previous and currently unavailable experts, Mr. Pepper and Dr. Bick (hereafter, the "Pepper/Bick MIL");

2.  testimony from and grievances submitted by Class Members Kenneth J. Williams, Kenneth Williams, and Michael Boyle (hereafter, the "Williams/Boyle MIL");

3.  inmate grievances as evidence of prison conditions (hereafter, the "Grievances MIL");

4.  arguments based upon the County's budgetary procedures and legislative process (hereafter, the "Procedures MIL"); and

5.  references to diseases for which no Class Members were diagnosed (hereafter, the "Diseases-Not-Suffered MIL").

(See Support Memo at 1-2.)

By way of its Daubert motion, the County seeks to exclude the testimony of Plaintiffs' proffered medical expert, Dr. Muthusamy Anandkumar.  (See id. at 1.)  For all intents and purposes, it is the County's sixth MIL; for convenience, the Court shall refer to it as the "Daubert MIL".

The Court proceeds to address each of the above-listed MILs, in order.

DISCUSSION

I.    In Limine Motions, Generally

As thoroughly explained by Honorable Katherine B. Forrest of the Southern District of New York:

> In limine motions can play an especially important and useful role in a jury trial, allowing the parties to seek rulings in advance as to issues that otherwise may require extensive side bars or argument that can interrupt the proceedings. See Palmieri v. Defaria, 88 F.3d 136, 141 (2d Cir. 1996); accord Highland Capital Mgmt., L.P. v. Schneider, 551 F. Supp. 2d 173, 176 (S.D.N.Y. 2008). Well-grounded in limine motions may also require the parties to sharpen their focus on the real issues in a case and streamline their presentations. See In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., 517 F. Supp. 2d 662, 666-67 (S.D.N.Y. 2007). . . .
>
> The Court's role with regard to such pre-trial rulings is grounded in [R]ule 104 of the Federal Rules of Evidence. That rule "requires that a court make a preliminary determination of the admissibility of all evidence." SEC v. Tourre, 950 F.Supp.2d 666, 675 (S.D.N.Y. 2013). In the context of a pre-trial in limine ruling, challenged evidence "should only be precluded when it is 'clearly inadmissible on all possible grounds.'" Id. (quoting Commerce Funding Corp. v. Comprehensive Habilitation Servs., Inc., No. 01 Civ. 3796, 2005 WL 1026515, at *3 (S.D.N.Y. May 2, 2005)).
>
> In limine rulings are "necessarily preliminary—and [ ] subject to change when the case unfolds." Id. at 676 (citing Highland Capital Mgmt., 551 F. Supp. 2d at 176; Commerce Funding, 2005 WL 1026515, at *4). "A foundation may be laid contrary to expectations; relevance may appear where previously considered unlikely; the balancing of factors under Rule 403 may change as events

in the courtroom drama unfold. The Court recognizes that trials often contain unexpected moments and developments, and[, thus,] the parties should bear those developments in mind when determining whether to drop or re-raise an issue decided by this order." Id.

Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie, No. 11-CV-0681, 2015 WL 5459662, at *1 (S.D.N.Y. Sept. 16, 2015); see also Williams v. Geraci, No. 14-CV-5742, 2020 WL 5848738, at *5 (E.D.N.Y. Sept. 30, 2020) (discussing MIL standard).

II. The County's Motions in Limine

    A. The Pepper/Bick MIL

        1. The County's Position

The County contends Plaintiffs intend to introduce the opinions and testimonies of their prior experts, Mr. Pepper and Dr. Bick, neither of whom is now available, via their current proffered experts, Ms. Skipworth and Dr. Anandkumar. (See Support Memo at 3-7.) The County highlights that, in their respective Reports, each of these proffered experts refer to the prior Reports of Mr. Pepper[2] and Dr. Bick.[3] For example, in her Report, Ms. Skipworth compared the conditions of the Facilities she observed

---

[2] The Pepper Report is the December 16, 2015 Report, revised February 22, 2017. Thus, where referred to as the "2017 Pepper Report" by the Court, it is this Report to which the Court refers. Moreover, while docketed several times in this Action, herein the Court cites to the Pepper Report as docketed under ECF No. 637-1.

[3] The Bick Report is the February 24, 2017 Report. It is docketed in this Action at ECF No. 480-113.

"to the conditions documented in Mr. Pepper's report."  (Support Memo at 3 (quoting Skipworth Report, Ex. A, ECF No. 610-1, attached to Support Decl., ECF No. 610); see also id. at 3-4 (providing further examples in Skipworth Report.)  Additionally, Ms. Skipworth "also relied upon the photos taken by Dr. Pepper" without "doing anything to verify their accuracy."  (Id. at 4.)  Similarly, in his Report, Dr. Anandkumar relied upon the Pepper Report (see id. at 4 (citing Anandkumar Report, Ex. B, ECF No. 610-2, at 5-6, attached to Support Decl.)), as well as made "heavy use of Dr. Bick's report."  (See id.; see also id. at 4-5 (providing further examples in Anandkumar Report).)

While the County recognizes FRE 703 "allows an expert to rely upon inadmissible evidence that 'experts in the particular field would reasonably rely on'", it argues "an expert cannot 'blindly rely on reports prepared . . . by non-testifying experts.'"  (Id. at 5 (quoting Fed. Housing Fin. Agency v. Nomura Holding Am., No. 11-CV-6201, 2015 WL 539489, at *10 (S.D.N.Y. Feb. 10, 2015), and citing In re Methyl Tertiary Butyl Ehter (MTBE) Prods. Liabl. Litig., 980 F. Supp. 2d 425, 442 (S.D.N.Y. 2013) ("An expert's report may not be used as a conduit for the inadmissible hearsay of another.")).)  Thus, here, since neither Ms. Skipworth nor Dr. Anandkumar did anything to verify the Pepper Report or Bick Report, upon which they rely, "they are merely acting as conduits, which is not permissible.  (Id. at 6.)  In

other words, "[i]f Ms. Skipworth and Dr. Anandkumar were permitted to rely on or reference [Mr. Pepper's and/or Dr. Bick's Reports], it would subject the County to the testimony of two experts that they cannot cross-examine." (Id.)    Plus, such reliance would further and improperly bolster Ms. Skipworth's and Dr. Anandkumar's testimony by claiming other experts agree with their testimony. (See id.)

In addition, the County asks that photographs taken by Pepper not be admitted since Plaintiffs do not have a witness who can authenticate them. (See id.)    It takes the position that, in this instance, Pepper "is the only individual familiar with the photos he took," thereby making him "the only individual capable of authenticating them." (Id. at 7.)    Without him to do so, therefore, his photographs become inadmissible. (See id.)

    2.    Plaintiffs' Position

In opposing the County's Pepper/Bick MIL regarding the use of Plaintiffs' prior expert Reports, Plaintiffs acknowledge said Reports may be hearsay, but assert they are, nonetheless, appropriate sources upon which Plaintiffs' current experts may reply since, "[a]lthough there may be valid concerns where an expert relies on 'the findings of another expert without familiarity regarding the basis for that expert's findings,' there is nothing 'improper' about an expert incorporating a prior expert's observations into her own report where she also includes

'additional observations' based on her own review of the 'underlying materials.'" (Opp'n at 4 (quoting Am. Home Assurance Co. v. Merck & Co., 462 F. Supp. 2d 435, 448 (S.D.N.Y. 2006)); see also id. at 5 (collecting cases).) Because Ms. Skipworth assessed the same areas of the Facilities as Pepper, there can be no serious debate that she did so without properly understanding the basis for Pepper's findings. (See id. at 5.) Further, the County deposed Pepper regarding his observations, as well as retained Balsamo to assess and critique Pepper's opinions; thus, Pepper's opinions have been subject to cross-examination. (See id.)

Moreover, Ms. Skipworth not only reviewed Pepper's findings, she "conducted her own inspection of the SCCF to formulate her opinions about the impact of the conditions within the SCCF on environmental health." (Id.) Under such a scenario, where the replacement expert made herself familiar with the original expert's findings, and then conducts her own inspection and made her own findings, which were similar to those of the original expert, there is nothing improper about the replacement expert incorporating the original expert's findings into the replacement expert's report. (See id. (discussing American Home Assurance Company for its endorsement of this approach); see also id. at 6 (relying upon Jung v. Neschis, No. 01-CV-6993, 2007 WL 5256966, at *15 (S.D.N.Y. Oct. 23, 2007), for the same proposition).)

The Plaintiffs put forth the same argument as to Dr. Anandkumar: His reliance on the Pepper Report and Bick Report[4] is permissible in this instance because, in addition to relying upon those prior Reports, Dr. Anandkumar made his own findings. (See id. at 6 (providing an example of Dr. Anandkumar noting the same ventilation obstructions being present in 2024 as recorded by Bick in his earlier Report, and opining "the risk of inadequate ventilation and its associated health risks remains unresolved" (quoting Anandkumar Report at 12)).) Therefore, according to Plaintiffs, "Dr. Anandkumar's use of Dr. Bick's report involves his independent expert opinion and is clearly permissible." (Id.)

Regarding the Pepper Photos, Plaintiffs take the position that said photos have already been authenticated by Pepper through his Report and deposition. (See id.; see also id. at 7 ("Mr. Pepper testified that he took the photographs during his inspection and that 'the entire set' was included in this report." (quoting Pepper Dep. Tr. at 199-202)).) "And the County purported to have its own expert rely on these same photographs to conclude that the conditions within the SCCF did not pose a substantial risk of harm to inmates." (Id. at 7.) Given this, and that the bar for authenticating evidence is not particularly high,

_____

[4]  Plaintiffs further take the position that because the County had the opportunity to depose Bick, but chose not to do so, Bick's opinions were subject to cross-examination. (See Opp'n at 5 (citing, e.g., Jung, 2007 WL 5256966, at *16).)

Plaintiffs argue "[t]he County cannot now reasonably suggest that Mr. Pepper's photographs are inauthentic."  (Id.)

      3.   The Court's Ruling

         a.   The Pepper/Bick Reports

            i.   The Pepper Report

The Court agrees with Plaintiffs that, given the facts and circumstances of this case, this is not a situation where the replacement experts are being used as conduits to introduce the hearsay evidence of the non-testifying, original experts.  As the Jung Court stated, "there are numerous cases allowing experts to rely on findings by other experts."  2007 WL 5256966, at *16 (collecting cases).  It underscored that "[t]he operative term appears to be 'findings'", explaining courts "appear to distinguish between the rather prejudicial circumstance of experts relying upon, or reciting, the opinions of other experts not subject to cross-examination, and modern evidence law's apparent recognition that experts often rely on facts and data supplied by third-parties, including other experts."  Id. (citing, e.g., Bryan v. John Bean Div. of FMC Corp., 566 F.2d 541, 545 (5th Cir. 1978); Am. Home Assurance, 462 F. Supp. 2d at 448 (S.D.N .Y.2006)) (emphasis in Jung).

Here, Ms. Skipworth's inspection was restricted to the same areas of the Facilities which Pepper inspected, and like Pepper, Ms. Skipworth conducted her inspection using the American

Public Health Association's Standards for Health Services in Correctional Institutions (3d ed.). (Compare Pepper Report at 5, with Skipworth Report, ECF No. 610-1, at 6.) Further, Ms. Skipworth reviewed the April 5, 2012 Amended Complaint, as well as the 2017 Pepper Report, the Anandkumar Report, and "other documents in the discovery record which are cited in [the Skipworth R]eport". (Skipworth Report at 5.) The Court rejects the County's argument that Ms. Skipworth should not be able rely upon Pepper's Report because she did not review all of the underlying documents reviewed by Pepper. (See Reply at 4 (citing Pepper Report at 3-4).) In advancing that position, the County relied upon the American Home Assurance Court's partial reasoning for determining it was appropriate for a replacement expert to incorporate the original expert's findings into the replacement expert's report, i.e., the replacement expert had "reviewed all the underlying materials that informed the [original] Report and reached similar conclusions." 462 F. Supp. 2d at 448. Yet, other than its bald claim that Ms. Skipworth did not review all the documents Pepper did, it does not explain how this apparent truncated review stymied Ms. Skipworth's ability for familiarize herself regarding the basis for Pepper's findings. Moreover, a fair reading of the relevant section of American Home Assurance shows the consideration of all the underlying materials was not a controlling consideration, but merely one factor in determining whether the replacement expert

had sufficient familiarity regarding the basis for the original expert's findings.  Here, by comparison, having reviewed the Pepper Report and the Skipworth Report, the Court is satisfied Ms. Skipworth is sufficiently familiar with the basis for Pepper's findings, especially since she: reviewed essential documents, e.g., the operative Complaint and the Pepper Report; employed the same Standards as Pepper; and, conducted an independent inspection of the same areas of the Facilities to make her own findings. Therefore, there is nothing improper about Ms. Skipworth incorporating Pepper's findings into her Report.  See, e.g., Am. Home Assurance, 462 F. Supp. 2d at 448.  To the extent Dr. Anandkumar has incorporated any of Pepper's findings in his Report, for the same reasons articulated supra and infra, Dr. Anandkumar may also refer to the Pepper findings.

### ii.  The Bick Report

As to incorporation of the Bick Report into the Anandkumar Report, for substantially the same reasons articulated, supra, the Court finds nothing to preclude its incorporation.  Like Bick, who reviewed the Pepper Report when creating his Report, here, too, Dr. Anandkumar, reviewed the Pepper Report; he also reviewed the more-recent Skipworth Report, which was based upon inspecting the same areas of the Facilities as inspected by Pepper. (See Anandkumar Report at ECF p.3.)  Of course, Dr. Anandkumar reviewed the Bick Report.  (See id.)  Moreover, like Dr. Bick, Dr.

Anandkumar did not review individual inmate health records. (See id. at ECF P. 4.) In this regard, once more, Dr. Anandkumar's approach to his Report is consistent with that of Dr. Bick. (Cf. Bick Report at 4.) Said review was sufficient for Dr. Anandkumar to familiarize himself regarding the basis for Bick's findings; the County does not explain how failing to review deposition transcripts of three Named Plaintiffs curtailed Dr. Anandkumar's familiarization; nor does the Court find this to have a significant or determinative impact on said familiarization. (See Reply at 4; compare Bick Report at 3.)

Furthermore, as to Bick's purported reliance "upon hearsay statements made by fifteen unidentified (15) inmates who reported sightings of rodents and rodent feces rather than Dr. Pepper's observations" (see id. at 3), said reliance is misplaced. In the subsection entitled "**Vermin Control**", Bick stated, inter alia:

> Rats, mice, and insects proliferate in unsanitary conditions and can transmit numerous infectious diseases. **(15)** Inmates at both Riverhead and Yaphank facilities report frequent sightings of cockroaches, rodents and rodent feces. Sanitary inspections identified flies breeding and living in the heavy organic matter buildup . . . .

(Bick Report at 8.) Reviewing the Bick Report holistically, one observes parenthetical numbers, in sequential order from "**(1)**" through "**(18)**", throughout the Report. (See Bick Report, in toto.)

Given this series of parenthetical numbers, it is clear the "**(15)**" in the text, above, is not a modifier of "Inmates". Rather, the Court surmises, having reviewed the placement of these numbers, each was meant to identify an endnote, notwithstanding none are included in the filed Bick Report. Yet, this is not enough to preclude Dr. Anandkumar's reliance on the Bick Report.

Nonetheless, to avoid any prejudice or confusion, the Court is precluding Dr. Anandkumar from testifying to a portion of his Report found in the subsection entitled "Rodents and Flies". Dr. Anandkumar's "Rodents and Flies" subsection is broken down into two categories: "Findings" and "Risk for Inmates." (See (Anandkumar Report at ECF p.13 (re: "Findings"), and at ECF p.14 (re: "Risk for Inmates").) In the "Risk for Inmates" portion, Dr. Anandkumar states his opinions, including:

> Dr. Joseph Bick's 2017 medical report highlighted significant health risks stemming from unsanitary conditions, including the proliferation of rodents and insects and the presence of rodent feces and fly breeding grounds. These conditions facilitate the transmission of various diseases, such as salmonellosis, leptospirosis, rat-bite fever, and murine typhus, through direct contact with rodents or their waste or indirectly through vectors like flies.

(Anandkumar Report at ECF p.14 (Rodents and Flies: Risk for Inmates, (unnumbered) ¶3 (hereafter, the "Paragraph 3 Opinion")).) Because it is unclear whether Bick's opinion regarding the "proliferation of rodents and insects" was improperly based upon

an isolated incident of hearsay, _i.e._, the inmates' reports, Dr. Anandkumar is precluded from testifying to the contents of the Paragraph 3 Opinion. In all other respects, Dr. Anandkumar may rely upon the Bick's Report.[5]

> b.  <u>The Pepper Photos</u>

As the Second Circuit has explained:

> The bar for authentication of evidence is not particularly high. <u>United States v. Dhinsa</u>, 243 F.3d 635, 658 (2d Cir.2001). "The requirement of authentication . . . is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). Generally, a document is properly authenticated if a reasonable juror could find in favor of authenticity. <u>United States v. Tin Yat Chin</u>, 371 F.3d 31, 38 (2d Cir. 2004). The proponent need not "rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." <u>United States v. Pluta</u>, 176 F.3d 43, 49 (2d Cir. 1999) (internal quotation marks and citation omitted).

<u>United States v. Gagliardi</u>, 506 F.3d 140, 151 (2d Cir. 2007); <u>see also</u> <u>United States v. Vayner</u>, 769 F.3d 125, 129-30 (discussing the requirements for authentication). "[T]he standard for authentication is one of 'reasonable likelihood'." <u>Gagliardi</u>, 506 F.3d at 151 (quoting <u>Pluta</u>).

---

[5] For thoroughness: The County will not be heard to complain Bick was not subject to cross-examination when it chose not to depose him, but had the opportunity to do so. That, too, fails as a reason to preclude Dr. Anandkumar from using the Bick Report.

Here, there are no claims by the County that the photos have been tampered. In addition, in his deposition, Pepper, the person who took the photos, testified he included all the approximate 100 photos he took, both the "good' ones and "bad" ones. He further testified that he saved all the photos on the disk in his digital camera and to his computer. The Court finds the fact Pepper could not recall the exact number of photographs he took, providing an estimation instead, to be of no consequence. (See Pepper Dep. Tr., ECF No. 637-2, at 199, attached to Opp'n Decl.) What is of import is that Pepper testified to including them all in his 2017 Report, i.e., he did not "cherry-pick" those of the best quality, but, rather, produced the full array of photos. (See id. at 201-202.) This weighs in favor of finding a lack of tampering. Moreover, and significantly, the County's expert, Balsamo, relied upon Pepper's photos in his own rebuttal Report (see 2017 Balsamo Report at 7); Balsamo did not raise any issues with the photos. This, too, lends credence to finding the photos are what they claim to represent. See, e.g., United States v. Al-Moayad, 545 F.3d 139, 172 (2d Cir. 2008) ("[P]roof of authentication may be direct or circumstantial."); compare FRE 901(b) (providing a list of examples, which is "not a complete list—of evidence that satisfies" FRE 901(a)). Indeed, considering Pepper was accompanied by, inter alia, the County's attorney during his 2017 inspection of the Facilities (see 2017 Pepper Report at

2.), the Court is hard-pressed to conclude Pepper would engage in tampering his photos when, under such a scenario, such tampering could easily be challenged.  In sum, the Court finds, based upon these combined considerations, there is sufficient proof here that a reasonable juror could find the photos are authentic.  See FRE 901(a); Vayner, 769 F.3d at 130. And, of course:

> after the proponent of the evidence has adduced sufficient evidence to support a finding that the proffered evidence is what it is claimed to be, the opposing party "remains free to challenge the reliability of the evidence, to minimize its importance, or to argue alternative interpretations of its meaning, but these and similar other challenges go to the weight of the evidence— not to its admissibility."

Id. at 131 (quoting Tin Yat Chin, 371 F.3d at 38; emphasis in Tin Yat Chin)).  Therefore, this portion of the Pepper/Bick MIL is DENIED.

B.    The Williams/Boyle MIL[6]

1.    The County's Position

The County seeks to preclude Kenneth Williams from testifying on the basis that when he moved to be an additional

---

[6]  Since the Plaintiffs' current List of Witnesses (ECF No. 691) does not include Michael Boyle or Kenneth J. Williams, thereby mooting the County's request that they be precluded from testifying, this subsection addresses only the County's request to preclude Kenneth Williams from testifying at trial.  (See also Opp'n at 8 ("Plaintiffs do not list Kenneth J. Williams or Michael Boyle as trial witnesses on the parties' Joint Pretrial Order and do not otherwise intend to call them.").)

Class Representative, although he had submitted a grievance while incarcerated, his affidavit (see ECF No. 505) submitted in support of the Plaintiffs' Substitution Motion (ECF No. 500), did not accurately describe the grievances he filed. (See Support Memo at 7-8.)  Rather, the grievances described in the subject affidavit were filed by a similarly named inmate, with this discrepancy coming to light during Kenneth Williams' January 2024 deposition. (See id. at 8.)  Because it did not know Kenneth Williams' true identity, the County argues, it was unable to adequately prepare for the deposition and the information revealed during the deposition "is insufficient to allow the County to prepare for trial testimony." (Id.)  The County further pressed the position that Kenneth Williams "signed a declaration that was not accurate." (Id.)  It asks the Court to bar Kenneth Williams from testifying to "protect the integrity of the trial." (Id.)

    2.    Plaintiffs' Position

    Plaintiffs maintain the County was able to, and did, depose Kenneth Williams "after Plaintiffs provided notice of an inadvertent mistake as to his identity." (Opp'n at 8; see also id. at 9 and note 2.)  Moreover, they assert "there are no misrepresentations" in his affidavit submitted in support of Plaintiffs' Substitution Motion.  (Id.; see also, e.g., Opp'n Decl., ¶5(c).)

3.    The Court's Ruling

Whether or not the County had advanced notice of Kenneth Williams' mistaken identity (see, e.g., Opp'n at 9 n.2, and citations therein), the County has had at least six months -- since his January 2024 deposition -- to seek corrective or follow-up discovery regarding Kenneth Williams before the deadline for supplemental discovery expired. For whatever reason, it did not do so. (See id. at 9; see also Opp'n Decl., ¶14.) Thus, any claim by the County that it is prejudiced by surprise is attenuated, at best. The Court will not countenance the County having sat on its rights during that more-than-adequate time period.

Moreover, the County is free to question Kenneth Williams about the content of the affidavit he signed versus the grievances he filed while housed in the Facilities. It seems readily apparent this issue of alleged inconsistency goes to the truthfulness and credibility of Plaintiffs' Witness and not-—as the County argues--the integrity of the trial. Thus, the Williams/Boyle MIL is DENIED.

C.    The Grievances MIL

1.    The County's Position

To the extent Plaintiffs seek to use their grievances to show the complained-of conditions-of-confinement actually existed, the County maintains the grievances are hearsay, since, in that context, they are being used to establish the truth of the matter

asserted.  (See id. at 9 (citing FRE 801 & FRE 802).)  In addition, "[f]or grievances filed by non-testifying class members, the County will not have the opportunity to cross-examine the individuals who made these statements," presumably implying prejudice to it.  (See id.)  However, recognizing the grievances may be admissible for other purposes, and seemingly reserving its right to do so, the County contends it may use the grievances for rebuttal purposes if the Plaintiffs put on evidence regarding claims they were prevented from grieving.  (See id. at 10.)  The County does not clearly request any relief in this section of its Omnibus MIL.

###### 2.   Plaintiffs' Position

In opposition, Plaintiffs contend they should be permitted to submit any grievances filed by Class Members since they are admissible as business records of the SCCF.  (See Opp'n at 11 (citing FRE 803(6)).)  Alternatively, Plaintiffs maintain, "depending on individual circumstances, grievances may be admissible to prove the conditions as statements against a party's interest, as present sense impressions, statements of the declarant's then-existing mental, emotional, or physical condition, or as recorded recollections."  (Id. (stating further "grievances are otherwise admissible for purposes to which the rule against hearsay does not apply"); see also id. at 12 (citing FRE 801(d)(2) (re: statement against interest); FRE 803(1) (re:

present sense impressions); FRE 803(3)[7] (re: statement of declarant's then-existing mental, emotional, or physical condition); and FRE 803(5) (re: recorded recollections).)

3.   The County's Reply

As to Plaintiffs' FRE 803(6) arguments regarding business records, the County counters the grievances cannot be considered business records since inmates do not have a business duty to file grievances. (Reply at 8-9.) In support of its position, the County puts forth a case from the Northern District of New York, Hill v. County of Montgomery, No. 14-CV-0933, 2020 WL 819225 (N.D.N.Y. Feb. 19, 2020). (See id.; see also id. at 9 (citing Jordan v. Van Winkle, No. 3:04-CV-0647, 2006 WL 2925657, at *3 (N.D. Ind. Oct. 6, 2006) (rejecting argument that grievance forms are admissible under Rule 803(6); stating "business records exception does not reach so far" because "[a]lthough the prison system plainly keeps grievance forms received from inmates in the regular course of business, the portion filled out by the inmate is neither made nor reported by a person with a business duty to do so")).)

As to Plaintiffs' arguments premised upon FRE 803(1), FRE 803(3), and FRE 803(5), the County asserts, whether any of the

---

[7] As the County correctly notes, Plaintiffs inadvertently cited to FRE 803(4) (see Reply at 9 n.2), which the Court presumes to be a scrivener's error.

specific exceptions apply is context-specific, thereby requiring Plaintiffs to lay a foundation for any specific statement sought to be offered into evidence.  (See id. at 9.)  It relies upon another Northern District case in support of this argument, i.e., Williams v. O'Gorman, No. 9:20-CV-1417, 2024 WL 4120440 (N.D.N.Y. Sept. 9, 2024); in that case, the district court "reserve[d] judgment on any grievances or portions thereof sought to be admitted for trial under these provisions." (Id. at 9-10 (quoting Williams, 2024 WL 4120440, at *4).)  The County maintains that, if Plaintiffs seek to introduce the grievances for purposes other than as evidence of conditions at the Facilities, Plaintiffs must be able to satisfy laying the proper foundation required by the FRE invoked and, then, if a grievance is admitted, an appropriate limiting instruction should be issued.  (See id. at 11.)

### 4.   The Court's Ruling

As an initial matter, the Court acknowledges grievance forms have portions filled out by inmates and portions for Facilities' personal to respond.  (See, e.g., Opp'n at 11-12 (citing Ewald Dep. Tr., ECF No. 480-13, at 259-61).)  To the extent Plaintiffs seek to introduce grievances as evidence of the conditions at the Facilities, the grievances are precluded as hearsay.  See Williams, 2024 WL 4120440, at *4 ("Plaintiff's statements in his grievances used to prove that Plaintiff experienced the conditions described therein would be hearsay and

consequently inadmissible if offered by the Plaintiff." (citing FRE 802)).

To the extent Plaintiffs argue the grievances are business records, the Court disagrees.  Rather, this Court agrees with the Hill Court:  The inmates "were under no duty to submit grievances to facility staff" regarding their complaints about the conditions-of-confinement.  Hill, 2020 WL 819225, at *2.  Hence, given the absence of this duty, the indicia for the trustworthiness of the statements is also absent, thereby making them unreliable.  See id.  In turn, Plaintiffs may not rely upon FRE 803(6) as a hearsay exception to introduce the inmates' portions of the grievances.[8]  Thus, to the extent the County seeks the exclusion of the grievances pursuant to FRE 803(6), that portion of the Grievances MIL is GRANTED.

Regarding Plaintiffs advancing other hearsay exceptions, i.e., FRE 803(1) (re: present sense impressions), FRE 803(3) (then-existing mental, emotional, or physical conditions), and/or FRE 803(5) (re: recorded recollections), the Court agrees with the Williams Court:  "[T]he question of whether any of these specific exceptions apply is context specific, and Plaintiff[s] must lay a

---

[8]  Because "[t]he County does not object to the admission of those portions of grievance forms that include statements by County employees indicating that a grievance was accepted or resolved" (Reply at 9 n.1), Plaintiffs are not precluded from introducing those identified portions of the grievances.

foundation for any specific statement or statements sought to be offered into evidence." Williams, 2024 WL 4120440, at *4 (cleaned up). Therefore, the Court "reserve[s] judgment on any grievances or portions thereof sought to be admitted for trial under these provisions." Id. (citation omitted).

To the extent Plaintiffs seek to introduce the grievances to establish the County's knowledge of the grievances and complained-of conditions-of-confinement, the County concedes "a grievance may be admissible to show the County was aware of complaints about the conditions." (Reply at 11.) If grievances are admitted for such a purpose, the County request a limiting instruction "cautioning the jury to consider the grievances only on the issue of notice" be issued at the time said evidence is introduced. (See id.) The Court will oblige the County: "[I]f requested, [it] will issue a limiting instruction at the time of introduction, and at the end of the case, cautioning the jury to consider the grievances only on the issue of notice, and not for the truth of the allegations in the grievances." Hill, 2020 WL 819225, at *2.

D.    The Procedures MIL

1.    The County's Position

The County seeks to preclude from evidence the length of time from a requested budget requisition to action on the approved requisition request.    Thus, claiming irrelevance, the County

asserts its budget procedures and legislative processes are not evidence of its deliberate indifference; therefore, such evidence is not admissible. (See id. at 10 (citing FRE 402).) In support of its position, the County relies upon a case out of the Western District of Oklahoma, Burnett v. Fallin, in which the pro se plaintiff brought an Eighth Amendment claim. (See id. at 11 (citing No. 17-CV-0385, 2018 WL 4376513 (W.D. Okla. June 5, 2018), aff'd, 785 F. App'x 546 (10th Cir. 2019)).) It maintains:

> [t]he alleged violations included that the governor "refused to use discretionary funds from revolving funds or 'rainy day' funds to alleviate prison overcrowding," dropping planned funding, and delaying the implementation of recommended reforms. The court dismissed these claims, holding that the defendant was "entitled to absolute legislative immunity for actions of a legislative nature, including budgetary decisions." The court explained that defendants' actions "reflected a discretionary, policymaking decision implicating the budgetary priorities of the city and the services the city provides to its constituents."

(Id. (quoting Burnett, 2018 WL 4376513, at *2, and *3; further citation omitted).) The County asserts the same holds true here: "Because the County's budget decisions are valid legislative actions, they cannot form the basis of a claim." (Id.) In turn, the Court should not permit arguments based on budgets procedures and legislative processes. (See id.)

The County advances further arguments of prejudice and an extended trial.    It claims the introduction of evidence regarding its budgets and legislative processes would be unduly prejudicial to it since such procedures and processes are "necessarily political" and "could be inflammatory". (Id. at 11.) Moreover, introducing such evidence will force the County to introduce its own evidence to explain "how budget requisitions for capital projects work and why this requisition took as long as it did," which "will significantly lengthen the trial and could confuse the jury." (Id.)

2.    Plaintiffs' Position

In opposition, Plaintiffs state:    "Evidence concerning the County legislature's knowledge and awareness of the inhumane conditions at the SCCF, and steps taken or not taken to address those conditions, including through the budgetary process, is directly relevant to Plaintiffs' claims."    (Opp'n at 13.) According to Plaintiffs, this relevant evidence goes to the heart of the County's deliberate indifference.    (See id. at 13-14 and note 4 (citing summary judgment record evidence of County's budget and legislative process which "demonstrates the County's knowledge of, and lack of response to, the hazardous conditions at the SCCF").)    Moreover, Plaintiffs would have the Court reject the County's immunity argument since Second Circuit precedent is clear:    "[T]here is no immunity defense, either qualified or

absolute, available to a municipality sought to be held liable under 42 U.S.C. § 1983." (Id. at 14 (quoting Goldberg v. Town of Rocky Hill, 973 F.2d 70, 74 (2d Cir. 1992)); see also id. (arguing the non-binding precedent cited by the County "stand[s] only for the limited proposition that individuals—as opposed to municipalities like the County—may be entitled to legislative immunity from Section 1983 liability for certain legislative actions").) Finally, Plaintiffs contend the County's "political" and "inflammatory" arguments are "nonsensical and unsupported by any authority"; instead, "[s]hielding juries from relevant matters involving legislative actions because they are political would essentially confer immunity upon municipalities," amounting to "an end-run around Monell". (Id. at 15.)

### 3.    The Court's Ruling

The Court finds unavailing the County's arguments advanced in support of its Procedures MIL. As an initial matter, the Court rejects, out-of-hand, the County's reliance on the non-binding Burnett case, which is inapposite to controlling Second Circuit law. Second, as persuasively argued by Plaintiffs, evidence of the budgetary and legislative processes goes to the issue of the County's knowledge; it is disingenuous to claim these conjunctive processes do not have a tendency to address the County's knowledge of, and response to, the complained-of conditions-of-confinement. Indeed, contrary to the County's

stance, as Plaintiffs argue, these interdependent processes go to the heart of the County's deliberate indifference, making them highly relevant.  See FRE 401, FRE 402.

Third, the County's assertion of prejudice as a basis for exclusion, see FRE 403, because of the political nature of the budgetary and legislative processes is without merit.  It is not unknown that these processes are often long and, to a certain extent, can be outside of the control of parties seeking requisitions.  Therefore, the County's claim of juror confusion rings hollow.  See FRE 403.  And, in any event, a limiting instruction to that affect can be proffered for the Court's consideration.  More important, it appears Plaintiffs' position is more nuanced, i.e., that in seeking to establish the County's deliberate indifference, it seeks to introduce evidence showing multiple, repeated requests for funding, based upon the same, repeated issues and concerns.  In sum, the County has not established the "political" nature of the budgetary and legislative processes is more prejudicial to it than relevant to Plaintiffs' in establishing the County's alleged deliberate indifference.  Hence, this MIL is DENIED.

E.   The Diseases-Not-Suffered MIL

1.   The County's Position

The County would further have the Court preclude Plaintiffs' medical expert, Dr. Anandkumar, from testifying about

diseases referenced in his Report as to which none of the Class Members have been diagnosed (hereafter, the "Diseases-Not-Suffered"). (See Support Memo at 12.) In support of this position, the County calls to attention: Plaintiffs have not produced medical records for any Class Members; no Class Member has had an independent medical exam; and, Dr. Anandkumar has neither examined any Class Member nor reviewed their medical records. (See id. (quoting Anandkumar Report at 3).) What is more, Dr. Anandkumar fails to cite "any sources for his claims" that the Diseases-Not-Suffered "can be caused by the alleged conditions." (Id.) Nonetheless, Dr. Anandkumar lists seven "Areas of Concern", exposure to which, he contends, poses risks of contracting various of the Diseases-Not-Suffered. (Id.; see also id. at 12-13 (listing various diseases and health conditions which comprise the Diseases-Not-Suffered).)

In raising this objection, the County maintains the introduction of Diseases-Not-Suffered by inmates is irrelevant and unfairly prejudicial. More specifically, as to relevance, according to the County, "it is not relevant that some environmental conditions could allegedly cause that disease in some circumstances." (Id. (citing FRE 402).) And, as to prejudice, "references to these diseases would be unfairly prejudicial to the County by painting a false picture of an extremely sick inmate population." (Id. ("Allowing Dr. Anandkumar

to discuss these illnesses would unfairly create the image that [the] County's prisons are third world countries . . . .").) Therefore, pursuant to FRE 403, references to and arguments based upon diseases not suffered should be barred.  (See id. citing FRE 403); see also id. at 14 (relying upon FRE 403 to further assert introduction of Diseases-Not-Suffered would also "waste time and confuse the jury").)

### 2.    Plaintiffs' Position

Plaintiffs counter, in essence, that the County misses the mark:

> In order to establish the County's liability for violations of the Eighth and Fourteenth Amendments' prohibitions against cruel and unusual punishment, Plaintiffs must prove only that the conditions in the SCCF present a substantial risk of serious harm--exposure is sufficient, and class members need not have actually been diagnosed with the particular diseases.

(Opp'n at 15.)

### 3.    The Court's Ruling

Plaintiffs are correct in framing one of the issues they need to establish, i.e., a "substantial" or "excessive" risk to the health or safety of the inmates caused by the complained-of conditions-of-confinement.  See Summary Judgment Order, 2023 WL 5096218, at *31-32.  That also is the framework for deciding this MIL.  Thus, as Plaintiffs argue:

> [t]he specific diseases that can be caused by
> exposure to the conditions in the jails (as
> distinguished from proof that a class member
> had those diseases) are relevant to
> establishing the risk to which class members
> were exposed and the harm that class members
> could have suffered as a result.

(Opp'n at 16.)  The Court agrees; it is the level of risk to exposure that is at issue.  Therefore, testimony regarding diseases to which inmates may be potentially exposed, i.e., the Diseases-Not-Suffered, is an appropriate line of questioning in this instance.  See FRE 401; FRE 402.  It is a precursor, because in the absence of the presence of a risk, there is no need to inquire about the level or extent of said risk.

The County's objections are more properly directed to the weight of the evidence.  In that vein, on cross-examination, the County is free to question Dr. Anandkumar regarding his opinions on the likelihood of the inmates contracting any of the various diseases he has identified in his Report.  Whether the risk or likelihood is substantial or excessive is a question for the jury to determine.  Moreover, the Parties are free to stipulate that, as to the Diseases-Not-Suffered, no Class Members have contracted them.  (That issue is distinct from deciding the risk level to the inmates, if any, of such expose, which is an issue for the jury to decide.)  Such an approach would certainly assuage the County's concerns regarding time, i.e., increasing the length of the trial, and regarding confusing the jury.  Accordingly,

because determining whether being exposed to Diseases-Not-Suffered is relevant to deciding whether the County is liable to Plaintiffs for Eighth and Fourteenth Amendment violations, the Diseases-Not-Suffered MIL id DENIED.

      F.    The *Daubert* MIL

          1.    The County's Position

In addition to its specific disagreement with Dr. Anandkumar's Report (see supra, DISCUSSION, Part II(E)), more broadly, the County seeks the preclusion of the entire Anandkumar Report, arguing it does not rest on a reliable foundation and is not relevant to the task at hand. (See id. at 14 (citing FRE 701, FRE 702, and Daubert, 509 U.S. 579).) It faults the Anandkumar Report since: (a) Dr. Anandkumar did not engage in the generally accepted method for determining whether an individual has a disease by not conducting any physical examines of inmates or, even, reviewing their medical records; and (b) barely citing any "sources for his claims that the alleged conditions could cause certain diseases and [not addressing] the likelihood that the condition could cause the disease or the prevalence of such diseases amongst people exposed to the alleged conditions." (Id. at 14-15.) It perfunctorily contends the Anandkumar Report does not meet the other Daubert factors and requests Dr. Anandkumar be precluded from testifying. (See id. at 15.)

2.    <u>Plaintiffs' Position</u>

In their Opposition, Plaintiffs note Dr. Anandkumar was asked to provide his expert opinion "on the potential health consequences of the conditions documented within the Suffolk County jails at Riverhead and Yaphank", and that he "will provide his expert opinion on the health risks to class members caused by exposure to the conditions in the SCCF." (Opp'n at 17 and note 7.)    Plaintiffs maintain, pursuant to <u>Daubert</u>, this kind of testimony, <u>i.e.</u>, testimony of medical experts, "regarding the health risks arising from living conditions is just the sort of expert testimony frequently allowed by courts." (<u>Id.</u> at 18 (collecting cases).)    Moreover, "Dr. Anandkumar's proposed testimony meets the Rule 702 and <u>Daubert</u> standards because it 'both rests on a reliable foundation and is relevant to the task at hand.'" (<u>Id.</u> at 19 (quoting <u>Daubert</u>, 509 U.S. at 597).)    In that vein, Plaintiffs assert Dr. Anandkumar is well-qualified given his prior correctional-facilities-related experiences, together with his medial training, both of which he can properly draw upon in rendering an opinion. (<u>See</u> <u>id.</u> at 19 (citing several cases in which Dr. Anandkumar was appointed "medical expert charged with monitoring efforts to improve jail conditions"); <u>see also</u> <u>id.</u> at 20 (citing cases for proposition that doctor can qualify as an expert based upon experience and reviewing relevant scientific literature).)    Finally, Plaintiffs assert the County's contention

regarding Dr. Anandkumar's failure to examine inmates is of no consequence since he "has not purported to diagnose any class member's disease"; instead "he has assessed the risk of disease posed by conditions in the SCCF, an assessment that does not require examining any particular class member's medical records." (Id. at 20 (citation omitted).)

### 3.   The Court's Ruling

The County does not challenge Dr. Anandkumar's qualifications, which it would be hard-pressed to do.  (See Opp'n at 17 (providing Dr. Anandkumar's qualifications).)  Rather, it tries to conflate two issues: the purported need to examine the inmates and assessing the risk to inmates of being exposed to the complained-of conditions-of-confinement.  That will not do; the two issues are distinct.  The issue for which Dr. Anandkumar's expert testimony is being offered, i.e., assessing the risk of exposure to the conditions-of-confinement at the Facilities, has no bearing on inmates' medical examinations.  Therefore, the County's reliance on the lack of medical examinations of inmates by Dr. Anandkumar as a basis to preclude his testimony is misplaced.  See, e.g., Cody v. City of St. Louis, No. 4:17-CV-2707, 2022 WL 2315473, at *6 (E.D. Mo. June 28, 2022).[9]  Indeed, as the Cody Court stated:

---

[9]  Ironically, in Cody, the plaintiffs proffered James Balsamo—the County's proffered expert in this Action—"to opine on the medical

> Rule 702 "is one of admissibility rather than exclusion." Shuck [v. CNH Am., LLC], 498 F.3d [868,] 874 [(8th Cir. 2007)] (citation omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Olson v. Ford Motor Co., 481 F.3d 619, 626 (8th Cir. 2007) (quoting Daubert, 509 U.S. at 596). Proposed expert testimony "must be supported by appropriate validation - i.e., good grounds, based on what is known"; expert "knowledge connotes more than subjective belief or unsupported speculation." Daubert, 509 U.S. at 590 (citation omitted). But any "doubts regarding whether an expert's testimony will be useful should generally be resolved in favor of admissibility." Clark v. Heidrick, 150 F.3d 912, 915 (8th Cir. 1998) (citation omitted).

Id. at *5.  The Cody Court's reasoning is persuasive, and the Court adopts it herein.  Therefore, the County's Daubert MIL is DENIED.

[Proceed to next page.]

---

risk posed by the facility conditions", to which the city defendant objected, arguing Balsamo's opinions, i.e., the opinions of a non-medical-individual, "are based on assumptions not supported by adequate data".  2022 WL 2315473, at *4.  The County raises, essentially, the same objection here.  (See, e.g., Reply at 14 (arguing Dr. Anandkumar's "opinions amount to little more than speculation").)  While the Cody Court did exclude a portion of Balsamo's findings, it permitted the balance of his opinions to be admitted, which were based upon his "extensive experience in public and environmental health" and "which are focused on risks to the health and safety of the inmate population generally rather than medical diagnoses or causation in particular cases."  Id. at *6.

```
                            ***
```

To the extent the Court has not explicitly ruled on a portion of the County's Omnibus Motion, it is denied without prejudice to renew at trial, if warranted.


<u>CONCLUSION</u>

Accordingly, **IT IS HEREBY ORDERED** that the County's Omnibus MIL Motion (ECF No. 609) is **GRANTED in part and DENIED in part.** Hence, as to the following designated MILs, which comprise this Omnibus MIL:

I.   the <u>Pepper/Bick </u>MIL is GRANTED in part and DENIED in part, such that:

    A.   As to the <u>Pepper Report</u>, Plaintiffs' replacement experts may rely upon the Pepper Report;

    B.   As to the <u>Bick Report</u>, other than the Paragraph 3 Opinion in the "Rodents and Flies" subsection of the Anandkumar Report, which refers to the Bick Report, the Bick Report may be relied upon by Dr. Anandkumar; and

    C.   As to the <u>Pepper Photos</u>, Plaintiffs may rely upon them;

II.  the <u>Williams/Boyle MIL</u> is DENIED;

III. the <u>Grievances MIL</u> is GRANTED in part and DENIED in part; the grievances are not admissible as business records exception, <u>see</u> FRE 803(6); to the extent the Court reserves decision regarding Plaintiffs' seeking to introduce the grievances pursuant to

FRE 803(1), FRE 803(3), and/or FRE 803(5), for administrative purposes, the MIL is DENIED.  However, said <u>denial is without prejudice</u>.  If Plaintiffs seek to admit such evidence pursuant to the FREs identified <u>supra</u>, after hearing the Parties' arguments, the Court will render its ruling(s).  Finally, if warranted and the County so requests, the Court will issue a limiting instruction cautioning the jury to consider the grievances only on the issue of notice;

IV.  the <u>Procedures MIL</u> is DENIED;

V.   the <u>Diseases-Not-Suffered</u> MIL is DENIED; and

VI.  the Daubert <u>MIL</u> is DENIED.


                    **SO ORDERED.**

                                        <u>/s/ JOANNA SEYBERT    </u>
                                        Joanna Seybert, U.S.D.J.

Dated:     February 6, 2025
           Central Islip, New York